IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
SOUTHERN DIVISION

-------------------------------------------x

STEVEN J. GUTTER, on behalf    :
of himself and all others similarly    :
situated,    :
          Plaintiff,    :
   :
     -against-    :
   :
   :
E.I. DUPONT DE NEMOURS    :
AND COMPANY, and    :
EDGAR J. WOOLARD, JR.,    :
   :
         Defendants.    :

-------------------------------------------x

CIVIL ACTION No.
CLASS ACTION **95-2152**

COMPLAINT FOR VIOLATIONS
OF SECTION 10(b) OF THE
SECURITIES EXCHANGE ACT

MAGISTRATE JUDGE
GARBER

JURY TRIAL DEMANDED

Plaintiff STEVEN J. GUTTER, by his counsel, alleges based on knowledge with respect to himself, and upon information and belief with respect to all other matters based on an investigation by plaintiffs' counsel, which included, but was not limited to a review of public filings by, and analysts' reports and news articles regarding, E.I. du pont de Nemours and Company ("DuPont" or the "Company"), as follows:

### I. JURISDICTION AND VENUE

1. The claims asserted below arise under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC"), and the common law.

2. Jurisdiction is conferred upon this Court by Section 27 of the Exchange Act, 15 U.S.C. §78aa, 28 U.S.C. §1331 and by the principles of supplemental jurisdiction.



3.  Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b). Plaintiff resides in this District and many of the acts and transactions giving rise to the violations of law described in this Complaint occurred within this judicial district, including, but not limited to, the receipt by the investing public of the materially false and misleading statements described herein.

4.  In connection with the acts alleged herein, defendants directly and/or indirectly used the means and instrumentalities of interstate commerce, including the United States mails, and the facilities of the national securities markets.

## II. PARTIES

5.  Plaintiff Steven J. Gutter is a resident of Boca Raton, Florida.  Plaintiff Gutter purchased shares of DuPont common stock during the Class Period (June 19, 1993 to January 27, 1995) at an artificially inflated price, and was harmed thereby.

6.  Defendant DuPont is a Delaware corporation with its principal place of business in Wilmington, Delaware. As of April 24, 1995, DuPont had approximately 526.6 million shares of common stock outstanding.

7.  As a corporate entity, DuPont is charged with knowledge of all relevant facts which were known, or should have been known, by any agent, employee or representative of the Company, including but not limited to DuPont's officers, directors, legal counsel (both outside and in-house), and Alta Laboratories, Inc. ("Alta"), an entity engaged and/or retained by DuPont to conduct relevant scientific tests for DuPont, as described below.  Similarly, DuPont is charged with knowledge of and responsibility for the acts of its agents, employees

2

and representatives, committed while acting under the scope of his or her agency or employment.

8.  Defendant Edgar S. Woolard, Jr. ("Woolard") is and has been DuPont's Chairman of the Board and Chief Executive Officer since 1989, and has been a director since 1983.  He is also Chairman of the Company's Strategic Direction Committee.

9.  By reason of his position as a DuPont officer and/or director, Woolard obtained knowledge and/or access to adverse, non-public information about DuPont as a result of his: (1) access to internal corporate documents, (2) conversations and communications with corporate officers, employees and agents, including but not limited to DuPont's in-house and outside counsel, (3) attendance at meetings of the Board of Directors and/or committees thereof, and/or (4) receipt of reports and information provided to him in connection with his corporate positions.  As detailed below, this material, adverse undisclosed information included, but was not limited to, material information regarding adverse test results which supported the claims of numerous parties suing DuPont that DuPont's Benlate product was contaminated and caused substantial damage to the Benlate plaintiffs' property, thereby substantially increasing the magnitude and probability of DuPont's liability in the Benlate litigations.  DuPont and Woolard had a duty to promptly disseminate accurate and truthful information regarding, inter alia, the probability and magnitude of the Company's liability exposure in the Benlate litigations, so that the market price of DuPont's common stock would be based on truthful and accurate information.

10.  Likewise, as detailed below, DuPont and Woolard participated in a fraud on the courts where the Benlate cases were pending by, inter alia, formulating and undertaking a plan

and scheme to intentionally conceal adverse material information from the courts and plaintiffs in the Benlate cases.  DuPont and Woolard, among others, executed, participated in, approved, and/or acquiesced in this scheme to defraud the Benlate courts and plaintiffs by, inter alia, (a) concealing adverse test results which, as Dupont's lawyers later admitted, supported the Benlate plaintiffs' claims against DuPont; and (b) misrepresenting to the Benlate courts and plaintiffs that there was no scientific evidence supporting the Benlate plaintiffs' claims, and that DuPont had produced all documents relevant to the Benlate plaintiffs' claims when, in fact, DuPont knew or recklessly disregarded that DuPont and/or its agents possessed, but did not produce to the Benlate courts or plaintiffs, substantial documentary evidence which supported the Benlate plaintiffs' claims against DuPont.   As detailed below, DuPont's fraud on the Benlate courts and plaintiffs also had the foreseeable and intended effect of concealing material adverse information regarding the probability and magnitude of DuPont's liability exposure in the Benlate litigation.

11.  As a result of their access to, and/or receipt of, adverse material information, DuPont and Woolard knew, or recklessly disregarded, that DuPont's public disclosures relating to, inter alia, the probability and/or magnitude of its potential liability in the Benlate lawsuits were materially false or misleading in that such public disclosures misrepresented material facts and/or omitted facts necessary to make the disclosures made, not misleading.

12.  Notwithstanding that they knew, or should have known, that DuPont's public documents and statements were false and/or misleading, neither DuPont nor Woolard did anything during the Class Period to: (a) prevent the further issuance of materially misleading statements, and/or (b) publicly correct earlier false and misleading statements.

13.  Based on his corporate position, defendant Woolard possessed and exercised the ability to control DuPont's operations.  Moreover, defendant Woolard possessed and/or exercised the ability to control the fraudulent conduct by DuPont alleged herein, including (a) DuPont's public issuance of materially false and misleading press releases, SEC filings and other statements as alleged herein; and (b) DuPont's scheme to conceal material damaging evidence from Benlate courts and plaintiffs.  As a result, defendant Woolard is a "controlling" person of DuPont, as those terms are used in Section 20(a) of the Exchange Act.  As such, defendant Woolard is jointly and severally liable for DuPont's violations of Section 10(b) of the Exchange Act.

## III. EFFICIENT MARKET ALLEGATIONS

14.  Throughout the Class Period, DuPont's common stock traded in an open developed and efficient market, as evidenced by the fact that:

(a)  the stock was traded on the New York Stock Exchange, a nationally recognized, established securities market;

(b)  as of April 24, 1995, there were approximately 526.6 million shares of DuPont common stock outstanding;

(c)  millions of shares of DuPont common stock were traded in the open market during any given week of the Class Period;

(d)  during the Class Period, the Company was followed and reported on by a variety of securities analysts, including, inter alia, analysts at the following companies: Salomon Brothers Inc.; Merrill Lynch, Inc.; PNC Institutional Investment Service; Donaldson,

Lufkin & Jenrette Securities; Dean Witter Reynolds; Bear, Stearns & Co., Inc.; and Market Guide Inc.

15. Plaintiff and other members of the Class, ignorant of the adverse facts and falsity of the misrepresentations complained of herein, relied on the integrity and efficiency of the market in which DuPont stock was traded, and the price the market established for DuPont stock, in purchasing such stock. Had the adverse facts regarding the Company been publicly disclosed, the members of the Class would not have purchased DuPont stock at the artificially inflated prices at which they did, if at all.

## IV.  CLASS ACTION ALLEGATIONS

16. This action is brought by plaintiff as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure.

17. Plaintiff seeks relief individually and on behalf of all other persons who purchased DuPont common stock (the "Class") between June 19, 1993 and January 27, 1995, inclusive (the "Class Period"). Excluded from the Class are DuPont and/or its affiliates, successors and assigns and DuPont's officers and directors and their immediate families or any entity in which any of them have an interest.

18.  There are thousands of individuals or entities that purchased DuPont's stock during the Class Period and who are geographically dispersed. As a result, joinder of all potential class members in a single action is impracticable.  The precise number and identity of the members of the Class are not presently known to Plaintiff but can be learned through discovery.

6

19.   Plaintiff will fairly and adequately protect the interests of the members of the Class, inasmuch as he is a member of the Class and his claims are typical of the claims of all class members. Plaintiff has retained competent counsel who are experienced in class action securities litigation. Plaintiff has no interests that are adverse or antagonistic to those of the Class. Plaintiff's interests are to obtain relief for himself and for the Class for the harms arising out of the violations of law set forth herein.

20.   There are common questions of law and fact arising in this action, including, inter alia:

(a)   whether DuPont violated the federal securities laws, as well as the common law, by making materially false and misleading statements and/or omitting material information from DuPont's filings with the SEC, as well as other public filings, press releases and other publicly disseminated documents and/or information during the Class Period;

(b)   whether DuPont's public statements during the Class Period concerning, inter alia, the probability and magnitude of DuPont's exposure to product liability suits related to its Benlate product were materially false and misleading and/or omitted material information, resulting in a fraud on the market for DuPont's stock;

(c)   whether DuPont, by its wrongful conduct, created a fraud on the market for its stock, and caused the Plaintiff and other members of the Class to sustain damages; and

(d)   whether defendant Woolard is a "control" or "controlling" person of DuPont within the meaning of Section 20 of the Exchange Act and, if so, whether he is therefore, jointly and severally liable with DuPont for DuPont's violations of Section 10(b) of the Exchange Act.

21. The questions of fact and law that are common to the Class predominate over any questions solely affecting individual members.

22. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. It would be impracticable and undesirable for each member of the Class who has sustained damages to bring separate actions. In addition, the bringing of such actions would put a substantial and unnecessary burden on the courts, while a single class action can determine the rights of all class members with judicial economy.

## V. SUBSTANTIVE ALLEGATIONS

### A.    Pre-Class Period Events

#### 1. DuPont's History Of Benlate Problems

23. DuPont is a leading manufacturer and seller of chemicals, plastic materials, pharmaceuticals, agricultural and consumer products.

24. In the early 1970's DuPont began selling a powder fungicide called "Benlate WP", which  soon became a major component of DuPont's agricultural products business.

25. In 1983, DuPont started receiving complaints from Belgian greenhouse owners that Benlate was damaging their ornamental plants. Twice in 1984, DuPont suspected that some of its Benlate shipments might have been contaminated with Sulfonylurea ("SU"), an ultrapotent herbicide. SUs are so powerful that a spoonful could kill all weeds on an acre of land for up to two years. SUs kill not only weeds but also ornamental plants.  Such SU contamination was suspected because DuPont had produced both the SU herbicide and benomyl (the active ingredient in Benlate) in the same West Virginia plant.

8

26.  As a result of the potential SU-contamination, Dupont conducted an investigation and ran various tests in 1984. Although these initial SU-contamination tests turned up negative, DuPont's scientists and executives continued to recognize a potential contamination danger. For example:

(a)  In 1987, an internal DuPont memo warned of the danger of SU contamination in a fungicide used in French vineyards.

(b)  In 1990, a DuPont researcher analogized Dupont's on-going quality-control problems with Benlate production to "playing Russian roulette."

(c)  A June 1991 internal DuPont memo dealing solely with SU production, discussed "eleven different ways that SU dust can get into environment and be a source of contamination." That memo also referred to "the last two" Benlate contaminations, the most recent one occurring in January 1991.

### 2.    The Domestic Benlate Claims

27.  In 1987, Dupont started marketing Benlate in a much easier-to-use granular form, called "Benlate DF".  In 1991, DuPont began receiving complaints of stunted plant growth from nurseries around the United States that had used Benlate DF.  DuPont pulled the granular form of Benlate (Benlate DF) from the market, but continued to market the powder form of Benlate (Benlate WP).

28.  When it began receiving these complaints in 1991, Dupont initially suspected that the crop damages were caused because the Benlate DF product had been contaminated by a common herbicide called Atrazine. Approximately two years earlier, in 1989, Benlate shipments had been contaminated with Atrazine by Terra Chemical, an outside contractor that

was formulating Benlate for DuPont. Those shipments of contaminated Benlate had been recalled by the Company in 1989, two years before the 1991 complaints..

29. Soon the complaints began to worsen, however. Large nurseries in Florida and Hawaii reported plants with a sickly yellowish cast, rotting leaves and dead roots. Fruit and vegetable growers told of acres of dead or deformed plants. When DuPont executives went to check the plants in question they realized that the problems were far more serious than suspected at DuPont's headquarters. As Kent Reasons, DuPont's director of agricultural product development, wrote in an internal memo, "[m]any ornamental growers may be put out of business . . . Lives are being shattered . . . . (We) may have only touched the tip of the problem." Reason's "greatest fear" was that Benlate had been contaminated by SUs.

30. Although Dupont did not concede that Benlate had caused the crop damages, the Company decided to compensate some growers who used Benlate DF because, according to a July 1991 internal Dupont memo, "[there is] overwhelming circumstantial evidence that Benlate is likely responsible for the damage in some way." Moreover, both Benlate and SU were among the Company's most promising new products and a high-profile judgment blaming them for crop losses could be a major setback.

31. During 1991, DuPont took various charges against earnings to establish a $500 million reserve to pay grower's claims.

### 3.   Lawsuits Against DuPont Escalated As The Company Formally Denied That Benlate Caused The Crop Injuries And Stopped Paying Claims

32. At approximately the same time that Dupont began to pay growers' claims, it also began an internal investigation of the problems. Based on this investigation, DuPont began

10

denying any responsibility for the growers' injuries. For example, as <u>The Miami Herald</u>

reported in May, 1992:

> After paying more than $330 million in claims to farmers for damage
> done by its fungicide Benlate DF, DuPont is trying to lay the blame elsewhere
> for lingering residual damage.

*         *         *

> DuPont suggested recently in reporting that in "every single concluded
> investigation," it had identified some other cause -- nutrient deficiencies in the
> soil, fungi, root disease, or improper fumigation or fertilizer practices.

33.  In November, 1992, DuPont formally announced that, based on the results of an

eighteen month, $12 million investigation, it concluded that Benlate did not cause the

growers' damages and it would stop compensating them for their claims. As DuPont's

Agricultural Products president William Kirk said on November 5, 1992:

> Consistently throughout the research we could find or establish no cause
> and effect relationship between our product and the crop damages reported
> since March 1991. We still do not know what caused the various crop losses,
> but we now are convinced that it was not Benlate.

> Since March 1992, DuPont has field-tested 250,000 plants with Benlate
> DF lots that growers alleged had caused damage and with Benlate WP and a
> combination of other frequently used chemicals, Kirk said. The study involved
> more than 100 people committed full time for one year and included members
> of the National Academy of Science, he said. He added that Benlate is one of
> the safest and most widely used crop protection products in the world.

34.  Pointing to the results of its in-depth study, DuPont continued to deny liability.

For example, as the <u>Orlando Sentinel</u> reported on December 5, 1992:

> In its first meeting with [Florida] state scientists and regulatory officials,
> the chemical giant DuPont Co. Friday outlined evidence that its Benlate
> pesticide was not to blame for more than $400 million worth of damaged crops
> in Florida.

*         *         *

11

"Something happened in late 1990 and 1991, something very unusual," causing millions of plants to be stunted or exhibit other signs of toxicity, said Bruce Hadley, DuPont's Benlate research manager.

Record hot, dry weather may have been partly to blame, along with numerous other factors ranging from common plant pests to grower misuse of herbicides and other chemicals. "It's not any single cause," Hadley said.

35.   In reaction to DuPont's decision to stop paying claims, hundreds of lawsuits against the Company were filed in late 1992 and early 1993. It was evident early on that an adverse judgment in the Benlate cases could have a huge direct and indirect financial impact on the Company. Because nurseries were not claiming simply a one-year loss, but rather, prolonged soil damage that caused yearly production declines, the direct damages were far greater than originally anticipated. As the Miami Herald reported in May, 1992:

Agriculture Commissioner Bob Crawford calls the Benlate DF damage the worst to hit Florida agriculture since the $500 million Christmas freeze of 1989. Now farmers who have replanted are reporting damage to new crops not treated with Benlate DF.

Moreover, the thousands of claims, which could easily amount to over $1 billion in damages, were likely to exceed insurance coverage. Indeed, DuPont's insurers had already started challenging their obligation to pay claims as early as September 1991.

36.   In addition to the direct impact of an adverse ruling, liability in the Benlate suits threatened to severely undermine the Company's agricultural business. As The Wall Street Journal reported on June 30, 1993:

Adverse judgments that highlight contamination by sulfonylurea [SU] herbicides could also set back DuPont's nearly $2 billion agricultural products business. DuPont has been counting on rapid growth in low-dose sulfonylurea [SU] sales to keep this business thriving.

12

37.  As the number of lawsuits against DuPont steadily increased in late 1992 and early 1993, the Company steadfastly denied in news articles, press releases and public filings that Benlate had been contaminated, or that the product was responsible for the crop injuries.

38. In mid-June 1993, four plaintiffs in a consolidated action in the U.S. District Court in the Middle District of Georgia (the "Bush Ranch" action) uncovered, through discovery, various documents regarding the 1983 Belgian Benlate damage claims and DuPont's internal memos regarding the danger of SU contamination. Trumpeting these documents, the plaintiffs argued that these documents evidenced that: (a) Dupont had foreseen the danger that Benlate could be contaminated by SUs or other herbicides and (b) DuPont's guilt was evidenced by the fact that it had concealed the damning information.

39.  DuPont denied the relevance and significance of the information, arguing that there was absolutely no scientific evidence that the Benlate shipments purchased by the plaintiffs were, in fact, contaminated, or that the plaintiffs' injuries were, in fact, caused by Benlate. In fact, DuPont repeatedly stated that months of scientific research expressly refuted the Benlate plaintiffs' causation claims. As The Wall Street Journal reported on June 14, 1993:

> A DuPont spokeswoman said the company continues to dispute that Benlate was contaminated or that it is responsible for crop losses. She said the company also disputes the judge's conclusion that it has been withholding documents.

> *          *          *

> Patricia Getter, the DuPont spokeswoman, said the documents that surfaced in the course of pretrial hearings as well as other internal DuPont documents delivered to plaintiffs raised several **theories about Benlate contamination that were subsequently disproved by company researchers**.

13

(emphasis added).

40.  Two days later, on June 16, 1993, DuPont reiterated its prior publicly disseminated view that there was no scientific support for the Benlate plaintiffs' causation theory. On that day, the Company issued a press release announcing that it would pay for any tests for all Benlate plaintiffs to scientifically prove their causation theory. As the press release stated:

> DuPont Chairman Edgar S. Woolard Jr. today expressed outrage at recent attacks on the company's integrity.
>
> He issued a public challenge to those who claim that "Benlate" DF caused crop damage or the company willfully covered up evidence. At a news conference today at corporate headquarters, Woolard dared any plaintiff with a current lawsuit against DuPont to accept the Benlate Challenge: test Benlate DF on plants specified in their lawsuits, at label rates, at any one of 10 top agricultural universities in the United States. DuPont is offering to pay for the test as part of a legally binding agreement with the plaintiff.
>
> If tests show Benlate caused the damage claimed in a suit, DuPont will pay for the crop damage, he said. Conversely, if Benlate is shown not to cause plant damage, the plaintiff must agree to withdraw the suit. "Based on the data we gathered during our 1992 studies," Woolard said, "we are confident we will win every time."

41. DuPont's "Benlate Challenge" was specifically designed to bolster its public image. As DuPont's CEO, Woolward, stated at a June 17, 1993 press meeting:

> DuPont [is] taking its case concerning Benlate to the "court of public opinion." He said he hoped DuPont would fare better there than it has so far in pretrial hearings in federal court.

Similarly, the Wall Street Journal referred to DuPont's "Benlate Challenge" as a "public-relations gambit."

14

42.  The next week, on June 22, 1993, Dupont mailed letters containing the "Benlate Challenge" to various plaintiffs' attorneys. In discussing its challenge, Dupont's Agricultural Products president William Kirk stated:

> If litigants choose not to participate, it will be because they're afraid of going head to head with science, not because they hadn't heard about the challenge.

PR Newswire, June 22, 1993.

**B.     Class Period Events**

**1.     DuPont Discovers And Conceals
Scientific Evidence Establishing Its Liability**

43. It was generally recognized that the two central issues in the Benlate cases were: (1) whether DuPont's Benlate product was contaminated and (2) whether such contamination, in fact, caused the plaintiffs' properties to be contaminated or damaged.

44.  As set out above, during the period from mid 1992 through June 1993, DuPont repeatedly denied that it had any responsibility or liability for the nurseries' injuries because: (1) DuPont's costly, painstaking investigation evidenced that Benlate was not responsible for the nurseries' injuries and (2) there was no other, conflicting scientific evidence to establish a causal link between Benlate and the Benlate plaintiffs' damages. As set out below, however, by June 19, 1993, just three days after it issued its "Benlate Challenge", DuPont learned of scientific test results which evidenced that there was, in fact, SU contamination of plaintiffs' properties in four states: Georgia, Alabama, Hawaii and Michigan.

45.   The first group of Benlate claims (the Bush Ranch plaintiffs) was scheduled to go to trial shortly thereafter in early July, 1993.  While the Bush Ranch plaintiffs had a great deal of circumstantial and indirect evidence that DuPont's product was contaminated by SUs,

15

the plaintiffs had been unable to produce direct scientific evidence that their soils and waters had been contaminated. This was principally due to the fact that the necessary scientific testing could not be performed by the scientific equipment available to plaintiffs' experts. Apparently recognizing this weakness in their case, the <u>Bush Ranch</u> plaintiffs had previously allowed DuPont to take soil and plant samples from their properties in exchange for access to all results and data generated by any tests conducted on the samples.

46.  In an apparent effort to bolster its position, DuPont engaged Alta Laboratories, Inc. ("Alta"), a highly regarded laboratory, to perform the sophisticated analytical tests necessary to detect the presence of SU contamination in plaintiffs' soils samples. Both Dupont and the <u>Bush Ranch</u> plaintiffs recognized that Alta was most likely the only laboratory in the country capable of performing these intricate, highly technical, and almost prohibitively expensive scientific tests.

47.  On June 19, 1993, DuPont's lawyers were contacted by Robert Bethem and Robert Peterson, the two Alta Labs scientists that had tested the soil samples. Bethem told DuPont's attorneys that the preliminary tests evidenced SU contamination in soil samples from Georgia, Alabama, Hawaii and Michigan, at detection levels of 25 parts per trillion. Bethem subsequently testified that he recognized at the time he performed the tests that the initial results were "potentially bad news for DuPont" and might establish the Company's liability in the <u>Bush Ranch</u> case.[1]

---

[1]  Mr. Bethem's deposition, taken in November 1994, was publicly released for the first time in May 1995.

48.   According to Bethem's handwritten phone log of the June 19, 1993 conversation, DuPont's lawyers directed Alta's scientists to go back "after most of the work is done" and to "confirm (defirm)" the positive findings. The Alta phone log contains a note to "take out the spike results" and has scratched out a lower SU detection limit beginning at 25 parts per trillion that is replaced by a penciled in, higher detection limit beginning at 50 parts per trillion.

49.   As indicated by Bethem's notes, Alta re-performed the soil tests with different testing procedures. First, the minimum detection limit was raised from 25 parts per trillion to 50 parts per trillion. According to subsequent news articles, however, there were still indications of SU contamination even at these higher detection levels. According to a recent sanction opinion against DuPont by the U.S. District Court in the Middle District of Georgia (the Bush Ranch court), the tests were repeatedly redone and massaged. Soil samples that had been found to be positive were "homogenized" with other samples. After numerous tests continued to show positive results, one series of tests finally found no SUs present. Only this series of tests was used for summaries that were eventually presented to the Bush Ranch plaintiffs and the court.

### 2.      DuPont Embarked On A Massive Deception Scheme

50.   After the tests were redone to "take out the spike results", DuPont buried any reference to the earlier adverse test results. DuPont was required to produce to the Bush Ranch plaintiffs all of the data and materials generated from Alta's tests pursuant to general discovery rules, a specific order of the Bush Ranch court, and express conditions to DuPont's entry on to the plaintiffs' lands to take samples. Notwithstanding such obligation, however,

17

the Alta documents containing the early test results were never produced to the Bush Ranch plaintiffs.

51.   None of the underlying test data showing the repeated SU findings were presented to the Benlate plaintiffs. Moreover, most of the materials that were furnished to the Bush Ranch plaintiffs were produced only on the eve of trial, and, some documents were not produced until after the Bush Ranch plaintiffs had rested their case and DuPont was about to call its expert witness who would introduce and justify the test results.

52.   Not only did DuPont conceal the conclusions which Alta's scientists drew from the early test results, the Company also withheld and concealed the raw test data which the Bush Ranch plaintiffs' experts could have examined for themselves. In fact, DuPont withheld and concealed this negative information from Nicholas Albergo, Dupont's only expert at trial, who the Company eventually called to testify at trial regarding the conclusions to be derived from the test results. Rather than providing Albergo with the raw test data, DuPont provided him with only incomplete summaries, thereby enabling him to testify at both deposition and trial that he was not aware of any evidence of SUs in the Bush Ranch plaintiffs' soil or water samples.

53. DuPont and its lawyers repeatedly misrepresented and concealed the existence of the damaging test results over the course of the next 18 months. For example, on June 26, 1993, a week after DuPont's lawyers were secretly informed of the adverse test results, the Bush Ranch plaintiffs took a pre-trial deposition of Nicholas Albergo. During his deposition, Albergo testified, among other things, that Alta Labs had tested the Bush Ranch plaintiffs' soil and water samples for the presence of DuPont SUs and that, based on data available to

him from the Alta Labs at that time, there was <u>no evidence</u> of SUs on the <u>Bush Ranch</u> plaintiffs' soil and water samples.

54.  Three days later, on June 29, 1993, the <u>Bush Ranch</u> court held a hearing specifically to address DuPont's failure to fulfill its discovery obligations. Present at the hearing, as DuPont's representative, was Dr. Joel Wommack, the head of a team set up by DuPont to monitor, direct, and coordinate DuPont's legal efforts in the various Benlate suits. Even though DuPont knew as of the June 29, 1993 hearing of the unfavorable results from Alta's initial tests, DuPont's representatives were completely silent about the negative test results or any documents related thereto.

55.  On July 2, 1993, Dupont announced in a press release that a California Benlate plaintiff had voluntarily dismissed her suit with prejudice. In discussing the dismissal, Dupont's Agricultural Products President William Kirk stated:

> We were convinced the case lacked merit from the outset. Apparently the plaintiff agreed.

*          *          *

> **The decision by Darian to drop this case should be noted by others who have made similar Benlate damage allegations. We have the scientific evidence to back up our belief that Benlate did not cause crop damage and we will use it in court.**

(emphasis added).

56.  Contrary to Kirk's public statement that Dupont "[had] the scientific evidence to back up [its] belief that Benlate did not cause crop damage", the Alta test results evidenced SU contamination of  soil samples from four separate states.

19

**3.     The Bush Ranch Trial**

57.  On July 6, 1993, the <u>Bush Ranch</u> trial began. Throughout the seven week trial

DuPont's attorneys continued to conceal and misrepresent Alta's results regarding: (a) Alta's

testing procedures and (b) the absence of any evidence of SU contamination. For example,

during the trial's opening arguments, Dupont's attorney, Dow Kirkpatrick, told the jury that:

> DuPont has overwhelming scientific evidence that there was no SU
> contamination.

$$* \qquad * \qquad *$$

> The company was in a better position than the plaintiffs' experts to investigate
> Benlate.

$$* \qquad * \qquad *$$

> The tests run for the farmers were inferior and were based on limited samples,
> whereas, DuPont, on the other hand, conducted extensive field tests.

Dow Jones Newswire, July 7, 1993.

58.  During the trial the <u>Bush Ranch</u> plaintiffs produced dozens of internal DuPont

documents that indirectly implicated Benlate as the cause of plant damage. DuPont responded,

however, that the documents were drafted by scientists before the company conducted its

definitive Benlate tests in the summer of 1992.

59.  While the <u>Bush Ranch</u> plaintiffs introduced circumstantial evidence to imply that

Benlate had caused the damage to their properties, the only witness to testify regarding the

actual state of the plaintiffs' properties was DuPont's expert, Nicholas Albergo, who testified

that "I am absolutely confident there are no sulfonylureas on [the plaintiffs'] properties." As

set out above, Albergo's expert opinion was materially flawed and incomplete, however,

20

because DuPont withheld critical evidence from Albergo, thereby skewing the basis and foundation for his testimony.

60. DuPont harped on the plaintiffs' inability to produce scientific evidence to support their case. For example, during closing arguments to the jury, DuPont's lead defense lawyer, Dow Kirkpatrick stated:

> Where's the evidence of SU contamination? . . . The evidence shows that sulfonylureas are not present in the plaintiffs Benlate soil. . . . We are in a court of law, and if there's a Benlate ghost, they've got to prove it by the evidence and the science. They haven't done that. No, the scientific evidence supports our position.

61. Robert Bethem, the Alta scientist who performed the soil tests, testified in his November, 1994 deposition, which was first publicly released in only May, 1995, that the Alta test results did not support DuPont's blanket assertion that there were no SUs in the Bush Ranch plaintiffs' soil. Bethem testified that, at best, the Alta test results indicated only that no SUs were found at the higher detection level that was ultimately used for the summaries. Moreover, Todd David, one of Dupont's lawyers, recently testified in a deposition taken in connection with the Bush Ranch sanctions hearing that scientists could disagree about the ultimate conclusions to be drawn from the Alta tests results and raw data and that, in fact, there are scientists known to him, who have concluded from the Alta results and data that there was SU contamination.

62. DuPont's concealment of the Alta test results was critical to the outcome of the Bush Ranch trial. As the Bush Ranch court recently stated in an August 25, 1995 sanctions opinion (the "Bush Ranch Sanctions Opinion")[2] against Dupont:

_____

[2] See Exhibit A to this Complaint, The Bush Ranch, Inc., et al. v. E.I. DuPont de Nemours
(continued...)

21

The evidence which actually went to the jury . . . as to the presence of SUs in the Plaintiffs' soils was highly contested. DuPont presented the Alta Labs test summaries through its witness Albergo, and that unrefuted showing that the sole test results on that subject showed <u>absolutely</u> no SUs present in the Plaintiffs' soils was the only direct evidence which the jury had as to the SU soil content resulting from analytical soil tests. All the other evidence concerning the presence or absence of SUs on the Plaintiffs' properties was circumstantial and strongly contested by both sides.

**The introduction of the unrefuted critical opinion testimony by Mr. Albergo, stating without qualification that the Alta charts supplied to him by DuPont showed that no SUs were present in Plaintiffs' soils, effectively destroyed the Plaintiffs' circumstantial case on that decisive issue, just as testimony to the contrary would have been devastating to [Dupont's] case.**

*          *          *

[T]he evidence is now clear that, **had the Plaintiffs been given the information which the Alta tests disclosed and had not been led to believe that those tests showed no presence of SUs, the trial of the case may have been materially altered**.

<u>Bush Ranch</u> Sanctions Opinion at 17, 22.  Dupont's assistant general counsel in charge of the Company's Benlate defense, Jerry Ashby, also conceded that the Alta tests were probably a "significant factor in the [Hawaiian] trial", which resulted in $23.9 million verdict against Dupont.

<u>Bush Ranch</u> Sanctions Opinion at 17, 22 (emphasis added).

63.    Recognizing the apparent weaknesses in their case, the <u>Bush Ranch</u> plaintiffs settled the case while the jury was deliberating for $4.25 million (approximately 1% of the $430 million that were sought). In the weeks after the trial, two <u>Bush Ranch</u> jurors stated in news articles that they were definitely leaning toward DuPont because of the plaintiffs'

_____

[2](...continued)
<u>and Company</u>, Case No. 4:95-CV-36 (JRE) (the "<u>Bush Ranch</u>" case), Opinion and Order dated August 21, 1995 (M.D. Ga.) (the "<u>Bush Ranch</u> Sanctions Opinion")

inability to scientifically prove their case. As the <u>Miami Daily Business Review</u> reported on

August 20, 1993:

> If the plaintiffs in the widely watched Benlate product liability case against DuPont Co. hadn't reached a settlement last week, they probably would have walked away with nothing.
>
> Jurors in the courtroom here found the plaintiffs' case short on scientific evidence and had largely concluded that the growers failed to prove DuPont's Benlate fungicide caused millions of dollars worth of ornamental plants and crops to wither or die.
>
> The two jurors who agreed to discuss the jury's deliberations after the settlement said the plaintiffs seemed to be relying on sympathy for the growers because, as one of the jurors put it, "They didn't have a case."

*            *            *

> Indeed, the jury was on the verge of a verdict that would have absolved DuPont when U.S. District Judge J. Robert Elliott informed them that the plaintiffs had settled.

64.   The news of DuPont's cheap settlement was highly touted by the Company and

well received by the investment community. For example, in announcing the settlement on

August 13, 1993, DuPont's chairman and chief executive officer, Edgar Woolard Jr.,  stated

in a press release:

> I am pleased to announce that about an hour ago a settlement was reached in the Benlate trial in U.S. District Court in Columbus, Georgia. <u>The settlement is a victory for DuPont, our employees and our science</u>.

*            *            *

> **By this settlement, it is apparent that there is no evidence to support the claim that Benlate harmed crops. Distasteful as it is for us to pay anything at all, this settlement is a prudent business decision for several reasons.**

*            *            *

23

**We rightfully view this outcome as a victory for DuPont. We remain as convinced as ever that our product did not cause the damage claimed. We believe in the integrity of our science. And we firmly believe that our employees have always told the truth.**

\*                    \*                    \*

Other trials are pending. We will continue to vigorously defend Benlate. **We look forward to vindicating our product in other courts and before other juries where we expect to have a more balanced environment and where we will be able to present our undeniably strong case in its totality.** As I have said throughout this trial, I believe in our product and I trust our people.

(emphasis added).

65.    The investment community also evaluated the inexpensive settlement as a major boon for the Company.  As the <u>Wall Street Journal</u> reported on August 13, 1993:

Wall Street analysts said the possibility that the first Benlate trial might yield a verdict against DuPont in the hundreds of millions of dollars had cast a pall over the company's stock in recent months. Paul Raman, an analyst with S.G. Warburg Inc. in New York, said that while Wall Street would have preferred a clear verdict in DuPont's favor, the settlement was "very, very good news for DuPont."

66.    Dupont's stock price reflected the Company's "victory". The settlement was first announced late on August 12, 1993, after Dupont's stock had stopped trading for the day at a price of $46 5/8 per share. On August 13, 1993, the first day in which the markets had access to the news, Dupont's stock rose $1.50 per share to $48 1/8. The next day, Dupont's stock rose another $1.00 per share to $49 1/8 per share. Thus, in reaction to the disclosure Dupont's stock price rose $2.50 in the two days after the settlement was announced.

67.    In announcing the <u>Bush Ranch</u> settlement, Dupont did not disclose that to obtain its "victory" the Company had: (a) concealed material scientific evidence from the <u>Bush Ranch</u> plaintiffs, court and jury; (b) proffered an expert witness whose testimony and opinion

Dupont knew, or was reckless in not knowing, was materially incomplete and misleading; and

(c) falsely stated to the jury that there was no scientific evidence to support the plaintiffs'

claims.

68.  When Dupont stated in the settlement announcement that:

> By this settlement, it is apparent that there is no evidence to support the claim
> that Benlate harmed crops.

*          *          *

> We remain as convinced as ever that our product did not cause the damage
> claimed. We believe in the integrity of our science. And we firmly believe that
> our employees have always told the truth.

the Company did not disclose that it had known for almost two months about the scientific

test results which seriously undermined the Company's legal position and could establish its

ultimate liability.

### 4.    **Post-Bush Ranch Events**

69.  Subsequent to the Bush Ranch settlement, DuPont continued its deceptive scheme,

concealing and publicly misrepresenting the Alta test results. Within a month after the

conclusion of the Bush Ranch case, DuPont went to trial in a Florida Benlate case in which it

also concealed evidence. See Lambert et. al. v. E.I. DuPont, et. al., CA-92-067. Four months

later it also concealed evidence in two other Florida Benlate cases, Whitworth, et al. v.

Harrell's Inc., et al., GC-C92-1293 and Ritter, et. al. v. Growers Fertilizer Corp et. al., GC-G-

1374.

70.  On October 14, 1993, Dupont announced that a Benlate suit in Texas state court

had been dismissed after the judge decided after a bench trial that the Benlate plaintiff was

entitled to nothing and owed Dupont all court costs.

25

71. On February 14, 1994, Dupont announced that a Florida jury ruled in its favor, finding no damages for the Benlate plaintiffs. In announcing the verdict, Dupont said the jury ruled that "there was no product defect and no negligence on the part of DuPont" and called the verdict a "major trial win in its battle to vindicate" Benlate.

72. On Friday, April 22, 1994, DuPont announced in a press release after the investment markets had closed that it had settled 220 lawsuits for a mere $214 million, less than an average of $1 million per case. The settlement of approximately one half of the outstanding cases against DuPont was described as:

> the biggest single-day development in a case that has spanned three years and prompted 560 lawsuits against DuPont.

Sun Sentinel, April 23, 1994. Because the settlement was covered by existing reserves, it did not have a direct impact on DuPont's earnings. In reaction to the news, DuPont's stock jumped $3.50 per share on Monday, April 25, 1994, from $54 5/8 to $58 1/8.

73. As with its announcements regarding its earlier trial successes and settlements, Dupont did not disclose in its April 22, 1994 press release, that it had known since June 19, 1993 of damaging, adverse test results which could have a substantial impact on its potential liability. Dupont's failure to disclose the Alta test results was significant because DuPont had already inexpensively resolved more than half the cases against it through either trials or settlements. Because investors did not know that DuPont had concealed critical evidence, investors did not know of the probability and magnitude of the risk that those settlements and judgments could be reopened.

74. Moreover, even in the two Benlate-SU contamination suits that the Company had lost at trial, the Company had been held liable for far less in damages than the plaintiffs in

those actions sought. Thus, even to the extent that investors believed that there existed a possibility (however remote) that Dupont might face liability in the future, the Company's concealment of adverse tests results led investors to believe that the magnitude of the damages that Dupont might have to pay would be small.

75. Approximately two weeks later, on May 11, 1994, Dupont announced in a press release that the Company: (a) had received another favorable verdict by a Florida jury, and (b) cheaply settled another 50 Benlate suits. Regarding the verdict in which the jury found that Benlate 50 DF was not defective and awarded no damages to the plaintiff, DuPont's Senior Vice President and Special Counsel, John Schmutz stated:

> This verdict is DuPont's sweetest victory to date. Not only has the jury confirmed DuPont's steadfast belief that Benlate is not defective and did not cause crop damage, it sends a message to this plaintiff. DuPont is not a deep pocket, a bottomless pit or an underground well ready or willing to be tapped dry. We are indebted to six very responsible people who, for five very grueling months, listened attentively to the evidence and concluded that these lawsuits were baseless.

76. Regarding the settlement of an additional 50 Benlate suits, Schmutz stated in the May 11, 1994 press release that:

> This allows us to dispose of a block of Benlate litigation at a per-case rate lower than our settlement two weeks ago of 220 lawsuits. Business decisions don't get much more prudent.
>
> However, this settlement does not in any way change the scientific evidence that Benlate is not defective and did not cause alleged crop damage, and in fact, today's favorable verdict supports our conviction.

77. In reaction to the two litigation successes, Dupont's stock price rose approximately $2.00 per share over the next three days from $58 3/8 to $60 3/8 per share. As with its earlier announcements, DuPont failed to disclose in the May 11, 1994 press release

the existence of the adverse Alta tests and the risks such tests posed in terms of either undoing earlier litigation successes or preventing future successes.

78.  On Friday, June 10, 1994, Dupont announced in a press release that a jury in Mobile, Alabama had ruled that Benlate was not defective and had not damaged the plaintiff's crops. In the press release announcing the result, Dupont stated:

> We are delighted with the jury's verdict that DuPont's Benlate DF fungicide is not defective and did not cause damage to the plaintiff's plants. We were confident that the common sense of 12 conscientious people would lead them to conclude that this lawsuit was groundless.
>
> This verdict is the latest in a series of recent jury verdicts in  DuPont's favor and represents a clear vote of confidence for DuPont, our technology, and our Benlate product. We are confident that juries in future trials will also return verdicts in favor of DuPont.

PR Newswire, June 10, 1994.

## 5.    The Eventual Disclosure Of The Alta Tests

79. On October 7, 1994,  Alta's initial test results and the conversation between DuPont's lawyers and Alta's scientists were revealed for the first time, during discovery in a Benlate case in Hawaii.

80.  On Friday, January 27, 1995, a Hawaiian state court jury found DuPont liable for $23.9 million. Although the jury award was not monstrous compared to amounts sought by plaintiffs in other Benlate suits, the result was viewed as significant because it was the first case in which the previously concealed Alta test results were reviewed by a jury. Jerry Ashby, DuPont's assistant general counsel who heads the Company's Benlate defense, conceded that the Alta tests were probably a "significant factor in the trial in Hawaii." In reaction to the news of the adverse judgment, Dupont's stock dropped $1.50 from $56 to $54.50.

28

81. Moreover, on Monday, January 30, 1995, the next trading day, newspaper articles began discussing the fact that the discovery and successful use of the adverse Alta tests by the Benlate plaintiffs could seriously undermine DuPont's litigation defense, opening it to not only larger losses but also punitive damages. In reaction to such news, the stock continued to drop, falling $1 3/8, from $54.50 to $53 1/8.

82. Thus, in the two trading days after the disclosure of the Hawaiian verdict and the effect of the previously undisclosed Alta tests, in reaction to the disclosure DuPont's stock dropped approximately $3.00 per share.

83. Since the January, 1995 disclosures:

     (a)  DuPont has lost several trials in various states;

     (b)  DuPont has been sanctioned in at least two different courts for committing fraud on the courts by, inter alia, concealing the adverse test results from both the Court and the Benlate Plaintiffs (including a sanction in the U.S. District Court in the Middle District of Georgia for over $100 million); and, most importantly,

     (c)  at least one group of Benlate plaintiffs has sought to re-open its cases, which had been resolved, based on the belated disclosure that DuPont had concealed adverse test results that would support the Benlate plaintiffs' claims.

## C.    DuPont's False And Misleading Statements

84. During the Class Period from June 19, 1993 to January 27, 1995, Dupont made numerous false and/or misleading statements through various agents and representatives, including, but not limited to, Patricia Getter (Company spokesperson), Edgar S. Woolard, Jr. (Chairman of the Board and Chief Executive Officer), William Kirk (Agricultural Products

President), John Schmutz (Senior Vice President and Special Counsel), and Dow Kirkpatrick (outside counsel).

## 1.   Dupont Misrepresented And Concealed The Existence Of Adverse, Scientific Evidence Regarding Benlate

85.   As set out above, Dupont affirmatively misrepresented that there was "no evidence to support the claim that Benlate harmed crops." See, e.g., ¶ 64. Such statements were patently false because there did, in fact, exist scientific test results from which a jury could conclude that Dupont's product was defective (i.e. contaminated) and that Dupont's product had, in fact, damaged the Benlate plaintiffs' crops.

86.   During the Class Period, Dupont also made various public statements that were materially misleading, due, inter alia, to the Company's failure to disclose the existence of the initial Alta test results. As detailed above, Dupont repeatedly represented that the existing scientific evidence supported the Company's view that Benlate was not contaminated with SUs and did not cause the Benlate plaintiffs' injuries. For example, as set out above, Dupont made such statements as:

We have the scientific evidence to back up our belief that Benlate did not cause crop damage and we will use it in court.

\*　　　　\*　　　　\*

DuPont has overwhelming scientific evidence that there was no SU contamination.

\*　　　　\*　　　　\*

The evidence shows that sulfonylureas are not present in the plaintiffs Benlate soil. . . . [T]he scientific evidence supports our position."

\*　　　　\*　　　　\*

30

> The [May 11, 1994 block settlement of 50 Benlate suits] does not in any way change the scientific evidence that Benlate is not defective and did not cause alleged crop damage.

See ¶¶ 55, 57, 60, 76.

87.  By: (a) stating that the scientific evidence supported its position, without disclosing existing contradictory test results, and (b) affirmatively representing that there was no scientific evidence to support the Benlate plaintiffs' claims, Dupont created the materially misleading impression that all of the scientific evidence supported its stated conclusions when Dupont knew, or was reckless in not knowing, and actively concealed, that there existed scientific evidence which supported the Benlate Plaintiffs' claims.

88.  The fact that the initial Alta tests results provided enough of a basis for a jury to find against Dupont is evidenced by the admissions of Todd David, one of Dupont's lawyers, who recently testified in depositions taken in connection with the Bush Ranch sanctions hearing that scientists could disagree about the ultimate conclusions to be drawn from the Alta tests results and raw data. In fact, David also admitted that there are scientists who have concluded from the Alta results and data that there was SU contamination.

89.  Moreover, the Bush Ranch court expressly found in its $101 million sanction opinion that:

> The introduction of the unrefuted critical opinion testimony by Mr. Albergo, stating without qualification that the Alta charts supplied to him by DuPont showed that no SUs were present in Plaintiffs' soils, effectively destroyed the Plaintiffs' circumstantial case on that decisive issue, just as testimony to the contrary would have been devastating to [Dupont's] case.

> *                    *                    *

> [T]he evidence is now clear that, had the Plaintiffs been given the information which the Alta tests disclosed and had not been led to believe that those tests

31

showed no presence of SUs, the trial of the case may have been materially
altered.

"Bush Ranch Sanctions Opinion at 17, 22. Dupont's assistant general counsel in charge of the

Company's Benlate defense, Jerry Ashby, also conceded that the Alta tests were probably a

"significant factor in the [Hawaiian] trial", which resulted in a $23.9 million verdict against

Dupont.

> **2.      Dupont Failed To Disclose The Fraudulent
> And Improper Methods The Company Used To
> Secure The Litigation Successes, Which It
> Repeatedly Touted During The Class Period**

90.     During the Class Period Dupont repeatedly touted its litigation successes which

enabled it to get rid of many Benlate claims cheaply through either dismissals, inexpensive

settlements, and/or modest judgments. For example, as set out above, Dupont stated:

> The [August 12, 1993 Bush Ranch] settlement is a victory for DuPont, our
> employees and our science.

*               *               *

> This [May 11, 1994 Florida Jury] verdict is DuPont's sweetest victory to date
> [confirming] DuPont's steadfast belief that Benlate is not defective and did not
> cause crop damage

*               *               *

> [The May 11, 1994 settlement] allows us to dispose of a block of Benlate
> litigation at a per-case rate lower than our settlement two weeks ago of 220
> lawsuits. Business decisions don't get much more prudent.

*               *               *

> We are delighted with the [June 10, 1994] jury's verdict that DuPont's Benlate
> DF fungicide is not defective and did not cause damage to the plaintiff's plants.

32

We were confident that the common sense of 12 conscientious people would lead them to conclude that this lawsuit was groundless.

See ¶¶ 64, 75, 76, 78.

91. Likewise, Dupont stated in its public filings that:

To date, DuPont has been served with more than 550 lawsuits in several jurisdictions, principally Florida, Hawaii, and Puerto Rico, by growers who allege plant damage from using "Benlate" 50 DF fungicide. DuPont recently settled 220 lawsuits for various amounts totaling about $214 million. The settlement follows two recent verdicts in a Florida trial in which a jury found "Benlate" to be free of defects. With this settlement, about half of the lawsuits brought against the company since 1991 have been disposed of. Excluding this settlement, more than 75 "Benlate" cases have been disposed of by courts, juries, and settlements, many in DuPont's favor. Even where juries have awarded growers any damages, those damages have been, on average, less than a third of what they sought, and growers have been found to share responsibility for their claimed losses.[3]

92. In addition to discussing publicly its past litigation victories, the Company stated

that it hoped and expected to continue its successful results. For example, Dupont stated:

I am pleased to announce that about an hour ago a settlement was reached in [Bush Ranch trial] . . . Other trials are pending. We will continue to vigorously defend Benlate. We look forward to vindicating our product in other courts and before other juries where we expect to have a more balanced environment and where we will be able to present our undeniably strong case in its totality. As I have said throughout this trial, I believe in our product and I trust our people.

*            *            *

This [June 10, 1994] verdict is the latest in a series of recent jury verdicts in DuPont's favor and represents a clear vote of confidence for DuPont, our

---

[3] Report for fiscal quarter-ended March 31, 1994, filed on Form 10-Q with the SEC on or about May 10, 1994 (the "1994 First Quarter 10-Q") at 11; Report for fiscal quarter-ended June 30, 1994 filed on Form 10-Q with the SEC on or about August 9, 1994 (the "1994 Second Quarter 10-Q") at 11; Report for fiscal quarter-ended September 30, 1994, filed on Form 10-Q with the SEC on or about November 10, 1994 (the "1994 Third Quarter 10-Q") at 14.

technology, and our Benlate product. We are confident that juries in future trials will also return verdicts in favor of DuPont.
See ¶¶ 64, 78.

93.   By discussing its ability to relieve itself of potential liability inexpensively without also disclosing the existence of the negative, initial Alta tests, Dupont created a false and misleading perception of its potential liability. By not disclosing the existence of the negative Alta tests, Dupont concealed information investors needed to accurately evaluate the risk that: (a) the Company's previous litigation successes might be overturned and (b) the Company might not be as successful in the future if the Alta tests were discovered. Moreover, Dupont created the false impression that its success in these lawsuits was due to the correctness of its position while, in fact, it was due to the Company's concealment of the true facts from the plaintiffs, juries, and courts in the Benlate cases.

### 3.   Dupont Unreasonably Stated That It Believed That Benlate Had not Caused the Benlate Plaintiffs' Injuries And That The Benlate Claims Were Without Merit

94.   Finally, during the Class Period, Dupont repeatedly stated its "belief" that the Benlate plaintiffs' claims were without merit and that Benlate had not caused any injury to the Benlate plaintiffs' crops.  For example, as set out above, Dupont stated:

We remain as convinced as ever that our product did not cause the damage claimed. We believe in the integrity of our science. And we firmly  believe that our employees have always told the truth.

*          *          *

The [Florida jury which found Dupont not liable] confirmed DuPont's steadfast belief that Benlate is not defective and did not cause crop damage.

See ¶¶ 68, 75.

95.   Similarly, Dupont stated in its public filings that:

34

DuPont believes that "Benlate" DF 50 fungicide did not cause the alleged damages.[4]

$$* \qquad * \qquad *$$

DuPont believes that "Benlate" 50 DF fungicide did not cause the alleged damages and intends to continue to prove this in ongoing matters.[5]

96. Statements made by Dupont's management that they believed that the Benlate product did not cause the Benlate plaintiffs' crop damages and that the Benlate claims were without merit, were false and misleading because: (a) Dupont failed to disclose facts that seriously undermined the accuracy of its statements and (b) Dupont's knowledge of such contradictory facts (i.e., the adverse Alta test results and data) meant that it did not have an objectively reasonable basis for its stated belief.

**D.     DuPont Acted Intentionally In Concealing The Negative**
**Alta Tests And Falsely Stating That There Was No Scientific**
**Evidence To Support The Benlate Plaintiffs' Claims**

97. That Dupont intentionally concealed the negative Alta test results is evidenced by the findings of the U.S. District Court in the Middle District of Georgia (the Bush Ranch court) in its August 25, 1995, 79-page $101 million sanction opinion against the Company.

98. After a four-day evidentiary hearing in which the Bush Ranch court reviewed 79 exhibits, including trial and deposition transcripts from the Bush Ranch case and other actions, and judicio statements by DuPont and other parties, the Bush Ranch court found that the evidence clearly established:

---

[4] Report for fiscal year-ended December 31, 1993, filed on Form 10-K with the SEC on or about March 18, 1994 (the "1993 10-K") at 11.

[5] 1994 First Quarter 10-Q at 11; see also 1994 Second Quarter 10-Q at 11; 1994 Third Quarter 10-Q at 14.

(a)  That by mid-June 1993, the Alta Lab scientists employed and paid by Dupont had in fact found substantial evidence of SU contamination of the <u>Bush Ranch</u> plaintiffs' properties;

(b)  That the Alta Labs personnel promptly reported their findings to DuPont's lawyers and **that DuPont's [legal liaison] Dr. David Johnson necessarily knew about these findings**;

(c)  That Dupont's lawyers then proceeded to direct the Alta Labs scientists to go back to "confirm (defirm)" the positive findings by changing testing procedures and "homogenizing" soil samples;

(d)  That Dupont failed to present the underlying adverse information to either the <u>Bush Ranch</u> plaintiffs or the Court;

(e)  That rather than calling the Alta Lab scientist who performed the tests to testify, Dupont consciously misrepresented to the Court that Dupont's expert, Nicholas Albergo, had performed the tests and could testify as to the basis to the proffered test summaries, when such was not the case;

(f)  That Dupont introduced false and misleading evidence to the Court and <u>Bush Ranch</u> jury through Dupont's expert who had not been informed of the contradictory Alta Lab results; and

(g)  That "had the Plaintiffs been given the information which the Alta tests disclosed and had not been led to believe that those tests showed no presence of SUs, the trial of the case may have been materially altered."

99. Based on the foregoing and other similar factual findings, the <u>Bush Ranch</u> court stated the following regarding Dupont's knowledge:

> The Court concludes that, because both Alta and DuPont's counsel Alston & Bird had knowledge of the Alta information, and the possession of the Alta data and documents, **DuPont had actual or constructive knowledge of the information contained in, and had actual or constructive possession of, the Alta data and documents, from prior to Albergo's deposition through and including trial**.

*              *              *

> [The documents reviewed by the Court] establishe[s] that DuPont knew from at least early in the week before Mr. Albergo gave a discovery deposition on June 26, 1993, that there had been numerous initial positive findings of SU contamination, findings which the chemist conducting the tests has testified he recognized as "potentially bad news for DuPont" which he assumed might establish liability for damage at the <u>Bush Ranch</u> Plaintiffs' nurseries.

*              *              *

> The Alta Labs personnel then promptly reported their findings to DuPont's lawyers, Alston and Bird, in mid June, 1993, and **the Court concludes from the evidence that DuPont's [legal liaison[ Dr. David Johnson necessarily knew about these findings**.

<u>Bush Ranch</u> Sanctions Opinion at 65, 12, 19 (emphasis added).

100.  Regarding the Company's motive to conceal and misrepresent the Alta test results, the <u>Bush Ranch</u> court stated:

> The Court finds that DuPont's motive seems clear. Given the company's great reliance on the belief in scientific testing, together with the potential economic exposure because of the large numbers of pending but unresolved cases, a finding by its own scientists that its Benlate was contaminated with its own SUs would be particularly grave.

<u>Bush Ranch</u> Sanctions Opinion at 19.

37

101. Finally, regarding the Company's intentional decision to conceal the Alta test results, the Bush Ranch Court stated:

> **Having heard and reviewed all of the relevant evidence, the Court concludes that DuPont, in light of the hundreds of claims and lawsuits which had arisen out of the use of its product Benlate 50DF, decided that it would not reveal the potentially damaging evidence generated by the Alta tests. DuPont was faced with a difficult decision on the eve of the first Benlate-related trial -- to produce data and documents which would authorize a jury to conclude that the Bush Ranch Plaintiffs' soils and waters contained DuPont SUs, data and documents which by their use in the Bush Ranch case would be available to claimants and plaintiffs all over the United States, or to conceal that data and those documents. DuPont made the wrong choice.**

*          *          *

> [The adverse information] was deliberately and consciously kept by the Defendant from becoming a part of the evidence in the case through the employment by the Defendant of a scheme which the Court finds that DuPont perpetrated for the very purpose of hiding and concealing this critical and pivotal evidence.

*          *          *

> [Dupont] consciously, willfully, intentionally, and deliberately withheld and concealed [the Alta] data and documents. [I]f DuPont is to be believed, it caused and allowed that data and those documents, or part of them, to sit undisclosed in a box in the courtroom. To this date, neither the box nor the Alta data and documents have been produced by DuPont to the Court for the Court's examination and review. Were it not for Petitioners having discovered the existence of that data and those documents and having brought them in for this Court to review, DuPont's fraud on this Court would have gone undiscovered.

*          *          *

> **The essentially identical conduct of DuPont in concealing and misrepresenting Alta tests and documents in other courts immediately after the Bush Ranch trial is strong evidence of DuPont's intent and motive, and establishes a pattern of concealment and false representations on this crucial issue. That pattern of concealment has continued through the show cause hearing here.**

38

\*          \*          \*

It [is] apparent to the Court that DuPont [used] its in-house legal staff, local
Wilmington, Delaware, counsel, national coordinating counsel, and others to
carry out a deliberate effort to restrict legitimate discovery in these and similar
cases.

\*          \*          \*

The Court [finds] that DuPont had directed the progress of the <u>Bush Ranch</u>
cases.  The Court also reiterates that DuPont's CEO testified before this Court
during the hearing on the present petition and he testified that he had been
made aware of this Court's orders throughout the <u>Bush Ranch</u> cases and that
now, <u>today</u>, he fully supports the actions taken by and the conduct of DuPont's
representatives, agents, and/or counsel.  Moreover, Mr. Woolard acknowledged
that the responsibility for all such statements, representations and conduct rests
with DuPont.  **In so doing, DuPont has endorsed, authorized, directed,
acquiesced in, and ratified what happened here.**

\*          \*          \*

DuPont consciously and deliberately withheld the Alta data and
documents from the Plaintiffs and the Court, and perhaps even from the witness
Albergo, **thereby withholding this information from future litigants as well**.
DuPont urged falsely to the Court and elicited false testimony about what
Albergo had done, and what he knew, and what the evidence, in fact, arguably
showed. DuPont deprived the Plaintiffs, the Court, and the jury of data and
documents highly relevant to the issue which DuPont itself described as the
most critical issue in the case.  DuPont continued its concealment and deception
to the extent of presenting to this Court knowingly untrue representations about
DuPont's compliance with its discovery obligations and with this Court's orders
with the accomplished purpose of fraudulently obtaining an untrue order from
this Court to absolve DuPont of its misconduct, and to relieve DuPont of
sanctions it richly deserved.

\*          \*          \*

**DuPont's conduct with regard to the Alta data and documents,
beginning with conduct prior to Mr. Albergo's deposition, and continuing
through the <u>Bush Ranch</u> trial and to the present, was willful, deliberate,
conscious, purposeful, deceitful, and in bad faith.**  That conduct affected the
fairness of the trial and prevented the full and fair presentation and
consideration of the evidence.  DuPont's conduct affected the course of the
<u>Bush Ranch</u> trial from beginning to end -- from opening statement to closing

argument.  DuPont's conduct affected the <u>Bush Ranch</u> Plaintiffs' trial preparation and trial conduct.  DuPont's conduct affected the rulings and the orders of this Court and interfered with the administration of justice.  In short, DuPont's conduct deprived the <u>Bush Ranch</u> Plaintiffs of a fair trial and made that trial, which lasted approximately six weeks and which consumed vast judicial resources, a farce..

> **Put in layperson's terms, DuPont cheated.  And it cheated consciously, deliberately and with purpose.  DuPont has committed a fraud on this Court, and this Court concludes that DuPont should be, indeed must be, severely sanctioned if the integrity of the Court system is to be preserved.**

<u>Bush Ranch</u> Sanctions Opinion at 71, 19, 67, 4, 7, 65, 71, 71, 71 (emphasis added).

## COUNT I

### Against Defendant DuPont For
### Violation Of Section 10(b) of the Exchange
### <u>Act and Rule 10b-5(b) Promulgated Thereunder</u>

102.  Plaintiff repeats and realleges every preceding allegation as if fully set forth herein.

103.  Rule 10b-5 provides that it shall be unlawful for any person, directly or indirectly:

> (a)  To employ any device, scheme or artifice to defraud,

> (b)  To make any untrue statement of material fact or to omit to state a

material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

> (c)  To engage in any act, practice, or course of business which operates or

would operate as a fraud or deceit upon any person, in connection with the purchase or sale of a security.

104. As set out above, throughout the Class Period, DuPont repeatedly made materially false and misleading statements to the effect, inter alia, that there was no scientific evidence to support claims that Benlate had caused the Benlate plaintiffs' injuries. Such statements, combined with other statements by Dupont, created the false perception that there was little, if any, possibility that Dupont would face material liability in the Benlate product liability suits. In making such false and misleading statements, DuPont created a false and misleading perception as to the probability that Dupont would be held liable in the various Benlate suits and the size or magnitude of the Company's potential liability. In misrepresenting facts relating to and potentially impacting the probability and magnitude of its potential liability, Dupont artificially inflated the market price of its stock during the Class Period, resulting in a fraud on the market for its common stock.

105. During the Class Period, as alleged herein, DuPont knowingly and recklessly pursued a course of conduct which operated as a fraud upon plaintiffs and other members of the Class. This course of conduct included, but was not limited to, making various untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

106. Plaintiff and other shareholders similarly situated, at the time of said misrepresentations and omissions, were ignorant of, and could not have known of, the falsity of these statements, and believed them to be true. In reliance upon said misrepresentations and omissions, the integrity of the market, and the fidelity, integrity and superior knowledge of defendants, Plaintiff and the other class members were induced to and did purchase DuPont stock at artificially inflated prices and were damaged thereby.

41

107. By reason of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

## COUNT II
### Violation of Section 20(a) of the
### Exchange Act Against Defendant Woolard

108. Plaintiff repeats and realleges every preceding allegation, as if fully set forth herein.

109. Defendant Woolard, by reason of his position as DuPont's Chairman of the Board and Chief Executive Officer, was able to and did, directly or indirectly, control the Company's operations. In addition, Defendant Woolard possessed and/or exercised the power to control the content of the Company's public statements, including its public statements regarding the Benlate litigation and the probability and magnitude of DuPont's liability in the Benlate litigation.

110. Defendant Woolard not only possessed the power to control the Company's operations and public statements, but he exercised that power throughout the Class Period in connection with both the Company's (a) issuance of materially false and misleading public statements; and (b) plan and scheme to defraud the courts and the Benlate plaintiffs by, inter alia, fraudulently concealing damaging test results. Upon information and belief, Defendant Woolard controlled, approved, ratified and/or acquiesced in the content of numerous Company press releases and SEC filings throughout the Class Period which, as described below, contained materially false and misleading statements regarding the Benlate litigation, including, but not limited to (a) the purported absence of scientific evidence demonstrating that DuPont's Benlate products were contaminated; and (b) facts relevant to the probability

42

and magnitude of DuPont's potential liability in the Benlate suits.  In fact, Defendant Woolard (a) signed DuPont's annual report to shareholders on Form 10-K for the year ending December 31, 1993, which contained materially false and misleading statements regarding the Benlate litigation, as set forth in ¶¶ 95 above; and (b) signed/approved of DuPont's quarterly reports to shareholders on Form 10-Q issued during the Class Period, as set forth in ¶¶ 91, 95.

111.   Moreover, Defendant Woolard executed direct and substantial control over the Company's scheme to conceal incriminating information from the courts and Plaintiffs in the Benlate litigation.  For example, in an opinion holding DuPont responsible for over $100 million in sanctions, one court expressly held that, in spite of repeated assurances by DuPont representatives, including Defendant Woolard (in both court testimony and affidavits) that "DuPont understood what its discovery obligations were and that it would produce all documents responsive to [certain Benlate] plaintiff's requests," DuPont "continued to refuse to honor the [Benlate] plaintiff's legitimate requests and its earlier assurances to the Court that it would produce all responsive documents."  Bush Ranch Sanctions Opinion at pp. 8, 10.

112.   Similarly, the Bush Ranch Sanctions Order evidences that Defendant Woolard supported the actions taken by DuPont and its agents, including counsel, in concealing incriminating evidence from the Benlate courts and Plaintiffs.  As the court stated at p. 65 of the Bush Ranch Sanctions Opinion:

> The Court found that DuPont had directed the progress of the Bush Ranch cases.  The Court also reiterates that DuPont's CEO testified before this Court during the hearing on the present petition and he testified that he had been made aware of this Court's orders throughout the Bush Ranch cases and that now, today, he fully supports the actions taken by and the conduct of DuPont's representatives, agents, and/or counsel.  Moreover, Mr. Woolard acknowledged that the responsibility for all such statements, representations and conduct rests with DuPont.  In so doing, DuPont has endorsed, authorized, directed, acquiesced in, and ratified what happened here.

113. As a result, Defendant Woolard is a controlling person of DuPont and is subject to joint and several liability under Section 20(a) of the Exchange Act for Dow Chemical's violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

WHEREFORE, Plaintiff, on his own behalf and on behalf of the Class, pray for judgment as follows:

A.  Declaring Plaintiff to be a proper class representative and this action to be a proper class action;

B.  Awarding Plaintiff and all other members of the Class damages against all defendants jointly and severally, together with prejudgment interest thereon;

C.  Awarding Plaintiff legal fees and expert fees, together with interest, costs and disbursements; and

D.  For such other relief as to this Court appears just and proper.

Dated: September ⁄1, 1995

BURT & PUCILLO

By: _____
    Michael J. Pucillo
    Florida Bar No. 261033
    222 Lakeview Avenue
    Suite 300 East
    West Palm Beach, FL 33401
    (407) 835-9400

GARWIN, BRONZAFT, GERSTEIN & FISHER
Bruce Gerstein (BG 2726)
Noah Silverman (NS 5728)
1501 Broadway, Suite 1416
New York, New York 10036
(212) 398-0055

ELWOOD S. SIMON & ASSOCIATES, P.C.
Elwood S. Simon
John Zuccarini
355 South Woodward Avenue, Suite 250
Birmingham, MI 48009
(810) 646-9730

MILLER FAUCHER CHERTOW
 CAFFERTY and WEXLER
Marvin A. Miller
30 N. LaSalle Street, Suite 3200
Chicago, IL 60602
(312) 782-4880

dupont\complain.2

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

FILED
U.S. DISTRICT COURT
MIDDLE GEORGIA
95 AUG 21  PM 2:32

_[signature]_
DEPUTY CLERK

IN RE:  E. I. du Pont de Nemours   *
        and Company - Benlate®
        Litigation                 *

THE BUSH RANCH, INC., a Georgia   *
corporation, and WILLIAM R.
LAWSON, Individually              *

YELLOW RIVER GROWERS, a           *
partnership whose partners are
Roy Phillip Barber, Carol H.      *
Barber and Gregory Phillip
Barber, and CAROL H. BARBER, and  *

C. RAKER & SONS, INC., a          *
Michigan corporation,
                                  *
        Petitioners
                                  *
vs.
                                  *
E. I. du PONT de NEMOURS AND      *
COMPANY, a Delaware corporation,  *

        Respondent                *

CASE NO. 4:95-cv-36 (JRE)

## OPINION AND ORDER

A hearing which began on Tuesday, May 2, 1995, and ended on Friday, May 12, 1995, was conducted by the Court in connection with the matter above identified.  Following the suggestion made by the Court, counsel for the respective parties have filed proposed findings of fact and conclusions of law.  The Court now files this opinion in which the Court's findings of fact and conclusions of law, although not separately categorized, will be readily apparent.  The Court will enter a separate order with respect to and deciding all motions of the Petitioners and of DuPont which are still pending.

1

AO 7-A
(Rev. 8/82)

The Petitioners in this matter are nurserymen who previously were among the named Plaintiffs in separate actions against E. I. du Pont de Nemours and Company (hereafter DuPont) tried as consolidated cases in this court. A total of 14 such actions were filed, and all of the cases were consolidated for the purposes of discovery prior to trial of the consolidated cases. At all times, however, the first four of those actions (the "Bush Ranch cases") clearly were the "lead" cases. The Plaintiffs in those cases contended that DuPont's product, Benlate 50DF, a fungicide, was defective and was contaminated with, among other things, highly toxic herbicides generically called sulfonylureas ("SUs"), manufactured, formulated and/or warehoused by DuPont at the same Belle, West Virginia, plant where benomyl, the active ingredient in Benlate 50DF, is manufactured. It was claimed that such SU-contaminated Benlate caused damages to the ornamental plants and the soils and waters of their nurseries. Therefore, the testing for the presence of SU contamination was the most critical evidence for both the Plaintiffs and the Defendant in the Bush Ranch cases.

This Petition to Show Cause was filed with the Court on March 22, 1995. The Petitioners, three of the four Plaintiffs in the original lead consolidated cases (hereafter "Bush Ranch" cases), are alleging that DuPont, through its conduct, engaged in acts of misrepresentation and concealment as to critical evidence which constituted a fraud on the Court and a contempt of the Court's orders. On reviewing the petition, as well as the memorandum appendix in support and attached Exhibits 1-75, this Court on

2

March 23, 1995, entered an order directing DuPont to show cause on April 24, 1995, why it should not be sanctioned for the conduct described in the petition.

Among the motions filed by DuPont was a motion to recuse this District Court Judge before whom the wrongful conduct stated in the petition was alleged to have occurred. DuPont also filed motions to dismiss and to vacate the show cause order. Thereafter, considering these motions, the Court continued the hearing to May 1, 1995, and, at the request of DuPont's counsel, the Court continued the hearing to May 2, 1995.

On April 26, 1995, the Court denied DuPont's motion to recuse. On April 28, 1995, the Court denied DuPont's motion to stay all proceedings pending review in the appellate court, that motion having been filed on April 27, 1995. DuPont then filed an emergency motion for stay in the United States Court of Appeals for the Eleventh Circuit on April 28, 1995, along with a petition for a writ of mandamus and a writ of prohibition. These motions were denied by the Court of Appeals on Monday, May 1, 1995. As already noted, the hearing on the show cause order began on Tuesday, May 2, 1995, and ended on Friday, May 12, 1995. The sole purpose of the hearing was to determine whether sanctions should be imposed on the Respondent DuPont.

The show cause order was issued following consideration of a petition and voluminous exhibits, which alleged that DuPont had committed a fraud on this Court in connection with discovery matters, trial conduct, and a post-settlement application to the Court to

3

vacate previous sanctions orders.   As set out in detail in this opinion, the Court finds and concludes that DuPont did commit the fraud, the discovery abuses, and the violations of this Court's orders averred in the petition.   DuPont has failed to show any sufficient cause why it should not be sanctioned for the conduct detailed herein.

The Court has heard the testimony and has reviewed the documentary evidence.   The Court takes judicial notice of all of the pleadings, submissions, hearing transcripts, orders, and trial transcripts in the Bush Ranch cases.   The Court has observed the demeanor of the witnesses and considered any inconsistencies in the evidence.   The Court has determined that evidence from other cases involving allegations that DuPont's Benlate 50DF caused damages, which evidence in most instances consists of trial or deposition transcripts, court orders, or in judicio statements by DuPont, properly should be considered where it concerns what happened in this court, or where it concerns actions or positions taken by or on behalf of DuPont with respect to the Alta data and documents, or where it bears on the credibility of DuPont.   The essentially identical conduct of DuPont in concealing and misrepresenting Alta tests and documents in other courts immediately after the Bush Ranch trial is, however, strong evidence of DuPont's intent and motive, and establishes a pattern of concealment and false representations on this crucial issue.   That pattern of concealment has continued through the show cause hearing here.

4

AO 72A
(Rev. 8/82)

It is without dispute that the core, almost the ultimate, issue in the <u>Bush Ranch</u> trials was whether or not the soils and or waters of the <u>Bush Ranch</u> Plaintiffs' lands where their nursery businesses were conducted were contaminated by the use of DuPont's Benlate product which itself was defective due to contamination by sulfonylureas ("SUs") which were also manufactured by DuPont.  DuPont was confronted with hundreds of claims and lawsuits throughout the United States alleging damage by Benlate, thus establishing a significant economic risk for DuPont if Benlate was found to be defective through contamination.  While there was much circumstantial and indirect evidence of SU-contamination, throughout the bulk of the pretrial discovery Plaintiffs had not been able to produce direct test results of their soils and waters.  This was due principally to the fact that such testing could not generally be performed on scientific equipment available to Plaintiffs' experts.    The Plaintiffs agreed to allow agents of DuPont onto their properties where their nurseries were located for the purpose of taking soil samples.  The Defendant agreed, however, that in return for being allowed access to the soils, waters, and plants of the Plaintiffs for purposes of taking samples, DuPont would furnish Plaintiffs with all materials generated in connection with any tests conducted on those soil, water, and plant samples.

In an effort to bolster the defense contention that there were no SUs in Plaintiffs' soils or waters, DuPont engaged Alta Laboratories, Inc. (hereinafter "Alta") to perform sophisticated analytical chemistry tests, which few other laboratories, if any, in

5

the country could perform.  Although all materials generated in connection with such tests were to be furnished to Plaintiffs, both as a matter of discovery and pursuant to order of this Court, and as a matter of conditions made clear as a predicate to the entry of DuPont onto Plaintiffs' lands to obtain samples for these tests, the only documentary materials ever furnished were some tables or charts which the Defendant referred to and called "Summaries."  Some of those summaries were given to Plaintiffs on the eve of trial.  The remainder of them were not furnished until after Plaintiffs had rested their case and not until just before the Defendant was about to call its only witness through whom it would seek to elicit the information which was purportedly contained in the tables.  It is the conduct of DuPont surrounding the preparation and use of these "summaries," when taken together with the conduct generally of the agents and attorneys of DuPont, which gives rise to many of the allegations of fraud upon the Court currently before the Court.

For a year preceding the Alta tests, the Bush Ranch Plaintiffs and DuPont had been engaged in a protracted series of discovery disputes, as the result of which this Court had repeatedly found DuPont to be in flagrant violation of discovery orders and duties.  This Court had found Dupont's conduct to be the most serious abuse in its years on the bench and the most serious abuse reflected in the legal precedents.  A conditional sanction of, first, $500,000.00, then $1,000,000.00 had been set, without, it is now clear, altering DuPont's conduct toward the Court, the civil justice system, or the opposing parties.

During the lengthy discovery period in this case this Court was forced by the obstructive practices of DuPont to hold numerous hearings. Those hearings took place on the following dates: July 8, 1992; August 5, 1992; August 26, 1992; October 9, 1992; February 19, 1993; April 9, 1993; May 14, 1993; May 27, 1993; June 11, 1993; and June 29, 1993. As a result of the hearings held, the Court entered orders on the following dates:

(1)   Memorandum opinion and order on Plaintiffs' motion to compel discovery dated June 24, 1992;

(2)   Order dated July 21, 1992;

(3)   Order dated August 7, 1992;

(4)   Supplemental order dated September 25, 1992;

(5)   Order granting Plaintiff's motion to adopt report of special master dated October 15, 1992;

(6)   Order on pending motions dated October 23, 1992;

(7)   Order dated November 16, 1992;

(8)   Order dated December 10, 1992;

(9)   Order imposing sanctions dated March 15, 1993;

(10)   Supplemental order imposing sanctions dated April 14, 1993;

(11)   Memorandum and order on hearings of May 14, 1993, and May 27, 1993, dated June 7, 1993; and

(12)   Order on continuation of Plaintiffs' motion for sanctions hearing held June 11, 1993, dated June 15, 1993.

This Court had never experienced the kind of deliberate refusal to comply with discovery orders that was evidently taking place during this period of time. It became apparent to the Court that DuPont was using its in-house legal staff, local Wilmington,

7

Delaware, counsel, national coordinating counsel, and others to carry out a deliberate effort to restrict legitimate discovery in these and similar cases.  The Court entered an order making such a finding on March 15, 1993.  Efforts by the Court to bring DuPont into compliance involved requiring an affidavit from, and subsequently the appearance of the Defendant's Chairman of the Board and Chief Executive Officer, Edgar S. Woolard, Jr.  Mr. Woolard assured this Court that DuPont understood what its discovery obligations were and that it would produce all documents responsive to the Plaintiff's requests.   In spite of these assurances, the Defendant continued to refuse to honor the Plaintiff's legitimate requests and its earlier assurances to the Court that it would produce all responsive documents.  Because of the repeated refusals of DuPont to comply with the orders of the Court, and in order to make an appropriate impression on DuPont, the Court was constrained to enter a conditional order imposing a monetary sanction of $500,000.00.  As the case approached trial, the Court entered an order on June 7, 1993, addressing both the May 14, 1993, hearing and the May 27, 1993, hearing, and found, among other things, that:

> By way of preface, the Court notes that DuPont's prior non-compliance with the Court's discovery orders is exemplified by the fact that Mr. George Frank, DuPont's corporate counsel, submitted an affidavit on behalf of DuPont on January 4, 1993, wherein he certified to the Court that DuPont had fully complied with this Court's orders in that full production of documents had been made pursuant to the Plaintiffs' first requests for production even though he testified on cross-examination at the May 27 hearing that he never read through those requests.  The Court finds such conduct to be typical of the Defendant's attitude

8

toward discovery throughout the history of this case.

The monetary sanction against DuPont was increased in that order from $500,000.00 to $1,000,000.00 and was again reserved for later ruling by the Court following a future assessment of DuPont's discovery conduct.

A fifth sanctions hearing was held on June 11, 1993, at which time the Court received evidence that DuPont had intentionally withheld documents related to the crucial issue in the case, cross-contamination of Benlate with sulfonylureas. At that fifth sanctions hearing, the Court received evidence that over one month prior to the hearing on May 6, 1993, DuPont scheduled the deposition of John Olsen, the contamination prevention coordinator at the Belle, West Virginia, DuPont plant. In connection with that deposition, the Court received evidence of the following:

(a) On May 5, 1993, the evening before his deposition, Mr. Olsen was in the Atlanta office of Alston & Bird with Elizabeth Gilley preparing for his deposition. He presented her with additional documents from the Belle, West Virginia, DuPont facility, which had not previously been produced to the Bush Ranch Plaintiffs, but which related to the cross-contamination of Benlate.

(b) Rather than produce the documents and go forward with the deposition, DuPont's counsel, on the eve of the Olsen deposition, falsely represented that Mr. Olsen was unavailable, and that the deposition would have to be canceled.

(c) Mr. Olsen's deposition was rescheduled for June 4, 1993, and it was not until the evening of June 3, 1993, that these

9

same documents, already in the possession of DuPont counsel Gille~
since May 5, 1993, were produced to the <u>Bush Ranch</u> Plaintiffs.

(d)   In the interim between May 5, 1993, and June 3, 1993,
representatives of DuPont, including Dr. David Johnson and Edgar S.
Woolard represented to this Court that all responsive documents had
been produced by May 14, 1993.

(e)   DuPont recognized that documents concerning cross-
contamination of Benlate with sulfonylureas generated after the <u>Bush
Ranch</u> Plaintiffs' initial requests were responsive to and subject to
production pursuant to Plaintiffs' request for supplementation (filed
on May 24, 1993) to supplement the earlier document production.

As a result of the evidence presented at the June 11, 1993,
hearing, the Court found as follows:

> Well, the Court finds that the Defendant, DuPont,
> continues to take every means possible to obstruct
> discovery to which the Plaintiffs are entitled.
> This is just a continuation of what has been going
> on for months.
>
> . . . Now, having stated as I did just a moment
> ago that the Court finds that the Defendant
> continues to take every means possible to obstruct
> discovery to which Plaintiffs were entitled,
> immediately the idea comes to mind, of course,
> well, just increase the monetary sanctions from a
> million to two million, or five million, or what
> not.  But it's obvious that money does not make an
> impression on the Defendant.
>
> Now, with regard to what has been presented here
> today, the Court finds that it is without question
> now that the Plaintiffs have been clearly--<u>have
> clearly demonstrated that the Defendant has
> intentionally withheld documents relevant to the
> issue of cross-contamination of Benlate by
> Sulfonyl</u>, however you pronounce that, ureas.

10

. . . <u>(I)t prejudices the Plaintiffs in the</u>
<u>presentation of their case for these documents to</u>
<u>have been withheld until 30 days before the</u>
<u>beginning of the trial, when under the Court's</u>
<u>order the documents should have been produced long</u>
<u>ago.</u>  In other words, the Plaintiffs' case is
clearly prejudiced by this action, inaction on the
part of the Defendant.  It is simply an abuse of
the discovery process.  And during the recent
weeks, since this is the worst case of this nature
that I have ever had anything to do with, I have
been interested in other cases that have dealt
with abuse of the discovery process, and I haven't
found a case that approaches this.  In other
words, I haven't found a case where the deliberate
actions on the part of a defendant to obstruct the
discovery process approach what has happened here.
There may be some, but I haven't found any.
(Emphasis added.)

Subsequent to that June 11, 1993, hearing, DuPont produced
over 225,000 documents responsive to the <u>Bush Ranch</u> Plaintiffs'
initial and supplemental requests, including many documents which
were generated subsequent to Plaintiffs' initial document requests.
<u>None of the Alta test materials concerning SU contamination was</u>
<u>included in that production</u>.

On June 26, 1993, Plaintiffs took the deposition of Nicholas
Albergo, an expert witness named by DuPont.  On that date,
Mr. Albergo testified, among other things, that Alta had conducted
tests of the <u>Bush Ranch</u> Plaintiffs' soils and waters for the presence
of DuPont SUs.  Based on the data, contained in the few charts
available to him from Alta at that time, Mr. Albergo testified that
there was <u>no evidence</u> of SUs in any of the <u>Bush Ranch</u> Plaintiffs'
soils or waters which had been tested as reflected in the summaries.

A final sanctions hearing was held on June 29, 1993, less
than one week before the trial of the <u>Bush Ranch</u> cases was to begin.

11

At that time the Court received evidence concerning DuPont's continued non-compliance with its obligations and the Court's orders during the course of discovery, explicitly related to cross-contamination issues.

Present at the hearing as a corporate representative for DuPont was Dr. Joel Wommack, director of R&D and head of analytical chemistry for the Benlate Resolution Team since March, 1991. The Benlate Resolution Team was a group set up by DuPont to monitor, direct, and coordinate DuPont's legal efforts with regard to all Benlate litigation.

The Court's June 29 hearing was at a time when Alta's tests had already been conducted. None of the data or documents had been produced, nor had the attendant Alta documents, which disclose the history of the testing and the activities of DuPont in connection with the ultimate preparation of the Alta report and summaries, been produced. Those documents established that DuPont knew from at least early in the week before Mr. Albergo gave a discovery deposition on June 26, 1993, that there had been numerous initial positive findings of SU contamination, findings which the chemist conducting the tests has testified he recognized as "potentially bad news for DuPont" which he assumed might establish liability for damage at the Bush Ranch Plaintiffs' nurseries. These documents were withheld by Defendant from the Plaintiffs. While DuPont remained silent about the Alta data and documents, the Court made the following findings:

> (a)  ". . . but the Plaintiffs have been trying to get this information for a year. I've entered orders about producing tapes and producing results, and producing this, and producing another. And it's just been an

12

ongoing battle for the Plaintiffs and their efforts, legitimate efforts, to obtain discovery material, to get this information.  Finally, they get some of it, here just a week before the case is supposed to go to trial, and haven't got all of it yet."

(b) ". . . And by withholding this evidence until just a few days before the case goes to trial, of course, the effect is that once again the Plaintiffs have been prejudiced in the presentation of their case because they have been prevented because of the time constraints which are upon us, from conducting the discovery which would be necessary to further develop evidence concerning these deletions, and who did it, and why, and so on.

(c) ". . . the Court finds that the Defendant is not in compliance with the Court's order, and is <u>again ordered</u> to produce to the Plaintiffs before the close of business on Friday of this week, <u>all such information</u>, and particularly the Shalaby information, which has been the focus of two or three of our hearings."  (Emphasis added.)

The record reveals that DuPont has taken several positions as to why no sanctions should be imposed in response to the show cause order.  Among those positions, DuPont states that it was under no obligation to produce to Plaintiffs in the <u>Bush Ranch</u> cases the Alta data and documents.  DuPont states that the <u>Bush Ranch</u> Plaintiffs' discovery, including the Plaintiffs' supplemental discovery served not long before trial, did not require the production of the Alta data and documents, and that if the discovery did so require, DuPont had no duty to supplement its discovery responses through trial.  DuPont also states that there was no outstanding order of the Court requiring DuPont to produce <u>all</u> Benlate-related documents, which orders Petitioners allege would include the Alta data and documents.

13

Further, DuPont, at times, has argued that the Alta data and documents were not subject to production because of a claim of work product protection.

Concerning the chronology of discovery in the <u>Bush Ranch</u> cases, as it bears on the petition and the show cause hearing and as it bears on the reasons urged by DuPont why no sanctions should be entered, the Court summarizes its findings and/or finds as follows:

(a)  The conduct and strategy of DuPont in the discovery process was controlled either through its in-house counsel, national coordinating counsel, or Wilmington, Delaware, counsel and not solely by Alston Bird or other local counsel, and DuPont continues to knowingly approve, ratify and acquiesce in the past and present conduct of its counsel in this and subsequent Benlate cases.  DuPont, through its corporate officers and other officials, ratified, approved, and adopted this conduct and strategy and caused the same to be used by counsel representing DuPont in Benlate cases all across the country.

(b)  The Court found a continuing and deliberate effort by DuPont to impede, delay, and otherwise restrict legitimate discovery by Plaintiffs in the underlying cases and a repeated failure to comply with the Court's orders concerning discovery.

14

(c)   supplementation of discovery responses was both ordered by the Court and recognized by the parties; it is, moreover, encompassed within the civil rules.

(d)   This Court maintained a continuing order outstanding through the trial of the <u>Bush Ranch</u> cases which required DuPont to produce all Benlate-related documents to Plaintiffs.

(e)   Benlate-related documents included by definition all of the Alta data and documents.

(f)   The Alta data and documents were not produced to Plaintiffs, were not offered to Plaintiffs, were not provided to this Court, or were not otherwise made available to this Court or Plaintiffs in the underlying <u>Bush Ranch</u> cases.

(g)   DuPont made no claim of protection or privilege, either work product or attorney-client, to any of the Alta data and documents; and such a claim, if made, would not have been sustainable.

(h)   DuPont engaged in a deliberate effort to obstruct discovery during the <u>Bush Ranch</u> cases.

(i)   DuPont violated the rules of discovery, Court orders, and duty to participate in litigation in good faith during the <u>Bush Ranch</u> cases.

15

(j) Court orders entered during these cases clearl

required DuPont to produce all documents relevant to, o

likely to lead to information relevant to, the contention

and defenses in those cases, including contamination o

Benlate by SUs, the very subject of the Alta tests, and th

hingepin of the <u>Bush Ranch</u> Plaintiffs' cases.

Whether or not Plaintiffs' soils were actually and in fact

contaminated with SUs was recognized by both parties as the critical

issue in the case.  The Defendant, in fact, argued strongly to the

Court that DuPont should be allowed to introduce the Alta lab test

"summaries" on that subject and that the Court's failure to allow

such evidence would be highly prejudicial to the Defendant on what

DuPont characterized as "the critical issue in the case."  That

"critical issue" is, however, not an issue which the Court need

resolve here as a predicate to deciding whether or not Defendant's

conduct regarding the withholding of such evidence as claimed by the

Petitioners here was conduct which should be sanctioned by the Court.

Whether or not SUs were in fact present in the Plaintiffs' soils was

for the jury in the <u>Bush Ranch</u> cases to determine.  Whether or not

there was <u>material</u> <u>evidence</u> bearing upon the presence of SUs in the

Plaintiffs' soils which was improperly withheld by the Defendant is

the question which this Court must determine.  The Court must also

determine at this time whether or not DuPont has even now told the

truth about the circumstances surrounding the Alta data and

documents.  The evidence which actually went to the jury, with the

16

exception of the Alta Labs evidence, as to the presence of SUs in the Plaintiffs' soils was highly contested.  DuPont presented the Alta Labs test summaries through its witness Albergo, and that unrefuted showing that the sole test results on that subject showed <u>absolutely</u> no SUs present in the Plaintiffs' soils was the only direct evidence which the jury had as to the SU soil content resulting from analytical soil tests.  All other evidence concerning the presence of SUs which the jury had before it, which evidence was circum- stantial in nature, was contested by both sides, and the jury was left to weigh the relative merits of opposing witnesses testifying as to differing views of whether or not, for instance, whether the boxes of Benlate supplied to the Plaintiffs contained SUs or whether or not it was possible for cross-contamination to occur at the fabricating plant in West Virginia where both Benomyl and sulfonylureas were produced.

Both sides had recognized Alta Labs to be highly regarded in the scientific community and most likely the only lab in the country capable of performing these very intricate, highly technical, and almost prohibitively expensive scientific tests.  The introduc- tion of the unrefuted critical opinion testimony by Mr. Albergo, stating without qualification that the Alta charts supplied to him by DuPont showed that no SUs were present in Plaintiffs' soils, effectively destroyed the Plaintiffs' circumstantial case on that decisive issue, just as testimony to the contrary would have been devastating to the Defendant's case had it been shown that its own

17

experts at Alta Labs had reached an opposite finding that there were SUs present.

The evidence produced at this show cause hearing demonstrates clearly that DuPont's Alta Lab scientists had in fact found in June of 1993 substantial evidence as a result of their testing that samples from each of the Bush Ranch Plaintiffs' soils showed positive findings for SU contamination. Mr. Bethem, one of the two scientists from Alta Labs, testified at his deposition in late 1994, which was admitted as evidence at the May 1995 hearing, as follows:

> Q:   Does your data support a representation that there are no sulfonylureas in the Columbus, Georgia Plaintiff's soils, without a reference to the detection limit?
>
> A:   No....
>
> Q:   And you could not state under oath or not under oath--
>
> A:   Okay
>
> Q:   --that sulfonylureas do not exist [sic] in the soil of the Bush Ranch Plaintiffs or the Columbus Plaintiffs at lower than fifty parts per trillion?
>
> A:   No, I could not state that with certainty.
>
> Q:   You have, in your data that reflect the presence of certain sulfonylureas in the extracts from certain samples at levels below that which you consider your detection limit, correct....
>
> A:   Yes, we do.

18

Q: When Mr. Cella asked you a question, if you had any factual basis for the presence of SUs in the Columbus, Georgia soils, I believe you said you had no basis for determining--that you had no factual basis for determining, for stating that there were SUs in the Columbus case soils; is that correct?

A: With the detection limit of fifty parts per trillion

Q: And, in fact, you do have a basis to believe that there were SUs in the extracts from those soils, don't you?

A: Yes, I do.

(Emphasis added.)

Mr. Bethem also testified that, at the time he made his findings with Alta's regard to SUs in the Plaintiffs' soils, he considered those findings to be "bad news" for DuPont.

The Alta Labs personnel then promptly reported their findings to DuPont's lawyers, Alston and Bird, in mid June, 1993, and the Court concludes from the evidence that DuPont's Dr. David Johnson necessarily knew about these findings. The evidence was not communicated to the Plaintiffs despite DuPont's clear duty to do so and in fact was deliberately and consciously kept by the Defendant from becoming a part of the evidence in the case through the employment by the Defendant of a scheme which the Court finds that DuPont perpetrated for the very purpose of hiding and concealing this critical and pivotal evidence.

The Court finds that DuPont's motive seems clear. Given the company's great reliance on and belief in scientific testing,

19

together with the potential economic exposure because of the large numbers of pending but unresolved cases, a finding by its own scientists that its Benlate was contaminated with its own SUs would be particularly grave. The evidence is undisputed, however, that following its reporting of its initial findings of SUs in mid June 1993, Alta Labs was ordered by the Defendant to go back, "after most of the work is done" and to "confirm (defirm)" the positive findings. The Alta documents containing this disclosure were not produced by DuPont. Testing procedures were changed. The minimum detection limit was raised. Tests were repeatedly redone and massaged. Soil samples that had been found to be positive were "homogenized" with other parts of the soil sample. Although the written data which comprised the Alta test procedures was highly complex and technical and incomprehensible to people without very specialized analytical chemical training, those documents were carefully concealed from the Plaintiffs and were, in fact, not made available to the only expert, Mr. Albergo, who the Defendant selected to testify with regard to the conclusions to be derived from that data.

DuPont never offered, proffered or produced the Alta data and documents to the <u>Bush Ranch</u> Plaintiffs, despite a clear duty to do so arising from repeated orders of this Court, from the Civil Rules, and from its own commitments and representations. Those documents, in fact, only came to light after a ruling by the Hawaii Supreme Court forced DuPont months later to produce them. The documents establish that DuPont knew, from at least early in the week before Mr. Albergo gave his discovery deposition on June 26, 1993,

20

that there had been numerous initial positive findings of SU

contamination, findings which the chemist conducting the tests has

testified he recognized as "potentially bad news for DuPont," and

which he assumed might establish liability for damage at the Bush

Ranch Plaintiffs' nurseries.

Rather than having the chemist who performed the tests

testify as to the results of those tests, the Defendant chose instead

to falsely present the results and conclusions of those tests through

a witness untrained in analytical chemistry and incapable of

interpreting the date showing the positive findings that Alta had

made.  Documents characterized by the Defendant as "Summaries" were

supplied to Mr. Albergo, which documents purported to list in a table

tests that Alta Labs had run on each of the Bush Ranch Plaintiffs'

soil.  Only a portion of these summaries were supplied to Plaintiffs

a few days before the trial began and the remainder were withheld

until after Plaintiffs had rested their cases and Defendant was well

into its case.  These "Summaries" were represented to be the results

of the work of Bethem and Petersen of Alta Labs compiled in table

form, and showing for each soil sample that no SUs were detected at

the detection limit shown on the chart.

When the Defendant attempted to introduce the documents at

trial through their witness Albergo who they had called as a

remediation expert, Plaintiffs objected to the introduction of the

charts on the basis that the witness had not performed the work on

the soil testing and was not competent to authenticate and vouch for

the document.

21

The Court did not allow the introduction of the charts but did allow the witness to give his opinion as an expert based upon the hearsay conclusions evidenced in the tables.   The Court now finds that Mr. Albergo on voir dire falsely represented to the Court his role in the oversight and supervision of the Alta tests which led to the preparation of those so-called summaries.   During that voir dire and argument by counsel as to whether or not the Court should admit the tables or the information which the tables purported to show, the Court finds counsel for DuPont misrepresented to the Court and misled the Court and Plaintiff's counsel as to the true facts surrounding what the Alta Labs tests showed with regard to the presence of SUs in the soil samples tested by Alta.   The Court further finds that the evidence which the Court permitted to go to the jury, based upon the false and misleading testimony of Albergo and upon the false and misleading representations and arguments of DuPont's counsel, provided the false basis for the Defendant to argue throughout the remainder of the case, without contradiction, that the test evidence showed that no SUs were present in the soils of the Plaintiffs.   The Court further finds that the evidence is now clear that, had the Plaintiffs been given the information which the Alta tests disclosed and had not been led to believe that those tests showed no presence of SUs, the trial of the case may have been materially altered.   The presentation of Plaintiff's witnesses, the cross examination of Defendant's witnesses, Plaintiff's rebuttal case, opening statements, and closing arguments, at the very least would have been entirely different.

22

Specifically, the Court finds:

That DuPont's expert, Nicholas Albergo, testifie[s] falsely and misled the Court as to his role in th[e] supervising, directing, and controlling of the Alta La[b] scientists, and in his understanding of the basis for th[e] summaries in connection with the testing of the Plaintiffs' soils in the <u>Bush Ranch</u> tests. In order to bolster his ow[n] credibility, Mr. Albergo testified to the <u>Bush Ranch</u> jur[y] that, "I visited the labs that I used, personally discusse[d] the results with the analytical chemists, and personall[y] looked at the raw data." These statements were false. I[n] reality, it is clear that Mr. Albergo and others have no[w] testified that Mr. Albergo had little, if any, contact wit[h] the Alta analytical chemists, did not see or review any of their raw data, nor did he consult with them about the methodology or results. Mr. Albergo testified by deposition January 19, 1995, that he was not actually involved in these tests; that he had not hired Alta; that he had not discussed the results or methodology with the Alta chemists or DuPont's counsel, that he had not reviewed any raw data; that he was never provided any data by DuPont, Alta, or DuPont lawyers; that he only saw summaries of the test results; and that, in fact, he had never even asked about the results or the underlying data.

That DuPont's counsel, Elizabeth Gilley, misrepresented to the Court during argument on the voir dire of the witness, Mr. Albergo, what the role of that witness was in procuring, supervising, directing, and controlling the Alta Labs scientists in the conduct of the testing of the Plaintiffs' soils in the <u>Bush Ranch</u> tests.

That Ms. Gilley, in conjunction with DuPont's expert Nicholas Albergo, represented to this Court that Mr. Albergo worked closely with the analytical chemists at Alta running these tests and consulted with them concerning the methodology of the tests, the results of the tests, and data underlying the tests. Ms. Gilley then stated:

> No, Your Honor, but they were conducted under his direction. He selected the labs to perform the analysis, he directed them as to what analysis should be performed, he told them what to look for, told them what methods to use, and they did everything under his direction and control. . . . So, Your Honor, we would submit that he would be entitled to testify to the results, to submit the data in support of those results because he is entitled to rely on that

23

information as an expert in that field. All this information is documentary evidence that he testified about in his deposition.

That DuPont's counsel, Dow N. Kirkpatrick, Jr. misrepresented to the Court during argument on the voir dire of the witness, Mr. Albergo, what the role of that witness was in procuring, supervising, directing, and controlling the Alta Lab scientists in the conduct of the testing of the Plaintiffs' soils in the <u>Bush Ranch</u> tests.

That in arguing to allow Albergo to testify and to permit the introduction of the Alta summaries into evidence, Mr. Kirkpatrick said:

> This is the only expert in the entire case who has actually taken these samples and had them analyzed, and this is <u>the issue</u> because Plaintiffs have claimed that they have contamination on their property although they have no proof. <u>And we have now got someone that has analyzed all of the samples, and will come in here and tell this Court and this jury that there are no SUs [sulfonylureas] on the property, in the plants, or in the product. And we believe that that testimony is critical</u>. (Emphasis added.)

> and

> The point simply is that we have the evidence that there are no SUs out there That is the issue in the case. . . .

> and

> Your Honor, we're talking about the crucial issue in the case. . . .

That DuPont's counsel, Dow N. Kirkpatrick, Jr. misrepresented to the Court during closing argument to the jury what the witness, Albergo, actually did and what the findings of the Alta Labs scientists actually were.

That in argument to the jury in closing Mr. Kirkpatrick said:

24

. . . Nick Albergo went out and tested soil and other samples. <u>He didn't find any SUs in the soil or any of the samples out there</u>. Those are our tests. Where are their tests? Do you recall when everybody went out, they dig up a shovel of dirt. We'd get half of it, they'd get half of it. <u>We brought our test results in here</u>. Where are their test results. Dr. Jones found plant disease. Mr. Albergo found no SUs.

. . . And our tests, <u>the ones Mr. Albergo did</u>, show there are not any SUs out there. What about Bush Ranch who plants his plants in the ground? He can't claim sulfonylureas damage either. We tested for that. Mr. Albergo gave you the results in that test.

. . . All of this factual scientific information is in contrast to the Plaintiffs in these cases who are talking about some minute, very small sulfonylureas contamination in Benlate which they think has wiped out their plants. The evidence shows that sulfonylureas are not present in Plaintiffs' Benlate soil.

. . . On the other hand, what did DuPont do? We asked Nick Albergo, a remediation specialist from Tampa to make a complete assessment. He visited each site, studied the property, took numerous samples, soil, water, air, other materials. He had them analyzed. You heard the results. There is no contamination. There are no SUs in the soil, water, or anywhere. (Emphasis added.)

That DuPont presented testimony, evidence, and argument that there was no evidence of SUs in the Plaintiffs' soils and waters, knowing the same to be false and misleading to the Court and jury.

That in relying on a summary of the Alta data and documents, DuPont's expert Albergo inherently relied on the data and documents generated by Alta Labs.

25

That DuPont's conduct with respect to this self-
described "most critical" evidence was in violation of the
Court's orders, the Federal Rules of Civil Procedure, a
litigant's duty of good faith and DuPont's express
agreements and representations, and, in and of itself, and
in connection with the other conduct which occurred in the
Bush Ranch cases deprived those Plaintiffs of a fair trial
and constituted a willful, deliberate fraud on this Court.

That DuPont precluded, through its willful misconduct,
meaningful cross-examination of witnesses, meaningful
scientific debate within the courtroom and meaningful
argument to the jury on this self-described "most critical
issue in the case."

That DuPont improperly valued its own views of
"science" to the exclusion of having the "science" tested
in the crucible of the courtroom.

That DuPont has now acknowledged that, as to the Alta
data and documents, scientists can and do disagree concern-
ing the ultimate conclusion and effect of Alta's tests. In
fact, DuPont acknowledged that the Alta data and documents
were subject to scientific opinion that SUs were in the
Bush Ranch Plaintiffs' soils and water.

That Todd David, one of Defendant's lawyers,
testified:

Q. [Mr. Gill]   Okay, and similarly there is a
disagreement as to what the Bush
Ranch initial findings mean or
don't mean, right? There could be
a scientific dispute about that.

A. [Mr. David]   Well, I know that Mr. Bethem
stands by his report from Alta as
to the Bush Ranch samples.

Q.   Can you answer the question?

A.   I know that Dr. Jodie Johnson
disagrees with Mr. Bethem's
conclusion.

Q.   Right. So, if you have the raw
data, there could be a scientific
disagreement about what all that
means, right?

A.   Yes, and had Mr. Pope's folks--

26

                                   You explicitly said to Judge Roberts, speaking about <u>Bush Ranch</u> that there is a scientific disagreement about what all that means, right?

A.                          Absolutely, sir.

While the <u>Bush Ranch</u> jury was deliberating the parties reached agreement on a settlement. The parties approached the Court and DuPont presented to this Court a motion to vacate the sanctions orders. DuPont represented there that, "Plaintiffs have agreed that, during the course of the case, DuPont did come in compliance with the Court's orders and its discovery obligation." While Plaintiffs could not and did not know that this representation was false, DuPont did. In reliance upon those representations, this Court vacated the discovery and sanctions orders. DuPont obtained that order through a deliberate and willful fraud on the Court, concealing and continuing its prior pattern of abuse. In so doing, DuPont has made this Court an instrument of its continuing fraud.

Within a month after the conclusion of the <u>Bush Ranch</u> cases, DuPont went to trial in another Benlate case, this time in Florida (<u>Lambert v. DuPont</u>). See <u>Lambert, et al. v. E. I. DuPont, et al.</u>, Civil Action No. CA-92-067, In the Circuit Court, In and For Hardee County, Florida. A third such trial occurred approximately four months after the end of the <u>Bush Ranch</u> cases, again in Florida (<u>Ritter-Whitworth v. DuPont</u>). See <u>Whitworth, et al. v. Harrell's, Inc., et al.</u>, Civil Action GC-G-92-1293 and <u>Ritter, et al. v. Growers Fertilizer Corp., et al.</u>, Civil Action No. GC-G-1374, In the Circuit

27

Court of the ___th Judicial Circuit In and For Polk County, Florida. In each of those cases, an identical pattern emerged. Alta was called on to conduct tests for the presence of SUs through the same analytical method used in Bush Ranch, and, in each instance, obtained positive results. In Lambert, the Alta chemist has (after completion of the trial) testified that he found the positive SU results to be conclusive. In both instances, DuPont intentionally withheld from the plaintiffs those test data and, as in Bush Ranch, was able to argue to the Court and the jury that the evidence established that there were no SUs in the Plaintiffs' soils or waters. See re Lambert, the following: May 3, 1995, Hearing Transcript, at pp. 465-467; May 9, 1995, Hearing Transcript, pp. 760-765; May 8, 1995, Hearing Transcript, at pp. 656-670, 694; May 9, 1995, Hearing Transcript, at pp. 761-784; May 11, 1995, Hearing Transcript, at pp. 1460-1461; Dr. Richard Browner, December 2, 1994, Kawamata Farms, Trial Transcript (PX 10); Dr. J. Johnson, August 22, 1994, Hashimoto Trial Transcript at pp. 36-37 (PX 11). See also, PX 80 and 81. See, re Ritter-Whitworth, the following: May 8, 1995, Hearing Transcript at pp. 579-583, 606-620, 642-648. See also, PX 97 and 98.

Following a bitter discovery dispute in another Benlate trial, Kawamata Farms v. DuPont, Civil Action No. 91-437 (Kona) and 920247K (Kona) In the Circuit Court of the Third Circuit, State of Hawaii. The Hawaii Court ordered DuPont to produce data and documents from Alta, which included the Bush Ranch data and documents, draft reports, and telephone memoranda. For the first time, the test data containing those parts indicating positive

28

findings were disclosed, along with notes from Alta showing
Defendant's directive to "confirm (defirm)" the positive results
DuPont strenuously resisted production both in the trial court and
through mandamus in the Supreme Court of Hawaii, and asserted a claim
of privilege as to the Alta data and documents, which claim is
directly opposite to DuPont's assertions to this Court in the show
cause hearing.  As set out, <u>infra</u>, this Court has concluded that
DuPont has presented false positions here when contrasted with its
judicial admissions and assertions elsewhere.

For example, DuPont has maintained here:

(1)  that it was not required by court order, rule or
     discovery request to produce the Alta data and
     documents;

(2)  that the Alta data and documents were shielded by a
     work product privilege despite DuPont's representa-
     tions to the Court that the Alta people were fact
     witnesses, and despite having never claimed a
     privilege or logged such documents in the required
     privilege logs;

(3)  that the <u>Bush Ranch</u> Plaintiffs never requested the
     Alta data and documents;

(4)  that DuPont "absolutely" <u>did</u> offer the data and
     documents to Plaintiffs' counsel in the <u>Bush Ranch</u>
     proceedings, but that Plaintiffs' counsel declined
     them;

29

(5)   that DuPont <u>would</u> <u>have</u> produced the Alta data and
documents <u>if</u> the <u>Bush Ranch</u> Plaintiffs had made a Rule
1006 "objection" to the misleading "summaries;"

(6)   that some part of the Alta data and documents were
"available" in the courtroom after the <u>Bush Ranch</u>
Plaintiffs rested, but that not all of those papers
were present, and DuPont cannot say what parts were
and what were not present, although it is now clear
that a number of the most damaging parts were <u>not</u>
present, assuming any of them were, since DuPont never
advised the Court or opposing counsel of the claimed
availability of a box of such papers in the courtroom.
In Hawaii, however, DuPont argued that the <u>Bush Ranch</u>
Alta data and documents were subject to a privilege
which had <u>never</u> been waived, and that those papers had
<u>never</u> been offered, proffered, tendered, or used in
the <u>Bush Ranch</u> or any other Benlate trial.

The Circuit Court in Hawaii, like this Court, found DuPont's
discovery abuses to be unprecedented, and imposed a sanction of
$1,500,000.00.  This Court is not engaged in determining whether a
sanction should be imposed for DuPont's conduct in other courts, but
its clear pattern of concealment and misrepresentation concerning the
same issues bears on DuPont's intent, willfulness, and motive, and
relates to the credibility to be given to its current professions of

30

a corporate i_ent or desire to conform to the discovery rules and court orders.

The Hawaiian production led plaintiffs in other Benlate cases to take the depositions of the Alta witnesses, Mr. Albergo and others, thereby disclosing much of the history of the events surrounding the Alta tests.  This Court is not persuaded that DuPont has even now told the full truth of its conduct in that regard.

In the proceedings before this Court on the show cause order, the Court finds that DuPont, when confronted with the allegations of the petition, which were supported by transcripts from other court proceedings, depositions, and court orders, has not fully and truthfully responded to those charges.  Instead, it has engaged in evasion, equivocation, and falsehood; through its witnesses such as Mr. David and Mrs. Gilley, DuPont refused to give straightforward answers to questions about its conduct in regard to the Alta documents and its positions before other courts, refused to give words their plain and ordinary meanings, and refused to respond candidly or directly; it has sought to give a distorted reading to the plain meaning of words; it has created a whole series of after-the-fact excuses which are not supported by the facts and events; it has put forward legally and factually inconsistent efforts at justifying its conduct; it has contradicted its own solemn representations to other courts, made to induce those courts to rule favorably to DuPont; it has resisted producing witnesses before this Court who have knowledge of the facts, and those witnesses who did testify for DuPont were not credible; it has sought to avoid

31

answering fo___ts conduct by making irrelevant <u>ad hominem</u> attacks o
Petitioners, Petitioners' counsel, and the Court; it has file
affidavits based on incomplete or inaccurate recitals of th
predicate facts; it has distorted the rules of evidence and the Civi
Rules; it is clear that DuPont continues to evidence an attitude of
contempt for the Court's orders and processes, and to view itself as
not subject to the rules and orders affecting all other litigants.

DuPont's actions and representations concerning the Alta
data and documents, and its ultimate false representation concerning
compliance with the order of this Court, constituted a fraud on the
Court and a contempt of the Court's orders. DuPont's conduct of
concealment and misrepresentation has continued through the show
cause hearing. This conduct merits, indeed requires, vigorous action
by the Court and the imposition of severe sanctions.

### The Court's Authority

DuPont has questioned the authority of this Court to issue
the show cause order and conduct the hearing which ensued, contending
also that the Court does not have the power to impose sanctions.

This Court has the power, the authority, and the
jurisdiction to investigate allegations of a fraud on the Court and
a fraud on the judicial system, particularly where the alleged fraud
was accomplished by concealing highly relevant and discoverable
information and evidence, bearing on the most critical issue in the
case, from the opposing parties and their counsel, from a testifying
expert witness, and from the Court and the jury; where the production

32

of such information and evidence was, pursuant to court orders, subject to both initial and supplemental discovery requests, was required by the Court's orders, and had been promised by DuPont's Chief Executive Officer, DuPont's legal department, and DuPont's trial counsel; where the alleged fraud ultimately involved the knowing and willful presentation to the Court and/or to the jury of false testimony and false argument; and where the alleged fraud involved the presentation to the Court of a motion containing materially untrue statements for the purpose of, and with the result of, obtaining an order from this Court vacating prior findings of discovery misconduct, and relieving DuPont of an obligation to pay monetary sanctions.   Such final action of presenting a false representation to the Court to obtain relief had the effect of using the Court as an instrument to further the misconduct and fraud of DuPont.

The <u>Bush Ranch</u> Plaintiffs and DuPont agreed in the pretrial order in those cases (see PX 1) that this Court had jurisdiction over the parties and the subject matter there involved.  The alleged fraud occurred in this Court, and this Court is the proper, if not the only, forum in which the matters raised in the present petition can, in the first instance, be determined.  See <u>Ex Parte Bradley</u>, 7 Wall. 364, 372, 74 U.S. 364, 372, 19 L.Ed. 214, 217 (1868) (it is anomalous for one court to take cognizance of an alleged contempt committed before and against another court; the court wherein the contempt occurred possesses ample powers to take care of its own dignity and punish the offender).  <u>See also</u> <u>Chambers v. Nasco, Inc.</u> 501 U.S. 32

33

(1991) (power — punish for contempts inherent in all courts). This Court has the power, the authority, and the jurisdiction to sanction DuPont, to hold DuPont in civil contempt, and otherwise to act to enforce the authority of this Court, if the allegations are shown by clear and convincing evidence to be true. This Court relies on its inherent powers, 28 U.S.C. §1651 and 18 U.S.C. §401, Federal Rules of Civil Procedure 11, 26, 33, 34, and 37, and case authority, including Chambers v. NASCO, Inc., supra; Roadway Express, Inc. v. Piper, 447 U.S. 752 (1980); National Hockey League v. Metropolitan Hockey Club, Inc., 427 U.S. 639 (1976); Link v. Wabash Railroad Company, 370 U.S. 626 (1962); Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238 (1944); Shillitani v. United States, 384 U.S. 364 (1966); Universal Oil Products Co. v. Root Refining Co., 328 U.S. 575 (1946); Cooter & Gell v. Hartmax Corp., 496 U.S. 384 (1990), Kokkonen v. Guardian Life Ins. Co., 511 U.S. _____, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994); Ex Parte Wall, 17 Otto 265, 2 S.Ct. 569, 27 L.Ed. 552 (1883); Ex Parte Robinson, 19 Wall, 505, 86 U.S. 505, 22 L.Ed 205 (1873); Ex Parte Bradley, 7 Wall 364, 74 U.S. 364, 19 L.Ed. 214 (1868); Malautea v. Suzuki Motor Corp., 987 F.2d 1536 (11th Cir.), cert. denied, _____ U.S. _____, 114 S.Ct. 181, 126 L.Ed 2d 140 (1993); Bankatlantic v. Blythe Eastman Paine Webber, 12 F.3d 1045 (11th Cir. 1994); Harre v. A. H. Robins Co., 750 F.2d 1501 (11th Cir. 1985), opinion vacated in part on reconsideration, 866 F.2d 1303 (11th Cir. 1989); Sizzler Fam. Steak Houses v. Western Sizzlin Steak, 793 F.2d 1529 (11th Cir. 1986); Carlucci v. Piper Aircraft Corp., Inc., 775 F.2d 1440 (11th Cir. 1985); Brandt v. Vulcan, Inc., 30 F.3d

34

752, 757 n.7 (7th Cir. 1994); <u>Properties International Ltd. v.</u> <u>Turner</u>, 706 F.2d 308 (11th Cir. 1983); <u>Southerland v. Irons</u>, 628 F.2d 978 (6th Cir. 1980); <u>Town of Columbus v. Barringer</u>, 85 F.2d 908 (4th Cir. 1936); <u>Porcelli v. Joseph Schlitz Brewing Co.</u>, 78 F.R.D. 499 (E.D. Wis. 1987); and <u>United States v. Pendergast</u>, 35 F.Supp. 593 (W.D.Mo. 1940).

"The power to punish for contempts is inherent in all courts; its existence is essential to the preservation of order in judicial proceedings, and to the enforcement of the judgments, orders, and writs of the courts, and consequently to the due administration of justice." <u>Ex Parte Robinson</u>, <u>supra</u> at 510. By statute, summary punishment for contempts may be inflicted: "1st, where there has been misbehavior of a person in the presence of the courts, or so near thereto as to obstruct the administration of justice; 2nd, where there has been misbehavior of any officer of the courts in his official transactions; and, 3rd, where there has been disobedience or resistance by any officer, party, juror, witness, or other person, to any lawful writ, process, order, rule, decree, or command of the courts." <u>Id</u>. at 511.

"The power to punish, as contempt, misbehavior committed in the presence of the court is an inherent power. Congress has not limited the time within which it may be punished. Perhaps there is an inherent limitation in the inherent power, a limitation arising out of laches--the punishment must not be unreasonably delayed. Certainly it is not unreasonably delayed if a proceeding for punishment is begun as soon as the misbehavior is discovered,

particularly if the misbehavants, by concealment and fraud, have prevented the discovery." United States v. Pendergast, 35 F.Supp. 593, 599 (W.D. Mo. 1940). The Pendergast Court explained apparently limiting language in Ex Parte Robinson, supra, which is not quoted above.

> If any doubt at all could arise from the language of the Supreme Court in Ex Parte Robinson, supra, it certainly was entirely dissipated in the later opinion in Toledo Newspaper Co. v. United States, 247 U.S. 402, 38 S.Ct. 560, 62 L.Ed. 1186. It was made perfectly clear by the opinion in that case that contempt was not restricted to interference with 'order and decorum.' When the opinion is read in connection with the opinion of the district court in the same case (220 F. 458) it is clear that it is the effect on the administration of justice which is the test of whether' misbehavior is contempt. If the tendency of the misbehavior is to affect the administration of justice, it is contempt, whether it is in the presence of the court or at some point away from the presence of the court, whether it affects the order and decorum of the courtroom or does not affect them.

Pendergast, 35 F.Supp. at 596.

Civil contempt has a remedial purpose, not the least of which is to give force and vitality to judicial decrees. "The private or public rights that the decree sought to protect are an important measure of the remedy." McComb v. Jacksonville Paper Co., 336 U.S. 187, 191 (1948). See also, Universal Cooperative, Inc. v. Tribal Co-operative Marketing Development Federation of India, Ltd., 45 F.3d 1194, 1196 (8th Cir. 1995) ("Sanctions are on occasion necessary 'not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent.' National Hockey

36

League v. Metropolitan Hockey Club, 427 U.S. 639, 643, 96 S.Ct. 2778, 2781, 49 L.Ed 2d 747, 751 (1976)").

"There can be no question that courts have inherent power to enforce compliance with their lawful orders through civil contempt." Shillitani v. United States, 384 U.S. 364, 370 (1966). Here, DuPont violated not just one court order, but an entire series of court orders, and misrepresented its conduct to the Court. DuPont breached its discovery obligations, its duty to proceed in good faith, and its representations to the Court and counsel. DuPont elicited and presented false testimony from a key witness. DuPont argued falsely to the Court and the jury. DuPont discredited the Bush Ranch Plaintiffs' witnesses with the Alta tests. DuPont's contemptuous fraud on this Court was brought to the attention of this Court as soon as practicable after the discovery of the conduct. DuPont's conduct constitutes contempt of this Court.

The Court of Appeals of this circuit recently considered and addressed a situation where, like here, the defendant "stubbornly withheld discoverable information. . . ." Malautea v. Suzuki Motor Co., Ltd., 987 F.2d 1563, 1565 (11th Cir. 1993). There, the district court specifically found four methods whereby the Defendants had resisted discovery: first, the defendants played word games, saying that certain words and phrases were not defined; second, the defendants unilaterally limited the meaning or scope of discovery requests; third, the defendants failed to produce documents ordered to be produced and in so failing showed disdain for the Court's orders; and fourth, the defendants deliberately covered up damaging

37

evidence. See id. at 1566-67. A review of the evidence here reveals all of the discovery avoidance methods shown in Malautea. Even more egregious misconduct occurred here than occurred in Malautea.

In Malautea the district court chose to strike the defendants' answers and enter a default judgment against them on the issue of liability. The Court of Appeals affirmed, despite the defendants' contentions that the suppressed evidence referenced by the Court was not encompassed by the Court's discovery orders, that the discovery orders were vague, and that any failure to comply was simply a misunderstanding. See id. 1569. The Court of Appeals held that the Federal Rules (there Rule 37(b)(2)(c)) "give district judges broad discretion to fashion appropriate sanctions for violation of discovery orders. . . ." Malautea, 987 F.2d at 1569. This Court also recognizes, in accord with the Court of Appeals' directions, that any sanction must be just, that is, it must comport with the requirements of due process, and that certain sanctions may only be imposed where the district court finds a willful or bad faith failure to obey discovery orders. Id.

In this matter, DuPont, like Suzuki in Malautea, has argued that the Alta data and documents were not encompassed by the Court's orders, that the orders were vague, or that DuPont simply misunderstood the orders. As reflected by this Court's preceding findings, those arguments are not supported by any credible evidence. To the contrary, the clear and convincing evidence directly contradicts DuPont's positions in this regard.

38

## Observations About Discovery

The obvious and overall purpose of discovery under the Federal Rules is to require the disclosure of all relevant information, so that the ultimate resolution of disputed issues in any civil action may be based on a full and accurate understanding of the true facts, and therefore embody a fair and just result. United States v. The Proctor & Gamble Company, 356 U.S. 677, 682; Hickman v. Taylor, 329 U.S. 495, 500-1 (1947). It is intended to operate with minimal judicial supervision unless a dispute arises and one of the parties files a motion invoking judicial intervention. The rules require that discovery be accomplished voluntarily; that is, the parties should affirmatively disclose relevant information without the necessity of court orders compelling disclosure. This is because lawyers are expected to act in good faith, follow the rules and do their duty as officers of the court seeking the truth. Malautea, supra; Pesaplastic, C.A. v. Cincinnati Milacron Co., 799 F.2d 1510, 1521-23 (11th Cir. 1986).

In cases involving claims of injury to person or property caused by defective products the subject matter is complex. Discovery is necessarily complex as well.

Adversarial machinations surrounding the discovery process are often at odds with the stated purpose of the Federal Rules of securing the just, speedy and inexpensive determination of every action. But procedural manipulation designed to frustrate resolution of disputes on their merits has become a common strategy.

39

It is the obligation of counsel under the rules, as officers of the court, to cooperate with one another so that in the pursuit of truth the judicial system operates as intended; so that neither the Court nor the litigants are put to unnecessary trouble and expense in pursuit of the truth; and disputes are resolved on their merits as promptly and economically as the circumstances of the case permit.  A litigant should not be allowed to play games with the court by concealing, denying, or giving an evasive answer to what he knows to be true.  Malautea, *supra*; Pesaplastic, C.A. v. Cincinnati Milacron Co., *supra*.

The rules are binding on the parties as well, and they must comply with their obligations.  Malautea, *supra*.  Attorneys have a continuing duty to advise their clients of their duty to make honest, complete, non-evasive discovery disclosures, as well as the spectrum of sanctions they face for violating that duty.  Fed.R.Civ.P. 26(g).

The Federal Rules require that counsel make a reasonable investigation and effort to assure that the client has provided all information and documents available to it which are responsive to the discovery request.  It is also required that counsel certify that the responses to discovery requests are complete and correct, and that objections are well grounded in fact and law and not interposed for delay or other improper purpose.  Fed.R.Civ.P. 26(g); Federal Rules Advisory Committee Notes, 1983 Amendments, Fed.R.Civ.P. 26(g).

The courts do not have the time to micro-manage discovery in every case.  They must depend on their officers, the lawyers, to keep faith with their primary duty to the court as its officers, and

40

so make the discovery system work by voluntarily making the required disclosures.  Counsel should not be allowed to "sell out" to their clients.  Malautea, supra; Pesaplastic, C.A. v. Cincinnati Milacron Co., supra.

Sometimes the source of the problem is the litigants themselves, as is its cure.  In some types of litigation the motivation to resist discovery is so great that offenders will not comply with discovery unless they know in advance that the cost of "stonewalling" will be greater than the benefits.  Only by imposing harsh sanctions against a willfully deceitful and evasive litigant do the courts take the advantage out of such misbehavior and turn it into a decided disadvantage.  Only by doing so can the courts empower their officers to refuse involvement in such misconduct, and give them the power to persuade their clients that such is not in their best interests.  There will be no point in paying lavish litigation fees and costs to a lawyer to suppress the truth if the swift and certain punishment will follow.  The choice can and should be made simple and clear:  Litigate in our courts honestly and by the rules, or suffer the consequences.  The public expects and deserves no less if confidence in our judicial system is to be preserved, as it must be.  Hoque v. Fruehauf Corp., 151 F.R.D. 635 (C.D. Ill. 1993); Baker v. General Motors Corp., CA 91-0991-CV-W-8 (W.D. Mo. 1994).

### The Court's Orders and the Federal Rules

This Court, in a series of orders dating from June 24, 1992, required, and the parties understood, that DuPont was obligated to produce all Benlate related documents to the Bush Ranch Plaintiffs.

41

AO 72A
(Rev 8/82)

Those orders extended through and included the trial of the <u>Bush Ranch</u> cases. Those orders required the production of the Alta data and documents, and DuPont's failure to produce such data and documents constitutes a conscious, willful, and deliberate violation of this Court's orders. <u>See</u> PX 29-40.

Furthermore, under the circumstances presented here, DuPont had a duty <u>under the Federal Rules</u> to reveal the contents of and to produce all of the Alta data and documents stemming from the tests conducted on the <u>Bush Ranch</u> Plaintiffs' soils and waters. As in force during the pertinent period, Fed.R.Civ.P. 26(3) provided that:

> (e)  Supplementation of Responses.  A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement his response to include information thereafter acquired, except as follows:
>
> (1)  A party is under a duty seasonably to supplement his response with respect to any question directly addressed to (a) the identity and location of persons having knowledge of discoverable matters, and (b) the identity of each person expected to be called as an expert witness at trial, the subject matter on which he is expected to testify, and the substance of his testimony.
>
> (2)  A party is under a duty seasonably to amend a prior response if he obtains information upon the basis of which (a) he knows that the response was incorrect when made, or (b) he knows that the response though correct when made is no longer true and the circumstances are such that a failure to amend the response is in substance a knowing concealment.
>
> (3)  A duty to supplement responses may be imposed by order of the Court, agreement of the parties, or at any time prior to trial through new requests for supplementation of prior responses.

42

_Anderson v. Cryovac, Inc._, __ Cir.
1988). _See also_ McNally v. Yellow Cab Co., 16 F.R.D. 460 (E.D.Pa.
1954) (notwithstanding any attempt to make the duty to supplement
continuing, "it may not be out of place for the Court to say at this
time what should be obvious, namely, that the Defendant is bound to
give truthful answers to the interrogatories and that both good faith
and the spirit of the Rule require it to see to it that its answers
are truthful as of the time of the trial as well as the time when the
interrogatories are answered").

Pursuant to Rules 26(e)(1)(2), because the substance of the
witness Albergo's testimony was misrepresented at his deposition, and
because the response that the Alta data and documents showed no
evidence of SUs in the Bush Ranch Plaintiffs' soils and waters was
incorrect when made and/or became no longer true such that DuPont's
failure to amend that response constituted a knowing concealment,
under Rule 26(e)(3), because "[a] duty to supplement responses [had]
been imposed by [orders] of [this Court], agreement of the parties,
[and] . . . through new requests for supplementation of prior
responses[,]" DuPont had a duty to supplement its discovery
responses, including those responses concerning the data obtained
from tests conducted on Plaintiffs' soils and waters. _See_ Anderson,
supra. DuPont violated both the letter and the spirit of the Federal
Rule, and the duty to perform its discovery obligations in good
faith, by failing to supplement its discovery responses and by
failing to respond completely and accurately to discovery requests.
_See_ McNally, supra.

43

Courts broadly interpret what constitutes an "order" for the purpose of imposing sanctions.  See Brandt v. Vulcan, Inc., 30 F.3d 752, 756 n. 7 (7th Cir. 1994), citing Metropolitan Life Ins. Co. v. Cammon, No. 88C 5549, 1989 WL 153558, at 4 (n.E.Ill. November 7, 1989) (violation of an "order" found where a party failed to deliver documents it promised to turn over by a certain date), and Properties Int'l., Ltd. v. Turner, 706 F.2d 308, 310 (11th Cir. 1983) (order found where a court directed a party to provide its opponent "with complete discovery").  Notwithstanding the valid order of this Court in place at the time DuPont's malfeasance occurred, and DuPont's obligation to supplement its discovery responses with this clearly discoverable information and relevant evidence, this Court concludes that the correspondence between DuPont and the Bush Ranch Plaintiffs, and the representations made during Albergo's deposition, both constitute agreements binding DuPont and requiring it to produce the Alta data and documents.  These agreements are clear to the Court, despite DuPont's contentions here that the correspondence reflected some other intent and despite the evasiveness of DuPont's counsel at Albergo's deposition.  A fair reading of both the correspondence and the deposition shows the Bush Ranch Plaintiffs' requested all data and documents generated by the Alta tests, including "hard copy" and "analytical data."  Those agreements made by and with officers of the Court, considering the discovery background in the Bush Ranch cases, constitute, for the purposes of this matter, "orders" of this Court.  C.F. Wehner v. Snytex Corporation, 107 F.R.D. 248 (E.D. Mo. 1985) (as a condition for the taking of samples, which in Wehner were in the

44

possession of the EPA, one can consider such taking and agreement
to make th__ results available to the person or party from whom t
samples were taken). DuPont represented as early as August 26, 199
that DuPont would produce "everything related to Benlate." DuPo
acknowledged during the hearing that, at the time the May and Jui
of 1993 correspondence occurred, and at the time of Albergo'
deposition, outstanding Court orders required the production of al
Benlate-related documents. These representations and acknowledge
ments clearly indicate that DuPont knew of its duty and makes it
subsequent failure to produce the Alta data and documents a violatior
of Court orders.

All prior orders of this Court were supported by the facts
and the law and were valid Court orders. "'Discovery orders must be
obeyed even by those foreseeing ultimate success in the district
court.'" Malautea v. Suzuki Motor Co., Ltd., 987 F.2d 1536, 1571
(11th Cir. 1993), quoting United States v. $239,600 in U.S. Currency,
764 F.2d 771, 773 (11th Cir. 1985). DuPont disagreed with this
Court's discovery and sanctions orders in the Bush Ranch litigation,
though during the hearing on the present petition, DuPont's CEO
acknowledged that the Court was justified in its earlier orders. In
any event, whether DuPont agrees or disagrees with the Court's
orders, DuPont was compelled to obey those orders absent relief from
the appellate court, which it sought to no avail.

The "Summaries" and Rule 1006

The "summaries" which DuPont sought to have admitted as
evidence were not summaries of all of the findings produced by the

45

AO 72A
(Rev. 8/82)

Alta tests, but were selected charts and tables showing only parts of the findings which DuPont believed to be adequate to lead an expert witness to testify that there was no evidence of Benlate contamination of the <u>Bush Ranch</u> Plaintiffs' property. As already noted, the Court did not allow the summaries to be admitted in evidence but did allow the witness Albergo to use them as hearsay as a basis for his opinion.

>  Federal Rule of Evidence 1006 provides as follows:
>
>>  The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both by other parties at [a] reasonable time and place. The court may order that they be produced in court.

The plain language of this rule makes it clear that Rule 1006, if used according to its terms, may be a vehicle to introduce charts, summaries, or calculations into evidence. Common sense reveals, and the case law indicates, that the proponent of such summary must invoke and rely upon the rule. <u>See</u> <u>United States v. Atchley</u>, 699 F.2d 1055, 1059 (11th Cir. 1983) (chart introduced <u>pursuant</u> to Rule 1006); <u>United States v. Harmas</u>, 974 F.2d 1262 (11th Cir. 1992) (introduction of summary evidence not error because <u>proponent laid the proper predicate</u> and the information summarized was before the jury in the form of documentary evidence). <u>See also</u> <u>United States v. Meyers</u>, 847 F.2d 1408, 1412 (9th Cir. 1988) (<u>proponent of summary</u> of voluminous writings must establish that the underlying materials upon which the summaries are based are admissible into evidence, though such voluminous writings need not

46

always themselves admitted; United States v. Stone, 925 F.2d

728, 736-37 (7th Cir. 1991) (original voluminous material need not

be introduced into evidence, but it must be made available to the

other party); Nichols v. The Upjohn Co., 610 F.2d 293 (5th Cir. 1980)

(documents from which summaries created had been provided to

Plaintiff prior to trial for examination).

The summaries which DuPont sought to introduce into evidence

through Mr. Albergo were hearsay. Albergo did not prepare them, and

he could not authenticate them, other than to say he received them.

Nor could Albergo vouch for the truthfulness, accuracy, or complete-

ness of the summaries. Further, Albergo could not authenticate or

otherwise testify at all about the underlying Alta data and

documents, in that he did not receive them, did not prepare them, did

not review them and, according to his qualifications and testimony,

could not understand them. In short, Albergo was a mouthpiece

through which DuPont furthered its fraudulent scheme.

Upon the Bush Ranch Plaintiffs' objections to the

introduction of those summaries into evidence, DuPont was obliged,

if it sought to pursue the introduction of the summaries into

evidence, to raise Rule 1006 as a possible vehicle for such

introduction. The Bush Ranch Plaintiffs clearly had no duty to nor

interest in raising Rule 1006 as an "objection" to the summaries so

as to give DuPont a possible assist in introducing evidence which

was, on its face, contrary to the Plaintiffs' interests. Only if

DuPont had raised Rule 1006 as a basis for the introduction of the

summaries into evidence would the Bush Ranch Plaintiffs have had any

47

AO 72A
(Rev. 8/82)

incentive or need to invoke the remaining aspects of that Rule, i.e. their right to examine and/or copy the original underlying writings. Contrary to DuPont's argument, the evidence does not support a finding or conclusion that the <u>Bush Ranch</u> Plaintiffs' counsel made some strategic choice to forego use of or review of the Alta data and documents.

Finally, Rule 1006 emphasizes that the originals, or duplicates of the originals, <u>shall</u> be made available at a reasonable time and place. The <u>Bush Ranch</u> Plaintiffs were justified in relying on DuPont's obligations and promises to produce the Alta data and documents. The <u>Bush Ranch</u> Plaintiffs had no way of knowing prior to July 29, 1993, or August 2, 1993, that DuPont intended to introduce the summaries into evidence. Even if DuPont had made some offer to produce the Alta data and documents during the <u>Bush Ranch</u> trial, <u>which DuPont did not</u>, such production would not have satisfied the mandatory requirements of Rule 1006. In court, after the opposing party has rested and just prior to an effort to introduce the summaries through a witness who did not prepare and who could not testify about the underlying data and documents, is <u>not</u> a reasonable time and place.

No evidence suggests that DuPont genuinely intended at any time to invoke Fed.R.Evid. 1006 as the basis for introducing the summaries into evidence through Mr. Albergo. DuPont never uttered "Rule 1006;" DuPont <u>never</u> offered, much less offered at a reasonable time and place, the <u>Bush Ranch</u> Plaintiffs an opportunity to examine and/or copy the Alta data and documents such that DuPont could invoke

48

after an after-the-fac~ effort at justification fo⌐ its wrongful conduct, and as such, its position in this regard is another DuPont subterfuge.

## DuPont's Claims of Privilege

Dupont has contended that the Alta data was protected from disclosure by the attorney-client privilege and/or the work product privilege.

This Court takes judicial notice of all matters of record in the Bush Ranch cases, including but not limited to, all pleadings, all motions, all briefs, all memoranda, all hearing transcripts, all trial transcripts and all orders.

An expert bases his opinion or inference on "facts or data." See Fed.R.Evid. 703. Thus, Albergo, if he relied on the summaries prepared by Alta, also as a matter of law relied on the facts and data generated by these tests. The Court concludes that, as a matter of law, the data generated during and by the tests are facts, as opposed to a scientist's opinion formed after a review. Therefore, whether or not Mr. Albergo relied on them, the Alta data and documents were responsive to the Bush Ranch Plaintiffs' discovery requests, were subject to this Court's orders, were not protected or privileged, and had to be produced. Further, this Court concludes that, as a matter of law, an expert who relies on a summary of data or facts, by definition relies upon the underlying data and the facts which form the basis for the summary. Any other conclusion negates the responsibility of the expert to demand, and then to form his opinion on, truthful and accurate information. See Marsee v. United

49

States Tobacco Co., 911 F.2d 955, 957 (4th Cir.) (pursuant to Rule 703, an expert relies upon <u>facts or data</u> when giving an opinion; such opinion is admissible only if it is based on facts that meet the criteria of the rule, that is, <u>facts</u> reasonably relied on by experts in the field).

Any summary of the Alta data and documents about which Albergo the expert was to form an opinion and testify was a summary which had to be based on facts. Stated otherwise, if Mr. Albergo relied on the <u>summary of facts</u> prepared by Alta, which a Rule 1006 summary must be, he relied on the data and documents underlying the summary, because a summary is, or should be, nothing more than a compilation of such facts. Because the Alta data and documents are facts, and/or because Albergo relied on the facts underlying the summary, which facts are the Alta tests and the data and documents generated thereby, the Alta data and documents had to be produced.

The case of <u>United States Postal Service v. Phelps Dodge Refining Corp.</u>, 852 F.Supp. 156 (E.D.N.Y. 1994), is remarkably similar to this case as to this issue and is illustrative of this situation. There, the Court had to grapple with claims of attorney-client privilege as to data and documents generated by an engineering firm, Hart & Associates, and a consulting firm, Conestoga-Rovers, which together were hired to conduct environmental studies of soil, oversee remedial work and develop a supplementary remedial program. See <u>id</u>. at 161. The Court first stated that:

> [T]he attorney-client privilege may cover "communications made to agents of an attorney . . . hired to assist in the rendition of legal services." <u>United States v. Schwimmer</u>, 892 F.2d

50

___ , 112 S.Ct. 55, 116 L.Ed. 31 (1991); <u>United
Sta s v. Kovel</u>, 296 F.2d 918 (2d Cir. 1961). In
<u>Kovel</u>, Judge Friendly ruled that "the attorney-
client privilege can attach to reports of third
parties made at the request of the attorney or the
client <u>where the purpose of the report was to put
in usable form information obtained from the
client</u>." <u>Federal Trade Comm'n v. TRW, Inc.</u>, 628
F.2d 207, 212 (D.C.Cir. 1980). The <u>Kovel</u> court
"analogized the role of the accountant to that of
a translator who puts the client's information
into terms that the attorney can use effectively."
<u>Id</u>.

As explained in 2 Jack B. Weinstein &
Margaret A. Berger, <u>Weinstein's Evidence</u> para.
503(a)(3)[01] at 503-31 to 38 (1993), the
application of the privilege in <u>Kovel</u> is now
recognized as extending to representatives of the
attorney, such as accountants; administrative
practitioners not admitted to the bar; and non-
testifying experts. <u>See</u> <u>also</u> Edward M. Spiro &
Caroline Rule, 'Kovel' Experts Cloaked by
Attorney-Client Privilege, N.Y.L.J., Feb. 22,
1994, at S1, S10 (privilege has been applied to
"communications with a psychiatrist assisting a
lawyer in forming a defense, a bail bondsman, and
a polygraph operator").

Neither Hart nor Conestoga-Rovers fall within
any of these recognized categories of repre-
sentatives or agents for purposes of the attorney-
client privilege. They cannot be characterized as
administrative practitioners since they were not
employed by Phelps Dodge attorneys specifically to
assist them in rendering legal advice. In fact,
<u>they were hired by defendants to formulate a
remediation plan acceptable to the NYSDEC and to
oversee remedial work at the Property. Their
function was not to put information gained from
defendants into usable form for their attorneys to
render legal advice, but rather, to collect
information not obtainable directly from
defendants</u>. Nor could the consultant be
characterized as non-testifying experts. Earlier
in this case, when defendants attempted to shield
from discovery studies prepared by Conestoga-
Rovers and Gitlen for other clients, defendants
denied that these consultants served as experts
and stated that <u>if either consultant testified at</u>

51

trial, it would do so as a facts witness and not
as an expert.

* * * * *

Defendants have made a claim of attorney-
client privilege that goes well beyond the "outer
boundary" of the privilege. Unlike the computer
study at issue in TRW, which arguably was
undertaken to assist the attorneys in litigation,
the studies and work performed by Hart and
Conestoga-Rovers clearly served other purposes.
Moreover, these consultants based their opinions
on factual and scientific evidence they generated
through studies and collected through observation
of the physical condition of the Property,
information that did not come through client
confidences. Such underlying factual data can
never be protected by the attorney-client
privilege and neither can the resulting opinions
and recommendations. There are few, if any,
conceivable circumstances where a scientist or
engineer employed to gather data should be
considered an agent within the scope of the
privilege since the information collected will
generally be factual, obtained from sources other
than the client.

Because employees of Hart and Conestoga-Rovers are
outside the attorney-client privilege documents
they have prepared are discoverable.

(Emphasis supplied.) United States Postal Service, 852 F.Supp. at

161-62.

This Court concludes likewise. The Alta data and documents

are facts, and thus, the data and documents should have been produced

for all of the reasons set forth herein. Alta is not an agent of the

attorneys such that any protection from production properly could be

asserted. These facts are not protected by any privilege, be it

attorney-client or the work-product doctrine. DuPont identified Alta

and its principals Bethem and Petersen as fact witnesses and as

persons with knowledge. DuPont represented, in arguing that this

52

Court allow Mr. Albergo to testify about the Alta tests, that the Alta personnel were fact witnesses. DuPont represented in other courts that Bethem and Peterson were fact witnesses. As in United States Postal Service, Albergo was hired to formulate a remediation plan and Alta was hired to collect information. Their function was not merely to put information gained from DuPont into usable form such that the attorney could use the information effectively. Alta generated factual and scientific evidence through testing; it did not obtain information through client confidences. In producing documents upon which Albergo relied for his opinion, DuPont was obligated and under court order to produce the Alta data and documents.

"Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation." Hickman v. Taylor, supra. As the Bush Ranch cases developed, this Court held that either party could claim a protection from discovery based upon the work product doctrine only if the information or the documents for which such protection was asserted was properly identified in a timely prepared and served privilege log. Moreover, as the Bush Ranch cases developed, this Court held that the Plaintiffs had shown "substantial need" for, and had required DuPont to produce all information and documents related to tests, the results of which would be used in the "defense" of the litigation. DuPont in fact waived its claim of work product protection to all information and documents related to test results which would be used in defense of the litigation.

DuPont did not assert on any log or at any other time a claim of work-product protection as the basis for its non-production of the Alta data and documents.  This Court did not alter its prior orders holding that the Bush Ranch Plaintiffs had shown substantial need for all information and documents related to tests where DuPont intended to use the results in defense of the litigation.  DuPont did not retract its waiver of any claim of work product protection as to tests the results of which would be used in defense of the litigation.  The Alta data and documents were not protected from production, therefore, on the ground of the work product doctrine. See United States Postal Service, supra.  See also 4 Moore's Federal Practice §26-66, at 26-403 to 26-406 (1991) ((1) factual portions of expert's report discoverable; (2) citing E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co., 24 F.R.D. 416 (D.Del. 1959), production of copies of memoranda and reports concerning the manner in which tests had been made is required; and (3) party engaging expert has no vested right in keeping secret any relevant facts).

The attorney-client privilege claim is invalid.  The work product privilege claim is invalid.

### DuPont's "They Didn't Ask for It" Defense

DuPont has contended that neither the discovery requests of the Bush Ranch Plaintiffs nor the orders of the Court required the production of the Alta data and documents and that since "they never asked for them" DuPont should not be faulted for not voluntarily producing them.

54

it is well recognized that complete and accurate responses to discovery _e imperative to the functioning of the modern trial process." <u>Averbach v. Rival Manufacturing Co.</u>, 879 F.2d 1196, 1201 (3rd Cir. 1989), <u>cert.</u> <u>denied</u>, 493 U.S. 1023 (1989), citing <u>Rozier v. Ford Motor Co.</u>, 573 F.2d 1332, 1346 (5th Cir. 1978) ("It is axiomatic that '[d]iscovery by interrogatory requires candor in responding.'" (quoting <u>Dollar v. Long Mfg., N.C.</u>, 561 F.2d 613, 616 (5th Cir. 1977), <u>cert.</u> <u>denied</u>, 435 U.S. 996 (1978)). The <u>Averbach</u> Court continued:

> The pre-trial deposition-discovery mechanism established by Rules 26 to 37 is one of the most significant innovations of the Federal Rules of Civil Procedure. Under the prior federal practice, the pre-trial functions of notice giving, issue formulation and fact revelation were performed primarily and inadequately by the pleadings. . . . The new rules, however, invest the deposition-discovery process with a vital role in the preparation for trial. The various instruments of discovery now serve (1) as a device . . . to narrow and clarify the basic issues between the parties, and (2) as a device for ascertaining the facts, or information as to the existence or whereabouts of facts, relative to those issues. Thus, civil trials in federal courts no longer need be carried on in the dark. The way is now clear . . . for the parties to obtain the fullest possible knowledge of the issues and facts before trial. <u>Hickman v. Taylor</u>, 329 U.S. 495, 500-01, 67 S.Ct. 385, 388-89, 91 L.Ed. 451 (1947) (footnotes omitted). The "[m]odern instruments of discovery" are thus a principal means by which trials are rendered "less a game of blindman's buff [sic] and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent." <u>United States v. Proctor & Gamble Co.</u>, 356 U.S. 677, 682, 78 S.Ct. 983, 986, 2 L.Ed.2d 1077 (1958). <u>See</u> <u>generally</u> C. Wright & A. Miller, <u>Federal Practice and Procedure</u> §2001 at 15 (1970) (describing purposes and uses of discovery).

55

rel' nce aspect of discovery, ermitting parties
to ⌐quest information inadmissible at trial where
such request is "reasonably calculated to lead to
the discovery of admissible evidence."   See
Fed.R.Civ.P. 26(b)(1).  Discovery could not serve
the function of triggering subsequent inquiry if
parties were not entitled to rely on the results
obtained at each step.   See Rozier, 573 F.2d at
1345 ("Our system of civil litigation cannot
function if parties . . . suppress information
called for upon discovery.")

Averbach, 879 F.2d at 1201.

The Averbach Court concluded that a party "certainly cannot

be faulted for failing to pry further by discovery into the very same

inquiry aborted by [the defendant's] misleading answer."   Id. at

1201.   The same legal and common sense principle applies to this

situation:   where DuPont provided to the Bush Ranch Plaintiffs at

Albergo's deposition a misleading summary which did not reflect the

suspected positives where DuPont had agreed prior to and during

Albergo's deposition to provide all of the data generated by and

during the Alta tests of the Bush Ranch Plaintiffs' soils; where on

July 28, 1993, DuPont belatedly produced to the Bush Ranch

Plaintiffs, among numerous other documents including other laboratory

summaries and some raw data, additional Alta summaries, but DuPont

failed at that time to include any of the Alta data and documents

which only subsequently came to light in the Hawaii litigation;

where, in any event, DuPont did not have available in Columbus,

Georgia, during the trial all of the Alta data and documents,

particularly those documents indicating the existence or presence of

SUs in the Bush Ranch Plaintiffs' soils and those revealing DuPont's

role in the creation of the misleading summaries; and where DuPont

56

the Alta dat. and documents.

The <u>Averbach</u> Court discussed the duty of litigants to answer truthfully in discovery, and the propriety of opposing litigants to accept as true such answers and representations and then to act in reliance on such truthfulness.

> A litigant is entitled to accept answers to previous interrogatories as true, and to refrain from seeking additional discovery directed to the same issue. Because the Federal Rules of Civil Procedure are structured to elicit truthful answers given under oath, the opposing party, in circumstances such as presented here, may reasonably rely on interrogatory answers.

> The Fifth Circuit in <u>Rozier</u> faced an analogous issue. After concluding that Ford Motor Company falsely stated in answers to interrogatories that it possessed no reports of the type the plaintiff inquired about, the court held that a new trial was warranted under a timely Rule 60(b)(3) motion because of Ford's misrepresentation. The court stated that Ford's nondisclosure prevented plaintiff from fully and fairly presenting her case because "[i]nevitably, information developed in the discovery stages of the case influenced the decision as to which theories would be emphasized at trial." 573 F.2d at 1342. The court thus concluded that, "[w]e are left with the firm conviction that disclosure of the [requested information] would 'have made a difference in the way plaintiff's counsel approached the case or prepared for trial.'" <u>Id</u>. (citation omitted).

> We noted in our earlier opinion in this case that the purpose of asking for information under penalty of false swearing in the court of discovery and of responding to such requests is "self-evident." <u>Averbach</u>, 809 F.2d at 1020. If the appellate courts recognize the discovery responses are calculated to elicit reliance, certainly we must uphold the jury's specific finding that there was such reliance.

<u>Averbach</u>, 879 F.2d at 1201-02 (footnote omitted).

57

The Bush Ranch Plaintiffs had done all that any litigant reasonably can be expected to do to obtain the production of relevant information and to bring DuPont into compliance with this Court's orders. Numerous motions, briefs, letters, hearings, and orders attest to those facts. The Bush Ranch Plaintiffs were entitled to rely on the factual accuracy of DuPont's summary produced at Mr. Albergo's deposition, and DuPont's promises to produce the "hard copy" analytical data, on DuPont's agreements and promises in correspondence to produce all of the data and documents generated by the soils and waters tests, on DuPont's compliance with this Court's outstanding orders. Unfortunately, DuPont was not candid, and it did not comply. The evidence sought was encompassed within the discovery requests; it was required to be produced by the Court's orders and DuPont had promised that it would be produced. The Bush Ranch Plaintiffs were not then required to go to DuPont and ask on bended knee that it be produced. DuPont's "didn't ask" defense is not worthy of serious consideration.

In a case somewhat similar factually to the situation before this Court, though the relief sought was different, the Court of Appeals for the First Circuit discussed a defendant's failure to inform plaintiff or to produce to plaintiff information and documents evidencing contamination of property. See Anderson v. Cryovac, Inc., 862 F.2d 910 (1st Cir. 1988). Numerous conclusions of law set forth there are applicable here.

(a) "In the case of intentional misconduct, as where the concealment was knowing and purposeful, it seems fair to presume that

58

suppressed evidence would have damaged the nondisclosing party." Id.
at 925, citing among other cases Nation-Wide Check Corp. v. Forest
Hills Distributors, Inc., 692 F.2d 214, 217-19 (1st Cir. 1982)
(deliberate nonproduction or destruction of relevant documents is
"evidence that the party which has prevented production did so out
of the well-founded fear that the contents would harm him).

     (b)  "It seems equally logical that where discovery material
is deliberately suppressed, its absence can be presumed to have
inhibited the unearthing of further admissible evidence adverse to
the withholder, that is, to have substantially interfered with the
aggrieved party's trial preparation. See Alexander v. National
Farmers Organization, 687 F.2d 1173, 1205-06 (8th Cir. 1982) (where
documents deliberately destroyed, court should draw factual
inferences adverse to party responsible); Telectron, Inc. v. Overhead
Door Corp., 116 F.R.D. 107, 134 (S.D. Fla. 1987) (where destruction
was motivated by "flagrant bad faith" conduct 'warrant[ed] the
inference that the destroyed documents would have been harmful to
[destroyer]'; resultant unavailability 'must therefore be seen as
prejudicial to [innocent party's] interest in pursuing the full and
fair litigation of its claims'); National Association of Radiation
Survivors v. Turnage, 115 F.R.D. 543, 557 (N.D.Cal. 1987) ('Where one
party wrongfully denies another the evidence necessary to establish
a fact in dispute, the court must draw the strongest allowable
inferences in favor of the aggrieved party.')." Anderson, 862 F.2d
at 925.

59

DuPont's "Releases" Defense

We have heretofore noted that while the <u>Bush Ranch</u> jury was deliberating the parties reached agreement on a settlement, and releases were signed. DuPont has contended that these releases bar the parties instituting this show cause proceeding.

Neither the releases nor the pre-release agreement put in evidence by DuPont bar the Court from considering the fraud on the Court alleged in the petition. No agreement between private parties can deprive the Court of its power to conduct an investigation into and rendering rulings on an alleged fraud upon this Court. <u>See</u> <u>Hazel-Atlas Glass Co. v. Hartford Empire Co.</u>, 322 U.S. 238 (1944); <u>Universal Oil Products Co. v. Root Refining Co.</u>, 328 U.S. 575 (1946). <u>See also Glover v. Southern Bell & Telegraph Co.</u>, 229 Ga. 874, 195 S.E.2d 11 (1972) (release only effective absent fraud). Further, the conduct alleged in the petition and in the memorandum/appendix in support, and the evidence of such conduct heard and seen by this Court, is not conduct "released" by the parties. The language contained in such releases and pre-release agreement does not contain language specifically releasing matters arising from the misconduct alleged. <u>See U.S. Anchor Mfg., Inc. v. Rule Industries, Inc.</u>, 27 F.3d 521 (11th Cir. 1994). <u>See also U.S. Anchor Mfg., Inc. v. Rule Industries, Inc.</u>, 7 F.3d 986, 1004 (11th Cir. 1993).

Due Process

Due process of law requires that sanctions "not be assessed lightly or without fair notice and an opportunity for a hearing on the record." <u>Roadway Express Inc. v. Piper</u>, 447 U.S. 752, 767 (1980)

60

(footnote omitted), citing Society International v. Rogers, 357 U.S. 197, 208-212 (1958). DuPont received fair notice and has been afforded ample opportunity to be heard on the record. This Court has thoroughly reviewed and has given careful consideration to the evidence presented and to the arguments of counsel and to their post-hearing submissions. The Court is keenly aware of the seriousness of this matter. The Court concludes that due process of law has been afforded.

### DuPont's Responsibility

Although it was the lawyers for the Dupont corporation whose acts of concealment and misrepresentation were the immediate cause of damage, the circumstances may justify imposition of sanctions on the corporation. See Geller v. Randi, 40 F.3d 1300, 1904-05 (D.C. Cir. 1994).

Counsel's knowledge and behavior should be imputed to the client. The Supreme Court has said:

> There is certainly no merit to the contention that dismissal of petitioner's claim because of his counsel's unexcused conduct imposes an unjust penalty on the client. Petitioner voluntarily chose this attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent and is considered to have "notice of all facts, notice of which can be charged upon the attorney." Smith v. Ayer, 101 U.S. 320, 326, 25 L.Ed. 955.

Link v. Wabash Railroad Company, 370 U.S. 626, 633-34 (1962) (footnote omitted).

61

"Under elementary agency principles, a corporation is personified through the acts of its agents.  Thus, the acts of its agents become the acts of the corporation as a single entity."  United States v. Hartley, 678 F.2d 961, 970 (11th Cir. 1982) (antitrust conspiracy case), cert. denied, 459 U.S. 1170, (1983).  "[T]he general rule is that a principal is chargeable with and bound by the knowledge of his agent while acting within the scope of his authority."  First Ala. Bank v. First State Ins. Co., Inc., 899 F.2d 1045, 1061 n.8 (11th Cir. 1990).   The first and oldest theory explaining this general rule is in the legal identity of the agent with the principal during the continuance of the agency.  "In other words, the agent, while acting within the scope of his agency is, as to the matter embraced within the agency, the principal himself or the alter ego of the principal.  See Holmes, The Common Law, 232 (1890)."  First Ala. Bank, 899 F.2d at 1061 n.8.

The evidence presented during the hearing on the petition revealed that DuPont was Alta's client and that DuPont paid Alta.  The evidence revealed that Alta communicated with DuPont's counsel, Alston & Bird, with regard to the tests conducted, their use in the Bush Ranch litigation, and the manner of their presentation.  The evidence also reveals that DuPont's scientist and legal liaison, Dr. David Johnson, was in the offices of Alston & Bird during the week or weeks during which expert depositions were scheduled, and that he was likely involved in meetings with Alston & Bird attorneys while conversations occurred involving such counsel and Alta.  When questioned about contacts with DuPont with regard to the Alta data

62

and documents, the DuPont witness invoked the attorney-client
privilege, which, by implication, indicates that some communications
occurred. At Albergo's deposition, DuPont's witness Albergo produced
to the <u>Bush Ranch</u> Plaintiffs' counsel a document prepared by Alta and
sent by facsimile to DuPont counsel, Alston & Bird. Alta entered
into a confidentiality arrangement with DuPont counsel Alston & Bird.
According to testimony at the hearing, DuPont had available in the
courtroom during the <u>Bush Ranch</u> cases some of the disputed Alta data
and documents. During this hearing, DuPont for the first time
claimed Alta as a consultant rather than a fact witness.

Those facts mean that Alta was, at least for the purpose of
conducting these tests and for the purposes of the matters raised in
the petition, an agent for, or sufficiently under the control of, or
in privity with, DuPont. Likewise, so was Alston & Bird. DuPont
CEO, Mr. Woolard, acknowledged as much at the hearing on the show
cause petition. DuPont is charged with all of the knowledge which
Alta and/or Alston & Bird possessed, and DuPont had sufficient
possession, custody, or control over the Alta data and documents such
that DuPont controlled the production, or non-production, of them.
<u>See also</u> <u>Pesaplastic, C.A. v. Cincinnati Milacron Co.</u>, 799 F.2d 1510,
1521-22 (11th Cir. 1986) (selective production of documents and
ability to obtain documents place the documents within the party's
possession, custody, and control).

The actions taken, and the statements made, by DuPont
counsel and other representatives here in this court, and in other
courts around the United States, properly may be considered in this

63

AO 72A
(Rev. 8/82)

matter pursuant to the doctrines and concepts of judicial and evidentiary admissions, estoppel and ratification. <u>See</u>, <u>e.g.</u>, <u>LWT, Inc. v. Childers</u>, 19 F.3d 539 (10th Cir. 1994) (inconsistent allegations contained in prior pleadings are admissible as evidence in subsequent litigation); <u>Pullman v. Bullard</u>, 44 F.2d 347 (5th Cir. 1930) (admissions in pleadings may be admitted into evidence and, unless withdrawn or stricken, may work an estoppel to deny them on the party making them); <u>W. T. Harvey Lumber Co. v. J. M. Wells Lumber Co., Inc.</u>, 104 Ga. App. 498, 122 S.E.2d 143 (1961) (attorney is such an agent of client that his declarations made during the course of his employment may be offered against his principal); <u>Everitt v. Harris</u>, 67 Ga.App. 64, 19 S.E.2d 545 (1942) (letter written by attorney on behalf of client may be considered as an admission by client); <u>Jabaley v. Jabaley</u>, 208 Ga. App. 179, 430 S.E.2d 119 (1993) (admissions can be found in motions); <u>Foster v. State</u>, 157 Ga.App. 554, 278 S.E.2d 136 (1981) (admissions in one action can be evidence in another action); <u>Cox v. Administrator</u>, 17 F.3d 1386 (11th Cir. 1994) (principal can ratify even the unauthorized act of an agent purportedly done on behalf of principal either expressly or by implication through conduct that is inconsistent with an intent to repudiate the unauthorized act; proof of authorization or ratification can be through circumstantial evidence, and all that need to be shown is knowing tolerance), <u>modified</u>, 30 F.3d 1347 (11th Cir. 1994); <u>Computel, Inc. v. Emery Air Freight Corp.</u>, 919 F.2d 678 (11th Cir. 1990 (under general agency rules a corporation (principal) will be vicariously liable for wrongful acts of employees (agents) when the

64

AO 72A
(Rev. 8/82)

acts are related to and within the course of employment, committed in furtherance of the corporation's business, and authorized or subsequently acquiesced in by the corporation). <u>See also</u> Fed.R.Evid. 801(d)(1) and (d)(2); O.C.G.A. §§ 24-3-30, 24-3-34, and 24-4-24.

This Court views the statements and representations made by DuPont counsel and representatives, and the conduct shown by same, as evidentiary admissions subject to rebuttal. However, as regards rebuttal, as the findings here make clear, this Court finds and concludes that DuPont, through its representatives, agents, and/or counsel, is not credible as to the issues surrounding the Alta data and documents. Thus, DuPont's statements, representations and conduct support the Petitioners' contention that DuPont has violated this Court's orders and has committed a fraud upon this Court.

The Court found that DuPont had directed the progress of the <u>Bush Ranch</u> cases. The Court also reiterates that DuPont's CEO testified before this Court during the hearing on the present petition and he testified that he had been made aware of this Court's orders throughout the <u>Bush Ranch</u> cases and that now, <u>today</u>, he fully supports the actions taken by and the conduct of DuPont's representatives, agents, and/or counsel. Moreover, Mr. Woolard acknowledged that the responsibility for all such statements, representations and conduct rests with DuPont. <u>In so doing, DuPont has endorsed, authorized, directed, acquiesced in, and ratified what happened here.</u>

As applied to this matter, the Court concludes that, because both Alta and DuPont's counsel Alston & Bird had knowledge of the

65

Alta information, and the possession of the Alta data and documents DuPont had actual or constructive knowledge of the information contained in, and had actual or constructive possession of, the Alta data and documents, from prior to Albergo's deposition through and including trial.   Both Alta and Alston & Bird ultimately were employed by and/or paid by DuPont.   During the hearing on the petition, DuPont witnesses invoked an attorney-client privilege when questioned about whether local counsel had discussed the Alta data and documents with DuPont Legal Department.   The Alta data and documents were subject to seasonably propounded discovery requests, Court orders, and/or agreements between and among the parties. DuPont consciously, and, therefore, knowingly, purposefully, deliberately, willfully and in bad faith, concealed and suppressed the information and documents.   This misconduct gives rise to a rebuttable presumption that the suppressed information and evidence would have led to other admissible evidence and that both the suppressed information and other evidence which may have been discovered would have been adverse to DuPont.   DuPont has not rebutted this presumption and has not shown by clear and convincing evidence that its nondisclosure was unintentional or that the withheld material was inconsequential.   In fact, credible testimony reveals that different scientists can reach and have reached different conclusions and could form and have formed different opinions with respect to the Alta data and documents.   Other Courts have found that such other conclusions and opinions exist and have validity.   DuPont witnesses, during the hearing on the show cause

66

order, admitted that the matters revealed in, by and through the Alta data and documents were a subject of scientific debate and a question for the jury upon the presentation of both sides. The evidence and DuPont's admissions make it clear that the Alta data and documents were manifestly relevant to the Bush Ranch cases. Thus, contrary to rebutting the presumption, the clear and convincing evidence reveals that the Alta data and documents were of significant consequence and that DuPont's wrongful failure to produce the data and documents prejudiced the Bush Ranch Plaintiffs. See also O.C.G.A. §24-4-22. The evidence also clearly reveals that not only did DuPont not make all reasonable efforts to comply with the Court's orders requiring the production of the Alta data and documents, it also consciously, willfully, intentionally, and deliberately withheld and concealed that data and documents. Rather, if DuPont is to be believed, it caused and allowed that data and those documents, or part of them, to sit undisclosed in a box in the courtroom. To this date, neither the box nor the Alta data and documents have been produced by DuPont to this Court for the Court's examination and review. Were it not for Petitioners having discovered the existence of that data and those documents and having brought them in for this Court to review, DuPont's fraud on this Court would have gone undiscovered.

### The Precedents

During the numerous hearings which were held prior to the Bush Ranch trial, in an effort to bring DuPont into compliance with its discovery obligation, the Court emphasized the egregiousness of DuPont's conduct and the prejudice the Bush Ranch Plaintiffs had

67

suffered on account of it. The Court imposed monetary sanctions of $500,000.00, which were later increased to $1,000,000.00, which amounts were subject to reconsideration, upward or downward, depending on DuPont's conduct. The Court informed DuPont that the Court was seriously considering the sanction of default or of striking DuPont's answer. In the face of all of the above, and more, DuPont still did not produce the Alta data and documents, which directly and critically concerned the presence of SUs in the Bush Ranch Plaintiffs' soils and waters that allegedly were present there due to the contamination of Benlate, or benomyl, by DuPont's SUs. This Court gives no credence to DuPont's arguments that the Court's orders did not encompass the Alta data and documents, or that those orders were vague, or that DuPont reasonably misunderstood the orders. In fact, those arguments seem little more than a continuation of the fraud on this Court.

In this situation there is ample precedent for the imposition of sanctions. We have earlier made reference to the decision of the Court of Appeals for the Eleventh Circuit in Malautea v. Suzuki Motor Co., Ltd., supra. In that case the District Court outlined the various methods whereby the Defendants resisted discovery, and it will be noted that they were remarkably similar to the methods used by DuPont in this case. The District Court chose to strike the Defendants' answers and entered a default judgment against them on the issue of liability. In the Court of Appeals the Defendants argued that the suppressed evidence referred to by the District Court was not encompassed by the Court's discovery orders,

68

that the discovery orders were vague, and that any failure to comply was simply a misunderstanding which, of course, are the same arguments made by DuPont in this case.

The Court of Appeals affirmed the decision of the District Court. The Court of Appeals for the Eleventh Circuit likewise affirmed the District Court's imposition of sanctions in Bankatlantic v. Blythe Eastman Paine Webber, 12 F.3d 1045 (11th Cir. 1994). In that case the defendant, Paine Webber, promised during a hearing on a motion to compel, like DuPont through local and in-house counsel promised during an in-chambers hearing in the Bush Ranch cases, to produce all documents in its custody, control or possession relating to an issue before the Court. See id. at 1047. The Bankatlantic Court relied on Paine Webber's representations, just as this Court has repeatedly relied on DuPont's representations, including those made by DuPont's CEO. Paine Webber argued that no court order directed it to produce the documents in dispute, that Bankatlantic had proved no prejudice, that Bankatlantic had failed to show that the documents were in Paine Webber's possession and that the documents were irrelevant and immaterial. See id. at 1048. The District Court found against Paine Webber's arguments and imposed sanctions.

In its opinion the Court of Appeals first observed that "'the standard of review for an appellate court in considering an appeal of sanctions under Rule 37 is sharply limited to a search for an abuse of discretion and a determination that the findings of the trial court are fully supported by the record.'" Id. at 1048,

69

—

quoting Pesap'astic C.A. v. Cincinnati Iacron Co., 799 F.2d 1510, 1519 (11th Cir. 1986). The Court also cited Carlucci v. Piper Aircraft Corp., Inc., 775 F.2d 1440, 1446-47 (11th Cir. 1985), for the proposition that federal courts have inherent power to impose appropriate sanctions for a party's failure to comply with court orders. Bankatlantic, 12 F.3d at 1048.

The District Court found, and the Court of Appeals affirmed the finding, that Paine Webber's counsel failed to meet its obligation to search Paine Webber's corporate files and that counsel acted in complete disregard of its responsibilities. The District Court found that Paine Webber had custody and control over the documents at issue such that the documents should have been produced. The District Court found the concealed documents manifestly relevant and concluded that Bankatlantic's learning of the discovery violation on the eve of trial prejudiced the plaintiff. The Court of Appeals affirmed these findings.

This Court ordered DuPont to produce all Benlate-related documents. DuPont represented to this Court that it would produce all Benlate related documents. DuPont represented to the Bush Ranch Plaintiffs that, if it were allowed to come onto the Bush Ranch Plaintiffs' properties to obtain samples for testing, it would produce to them all materials generated as a consequence of that testing. DuPont had access to and had custody and control of the Alta data and documents from mid-June, when the testing began, forward. The Alta data and documents should have been produced. That they were not produced violated this Court's orders. The Alta

70

data and documents were manifestly rele nt, and DuPont's failure to produce the clearly prejudiced the <u>Bush Ranch</u> Plaintiffs' opportunity to obtain a fair trial and denied them a fair trial. At a minimum, the <u>Bush Ranch</u> Plaintiffs were deprived of an opportunity to review the Alta data and documents, to obtain scientific review of same, to present testimony and/or cross-examine witnesses about the significance of the suspected positive findings and the detection limits changes, and to argue to the jury about the meaning of the evidence. Had the Alta data and documents been produced, DuPont could not have argued to the Court and to the jury that <u>no</u> evidence existed which showed the presence of DuPont's SUs in the <u>Bush Ranch</u> Plaintiffs' soils and waters. DuPont's failure to come into compliance with the Court's discovery and sanctions orders is now manifest, contrary to DuPont's untrue representations which were made to this Court in a motion to vacate submitted at the end of the <u>Bush Ranch</u> trial. This Court engaged in the judicial act of vacating its orders and the sanctions imposed there, in reliance on the truthfulness of DuPont's representations. DuPont's fraudulent conduct warrants severe sanctions.

### CONCLUSION

Having heard and reviewed all of the relevant evidence, the Court concludes that DuPont, in light of the hundreds of claims and lawsuits which had arisen out of the use of its product Benlate 50DF, decided that it would not reveal the potentially damaging evidence generated by the Alta tests. DuPont was faced with a difficult

71

decision on the eve of the first Benlat·-related trial--to produce data and documents which would authorize a jury to conclude that the Bush Ranch Plaintiffs' soils and waters contained DuPont SUs, data and documents which by their use in the Bush Ranch case would be available to claimants and plaintiffs all over the United States, or to conceal that data and those documents.  DuPont made the wrong choice.

DuPont consciously and deliberately withheld the Alta data and documents from the Plaintiffs and the Court, and perhaps even from the witness Albergo, thereby withholding this information from future litigants as well.  DuPont urged falsely to the Court and elicited false testimony about what Albergo had done, and what he knew, and what the evidence, in fact, arguably showed.  DuPont deprived the Plaintiffs, the Court, and the jury of data and documents highly relevant to the issue which DuPont itself described as the most critical issue in the case.  DuPont continued its concealment and deception to the extent of presenting to this Court knowingly untrue representations about DuPont's compliance with its discovery obligations and with this Court's orders with the accomplished purpose of fraudulently obtaining an untrue order from this Court to absolve DuPont of its misconduct, and to relieve DuPont of sanctions it richly deserved.

DuPont's conduct with regard to the Alta data and documents, beginning with conduct prior to Mr. Albergo's deposition, and continuing through the Bush Ranch trial and to the present, was willful, deliberate, conscious, purposeful, deceitful, and in bad

72

AO 72A
(Rev. 8/82)

faith. That conduct affected the fairness of the trial and prevented the full and fair presentation and consideration of the evidence. DuPont's conduct affected the course of the <u>Bush Ranch</u> trial from beginning to end--from opening statement to closing argument. DuPont's conduct affected the <u>Bush Ranch</u> Plaintiffs' trial preparation and trial conduct. DuPont's conduct affected the rulings and the orders of this Court and interfered with the administration of justice. In short, DuPont's conduct deprived the <u>Bush Ranch</u> Plaintiffs of a fair trial and made that trial, which lasted approximately six weeks and which consumed vast judicial resources, a farce. This Court has the power, authority, and jurisdiction to address such wrongful conduct.

DuPont's conduct was and, in fact, remained during the hearing on the present petition, subject to censure. It has shown a lack of respect for the civil justice system in general, which disrespect was evidenced by the attitude of DuPont's CEO, Mr. Edgar Woolard, that, and the Court paraphrases, "When DuPont says what the science means, that is what the science is." No party, be it an individual or a corporation, can disregard the authority of the judicial branch and disempower the American jury. No party, be it an individual or a corporation, can unilaterally <u>decide</u> the evidence.

Put in layperson's terms, DuPont cheated. And it cheated consciously, deliberately and with purpose. DuPont has committed a fraud on this Court, and this Court concludes that DuPont should be, indeed must be, severely sanctioned if the integrity of the Court system is to be preserved.

73

As is this court's practice, at the close of the show cause hearing, the parties were directed to submit to the Court findings of fact and conclusions of law, which each party would propose that the Court enter as its final findings of fact and conclusions of law. Each party has submitted extensive proposed findings of fact and conclusions of law which the Court has carefully considered. Following such consideration, the Court finds that DuPont's proposed findings of fact and conclusions of law are generally a continuation of the discredited positions urged during the hearing.  On the other hand, the Court finds that the proposed findings of fact and conclusions of law submitted by the Petitioners are essentially trustworthy and correct and, though while not adopting them in their entirety, the Court has relied heavily upon them and, where consistent with the Court's findings, has adopted many of them as proposed.

Consistent with the foregoing, the Court assesses the following sanctions and enters the following orders:

1.    Dupont is directed to send a copy of this opinion and order to each Plaintiff who filed an action against DuPont in this court and is also directed to deliver to each such Plaintiff a complete copy of all of the Alta data and documents which were withheld from production in this court by DuPont.  This action by DuPont shall be completed within 15 days from the date of entry of this order.

74

(a) on July 5, 1995, the petitioners'
counsel in the underlying <u>Bush Ranch</u> cases to file with the Court
verified statement of the pretrial and trial expenses incurred by the
Plaintiffs in those cases and in all cases that were consolidated for
discovery in this court which were paid by the Plaintiffs through
their counsel. Plaintiffs' counsel in the <u>Bush Ranch</u> cases were
further directed to file with the Court a verified statement of the
legal fees incurred and paid by the Plaintiffs in all of the
consolidated cases. Pursuant to those directions the Court has
received a statement of the amounts requested properly verified and
the Court now determines that the Plaintiffs in the underlying cases
have paid through their counsel in connection with the preparation
for and the trial of the underlying cases an amount of $6,843,837.53.

For its discovery abuses in the underlying and consolidated
cases, which abuses prolonged the trial of those cases and made a
mockery of the preparation for and the conduct of that trial, the
Court assesses a sanction against DuPont in the amount of
$6,843,837.53.

2(b). The Court determines that an amount equal to that
immediately above specified in paragraph (a), that being
$6,843,837.53, should be paid by DuPont as a sanction for the wasted
time, inconvenience, and waste of judicial resources inflicted upon
the Court and the jury for the pretrial and trial of the consolidated
cases.

DuPont is directed to pay the total amount of the sanctions
imposed in the above paragraphs (a) and (b), that amount being

75

the date of entry of this order.

       3.   For its contempt of this Court in obtaining the entry of the order of August 16, 1993, vacating prior discovery orders of this Court which had been entered in the consolidated cases, and for its continuing contempt evidenced in the show cause hearing, the Court, as a sanction for that civil contempt:

       a) Vacates the order entered in the consolidated cases on August 16, 1993, and reinstates all orders finding discovery abuse by DuPont and imposing sanctions on DuPont prior to the trial of the consolidated cases.  One of those orders so reinstated assesses a sanction of $1,000,000.00 against DuPont for the discovery abuse; and

       b)   Assesses a sanction against DuPont in the amount of $100,000,000.00.

The Court observes that DuPont in the past has been unresponsive to and unimpressed by previous impositions of sanctions in amounts of $500,000.00 and $1,000,000.00 and perhaps the amount of this sanction will not be sufficient to make an impression on the Respondent, but it is hoped that it will be sufficient to make a party, even with the financial resources possessed by DuPont, responsive to and respectful of the judicial system of the United States.  By entering the monetary sanctions set forth herein it is the Court's purpose to deter DuPont and others who might likewise engage in such misconduct from engaging in such egregious discovery practices in the future and to deter it and others from committing similar frauds upon this or any other Court.

76

AO 72A
Rev. 8/82)

The Court takes judicial notice of a commonly known fact (which was referred to during the testimony of DuPont's Chief Executive Officer) that while the hearing in this matter was in progress DuPont caused to be published in the <u>Wall Street Journal</u>[1] a full page advertisement which contained the following statement:

> **We categorically deny any and all allegations that DuPont has improperly withheld information, either in the courtroom or elsewhere. From the outset of this unfortunate situation, we have acted honorably, within the judicial process, with our customers, and in full accord with the law.**

The Court will permit DuPont to purge itself of the $1,000,000.00 sanction imposed by Section 3(a) above and the $100,000,000.00 sanction imposed by Section 3(b) above by complying with all of the other orders herein imposed upon DuPont and by further publishing a full page advertisement in the <u>Wall Street Journal</u> and in the most widely circulated newspaper in the state of Georgia and in the state of Alabama and in the state of Michigan, acknowledging its wrongdoing and giving notice of these orders and sanctions in a form to be approved by the Court. These publications to occur within 20 days of the date of this order. DuPont is required to elect whether or not to purge the sanctions referred to within 15 days of the date of this order and to notify the Court of its election within that time, and if it elects not to purge the sanctions then DuPont is directed to deposit into the registry of the

---

[1]<u>Wall Street Journal</u>, May 5, 1995, Section A, p.5.

77

court the total of the two sanctions that being $191,000,000.00 within 15 days of the date of this order.

4.    DuPont is directed to file on or before 25 days from the date of this order a certificate of compliance signed by it Chief Executive Officer stating that DuPont is in full compliance with all sections of this order. For each day thereafter that DuPont is not in compliance with all of the terms of this order DuPont will be directed to pay into the registry of this court, as a further sanction for its fraud upon this Court and for its noncompliance with the provisions of this order, an amount of $30,000 per day until such certificate of compliance is so filed by its Chief Executive Officer and such compliance has in fact been accomplished.

In the post-hearing submissions to the Court the Petitioners have suggested that the Court receive input from the Petitioners concerning the potential disposition of any funds received by the Court as a result of any monetary sanction or sanctions which might be imposed by the Court, such disposition to possibly include a number of public purposes as well as those persons and entities directly affected by DuPont's conduct. The Court will hereafter set a hearing date at which it will address, among other things, disposition of any funds ordered paid by DuPont into the registry of the court, and the assessment of court costs, attorneys fees, and expenses associated with this show cause proceeding and imposition of sanctions.

78

This order is an interim order not a final order, and the Court here expressly reserves jurisdiction over the parties and all matters herein pending further orders of this court.

IT IS SO ORDERED, this 21st day of August, 1995.

_____
UNITED STATES DISTRICT JUDGE

79

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| STEVEN J. GUTTER | E.I. DUPONT DE NEMOURS AND COMPANY, and EDGAR J. WOOLARD, JR. |

REC'D by ___ D.C.
OCT 4 1995

**95-2152**

**GRAHAM**

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF Palm Beach
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES)
NOTE. IN LAND CONDEMNATION CASES USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Michael J. Pucillo, Burt & Pucillo, 222 Lakeview Avenue, Suite 300, West Palm Beach, Florida, (407) 835-9400

ATTORNEYS (IF KNOWN) Plaintiff's Co-Counsel
See Attached Sheet

MAGISTRATE JUDGE
GARBER

(d) CIRCLE COUNTY WHERE ACTION AROSE: DADE, MONROE, BROWARD, PALM BEACH, MARTIN, ST. LUCIE, INDIAN RIVER, OKEECHOBEE, HIGHLANDS

## II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

1:95 CV 2152
Graham/Garber

## III. CITIZENSHIP OF PRINCIPAL PARTIES (For Diversity Cases Only)
(PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐1 | ☐1 | Incorporated or Principal Place of Business in This State | ☐4 | ☐4 |
| Citizen of Another State | ☐2 | ☐2 | Incorporated and Principal Place of Business in Another State | ☐5 | ☐5 |
| Citizen or Subject of a Foreign Country | ☐3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

## IV. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

15 U.S.C. Section 78j(b)

Va. 10 days estimated (for both sides) to try entire case.

## V. NATURE OF SUIT (PLACE AN x IN ONE BOX ONLY)

| A  CONTRACT | TORTS | | B  FORFEITURE/PENALTY | A  BANKRUPTCY | A  OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | PERSONAL INJURY | PERSONAL INJURY | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— Med Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury— Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | A  PROPERTY RIGHTS | B ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers Liability | | ☐ 640 R R & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | PERSONAL PROPERTY | ☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☒ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | A  SOCIAL SECURITY | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | B ☐ 380 Other Personal Property Damage | A  LABOR | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| A  REAL PROPERTY | A  CIVIL RIGHTS | B  PRISONER PETITIONS | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Habeas Corpus | ☐ 790 Other Labor Litigation | A  FEDERAL TAX SUITS | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | B ☐ 530 General | B ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | ☒ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | A or B |
| | | A or B | | | |

## VI. ORIGIN (PLACE AN x IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Refiled
Transferred from
☐ 5 another district (specify)
☐ 6 Multidistrict Litigation
Appeal to District
☐ 7 Judge from Magistrate Judgment

## VII. REQUESTED IN COMPLAINT:
CHECK IF THIS IS A CLASS ACTION
☒ UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ YES  ☐ NO

## VIII. RELATED CASE(S) IF ANY (See instructions):
JUDGE _____  DOCKET NUMBER _____

DATE 9/29/95

SIGNATURE OF ATTORNEY OF RECORD
Michael J. Pucillo, Esq.

FOR OFFICE USE ONLY: Receipt No. 9/28/95    Amount: 120.00
703837

<u>Plaintiff's Co-Counsel</u>

Bruce Gerstein, Esq.
Noah Silverman, Esq.
Garwin, Bronzaft, Gerstein
 & Fisher
1501 Broadway, Suite 1416
New York, NY 10036
(212) 398-0055

Elwood S. Simon, Esq.
John Zuccarini, Esq.
Elwood S. Simon & Associates, P.C.
355 South Woodward Avenue
Suite 250
Birmingham, MI 48009
(810) 646-9730

Marvin A. Miller, Esq.
Miller Faucher Chertow
 Cafferty and Wexler
30 N. LaSalle Street
Suite 3200
Chicago, IL 60602