UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**NIGHT BOX FILED**
AUG 04 1997

CARLOS JUENKE
CLERK, USDC / SDFL / MIA

------------------------------------------------x
STEVEN J. GUTTER, on behalf :
of himself and all others similarly :
situated, :
 :
Plaintiff, : CASE NO. 95-2152-CIV-MIDDLEBROOKS
 : REFERRED TO SPECIAL MASTER KLEIN
-against- :
 :
 :
E.I. DUPONT DE NEMOURS :
AND COMPANY, :
and EDGAR J. WOOLARD, JR. :
 :
Defendants. :
------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION TO FILE AN AMENDED AND SUPPLEMENTAL COMPLAINT

Plaintiff Steven J. Gutter ("Plaintiff") submits this memorandum of law in support of his Motion to File the Amended And Supplemental Complaint.

Pursuant to the Court's July 10, 1997 Opinion and Order, Plaintiff's counsel has amended the initial complaint in this action by: (a) removing any references to any jury arguments in the Benlate suits, (b) removing any quotations from, or references to, any sanctions opinions against DuPont regarding its litigation misconduct in the Benlate case and (c) delineating specifically which public statements Plaintiff asserts are actionable.

In addition, Plaintiff has supplemented the allegations in his initial complaint to include: (a) information obtained in discovery that was not known to Plaintiff's counsel at the time the first complaint was filed and (b) additional public statements made by Defendants prior to, and during,

1

the Class Period, which Plaintiff asserts were materially false or misleading,

Specifically, Plaintiff's counsel has discovered subsequent to filing the initial complaint that, in addition to the ALTA Lab tests discussed in the initial complaint, there were also other scientific tests and material information that DuPont improperly concealed from the Benlate plaintiffs and investing public prior to, and during, the Class Period. Such undisclosed information belied DuPont's repeated public assertions that there was no possibility that Benlate injured growers' crops and properties. For example, Plaintiff's counsel has discovered that in or about October 1992 (eight months before the start of the Class Period), DuPont secretly conducted a series of tests in Costa Rica, the results of which evidenced that Benlate did damage growers' crops and properties. Amended Cpt. ¶33. The Costa Rican test results were concealed for over three years until approximately April 1996. Amended Cpt. ¶¶ 33, 34, 39, 40, 60, 69, 70, 77, 79, 86, 92.

The eventual revelation of DuPont's concealment of the Costa Rican tests led Judge Donner of the Circuit Court of the Eleventh Judicial Circuit In and for Dade County, Florida, to impose sanctions on, and enter a directed verdict against, DuPont in August 1996, in an action entitled Davis Tree v. DuPont. (The Davis Tree Sanctions opinion is attached hereto as Ex. A.)[1]

The Costa Rican tests are only one of various types of scientific evidence that Plaintiff has discovered that DuPont concealed in addition to the Bush Ranch ALTA tests.

Since DuPont has not filed its answer as of yet in this action, Plaintiff is still entitled as a

---

[1] Judge Donner's sanctions opinion was subsequently vacated and sealed as a result of a settlement agreement between the Davis Tree plaintiffs and DuPont. Plaintiff's counsel obtained a copy of Judge Donner's opinion through a publication service called Mealey's publications.

2

matter of right to amend his complaint to add the additional allegations discussed above. See Fed.R.Civ.P. ("A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served . . ."); Driscoll v. Smith, Barney, Harris, Upham & Co., 815 F.2d 655, 659-660 (11th Cir. 1987); Caine v. Hardy, 905 F.2d 858, 863 (5th Cir. 1990).

However, out of an abundance of caution, Plaintiff has made this motion to respectfully request that the Court allow Plaintiff to file the attached complaint pursuant to Federal Rule of Civil Produce 15. Rules 15(a) and 15(d) permit a court to allow a pleader to amend and/or supplement an initial pleading with: (a) additional facts of which the pleader was unaware at the time of the initial pleading and/or (b) additional facts regarding events or transactions that occurred after the initial pleading was filed. Both situations apply here. Following Rule 15's dictate that "leave [to amend] shall be freely given when justice so requires", the Federal courts have repeatedly held that courts should only deny leave to amend or supplement a pleading where there is a reason for denying the request such as bad faith, dilatory tactics, undue prejudice or futility.[2] None of those problems exist here.

Thus, for the foregoing reasons, Plaintiff respectfully request that the court grant Plaintiff's Motion and allow him to file the Amended and Supplemental Complaint attached thereto.

---

[2] See Forbus v. Sears Roebuck & Co., 30 F.3d 1402, 1405 (11th Cir. 1994); Engstrom v. First Nat'l Bank of Eagle Lake, 47 F.3d 1459, 1464 (5th Cir. 1995); Frey v. City of Herculeum, 44 F.3d 667, 672 (8th Cir. 1995); Figgie Int'l, Inc. v. Miller, 996 F.2d 1178, 1180-1181 (7th Cir. 1992); Quarantino v. Tiffany & Co., 71 F.3d 58, 66 (2d Cir. 1995) (court should grant leave to file supplemental pleading absent showing of undue delay, bad faith, dilatory tactics, undue prejudice or futility).

Dated: August 1, 1997

Respectfully submitted,

GARWIN, BRONZAFT, GERSTEIN & FISHER

By: *Bruce Gerstein*
Bruce E. Gerstein
Noah Silverman
1501 Broadway, Suite 1416
New York, NY 10036
(212) 398-0055

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR DADE COUNTY, FLORIDA
GENERAL JURISDICTION DIVISION

CASE NO. 92-20006 (CA 23)

DAVIS TREE FARMS, INC., a
Florida Corporation; DAVIS
TREE FARMS NORTH, INC., a
Florida Corporation;

Plaintiffs,

vs.

E.I. DU PONT DE NEMOURS & COMPANY,
INC., a Delaware Corporation;
HELENA CHEMICAL COMPANY, a Florida
corporation; MAXWELL FERTILIZER AND
FARM SUPPLIES, INC., a Florida
corporation; ASGROW FLORIDA
COMPANY, a Florida corporation;
and CRAWFORD & COMPANY, a Georgia corporation;

Defendants.

ORDER ON PLAINTIFFS' MOTION TO STRIKE DEFENDANT DUPONT'S PLEADING

THIS CAUSE came before the Court on June 21, 1996 on Plaintiffs' Motion to Strike Defendant DuPont's Pleadings and Enter Default Judgment. The Court has considered the motion, the record, and the arguments of counsel. It is hereby, ORDERED AND ADJUDGED as follows;

1. The allegations that came before this Court on June 21, 1996, are that DuPont conducted a test in Costa Rica with Benlate 50 DF and ornamental plants in September, 1992. When the results of the test were unfavorable to DuPont, DuPont scientist ordered the plants to be destroyed, and then sought to conceal the nature of the test from Plaintiffs in this and other Benlate litigation.

2. These allegations are of a particularly serious nature because if true, they show that DuPont and its counsel have engaged in a deliberate pattern of discovery abuse and fraud before this Court.

I. FINDINGS OF FACT

DuPont's Willful Refusal to Comply with Court Orders

3. Plaintiffs learned of possible tests in Costa Rica in early 1996 and propounded interrogatories and requests for production designed to elicit information about the event.

4. Defendant responded to the interrogatories by giving unintelligible responses to production requests, agreeing to produce documents but never producing them, and claiming that the requested documents were privileged.

5. On April 23, 1996, this Court held a hearing on Plaintiff's request to produce documents related to the Costa Rican tests. At the hearing, the Court ordered DuPont to produce certain requested documents to the Plaintiffs, and to produce all documents over which DuPont claimed a privilege, for in camera inspection.

6. DuPont has repeatedly stated in depositions, filings, and in open court that it has waived work product privilege "in limited areas" with respect to the Monte Vista test site in Costa Rica. Examples of this stated waiver are as follows:

Mr. McGregor: Your Honor, we basically waived work product, and if we can get the issue of they claim this supposed field trial took place at the Monte Vista site and that is all transpired under this agreement with Welker that he showed to you and a confidentiality agreement with Cafalo and involves Mr. Vargas with respect to the Monte Vista site where this alleged field trial took place, then isn't that the issue that we're dealing with so they can look at it?

(Transcript of April 23, 1996 hearing, at 36-37).

The Court: It is opinion as opposed to fact. Therefore, if you put in memos facts such as we are going to conduct a field test, that is a fact. Or we have conducted a field test, that is a fact versus and opinion, is it not?

Mr. McGregor: That work product, I believe, has been waived with respect to Monte Vista.
(Transcript of June 21, 1996 hearing, at 20).

7. Despite acknowledging that DuPont waived work product privilege with regard to Monte Vista, and despite this Court's April 23, 1996 order, DuPont failed to produce the requested documents. Among the documents DuPont was required to produce, but did not, were expense records of DuPont employees' trips to Costa Rica. In addition to an agreement with the Plaintiffs re: additional time to comply with the order, DuPont filed two motions for extensions of time to produce the documents. Over Plaintiff's objections, this court granted DuPont's motion on May 31, 1996 and June 11, 1996.

8. On June 17, 1996, Plaintiffs filed a motion for an emergency hearing because DuPont still had not produced documents which plaintiffs needed to prepare for a deposition scheduled to take place the next day, and because a hearing on Plaintiff's Motion to Strike and Sanctions was scheduled for June 21, 1996. This Court had already continued and reset the hearing to accommodate Defendant's discovery production problems.

9. At the June 17, 1996 emergency hearing which was attended by all counsel telephonically, this Court entered an order requiring DuPont to produce all for the non-privileged documents requested by Plaintiffs within 24 hours, or be subject to a fine of $10,000 for each day DuPont delayed production. After 2 days, if DuPont had not produced the documents, this Court stated that it would strike DuPont's pleading without further hearing.

10. This Court issued such an order because it was apparent that DuPont had intentionally delayed the production for documents for which it had offered no legitimate claim of privilege.

11. Plaintiffs received some of the requested documents from Defendant in the morning of June 18, 1996. At 4:30 that day, Plaintiffs were notified that additional documents responsive to the Court's order were available for Plaintiffs to pick up at Defense counsel's office.

12. Plaintiffs received more documents on Wednesday, June 19th and even as late as 3:15 p.m. on June 20, 1996.

13. This Court was clear in its order of June 17, 1996 concerning production of documents. Additionally, when this court stated that Defendant was to produce the documents, it was clear that the documents were to be delivered to Plaintiffs, not simply made available for Plaintiffs to pick up.

14. At the June 21, 1996 hearing on Plaintiffs' Motion to Strike Defendant's Pleadings, Plaintiffs informed the Court that DuPont had failed to fully comply with the June 17,1 996 order. Plaintiffs presented a cover letter dated June 20, 1996, from DuPont producing relevant discovery. This denotes a blatant disregard for the Court's order to produce all documents within 24 hours.

15. Additionally, at the June 21, 1996 hearing, Plaintiffs provided the Court with some of the documents DuPont had produced in partial compliance with the order.

16. The documents provided by Defendant DuPont were such poor copies that they were completely illegible. Plaintiffs' counsel informed the court that when he

contacted DuPont's counsel about the legibility of the documents, DuPont's counsel informed him that Plaintiffs' counsel could obtain better copies by going to Delaware and requesting them at the Benlate document depository.

17. DuPont has produced these same documents in camera for this court to examine. This court examined the quality of the copies produced in camera and found them to be perfectly legible and of good quality.

18. This production of illegible copies to the Plaintiffs further shows a blatant disregard of the June 17, 1996 order as well as the spirit of the discovery process.

19. DuPont's counsel offered no explanation or contradiction to Plaintiffs' assertion of DuPont's failure to comply with the June 17, 1996 order.

20. Accordingly, this court finds that DuPont willfully failed to comply with its April 23, 1996, and June 17, 1996 orders. DuPont shall pay the fine of $20,000.

Testing at the Monte Vista Site

21. At the June 21, 1996 hearing, Plaintiffs presented the testimony of Richard Cefalo, R.P. Welker, and Leon Vargas in support of their allegations that DuPont had conducted a field test involving Benlate.

22. The testimony of the three witnesses corroborated one another's account of the events which took place in Costa Rica in September, 1992.

23. DuPont offered the testimony of Dr. Timothy Obrigawitch and Gerald Stephenson to rebut the testimony of Cefalo and Vargas. Dr. Obrigawitch is a scientist for DuPont and has testified in many of their Benlate trials. He was lead scientist for DuPont's Florida field trials. Mr. Stephenson is a salesman for DuPont who has been instrumental in investigating many growers' claims against Benlate.

24. These witnesses testified that they obtained the Monte Vista site simply to root some cuttings to bring into the United States at a later date, and did not conduct any tests. These witnesses denied many of the facts Cefalo and Vargas asserted about the project.

25. DuPont's story concerning Monte Vista has changed several times throughout this litigation.

26. Mr. Stephenson and Dr. Obrigawitch gave several versions as to why they went to Costa Rica originally.

27. Neither Mr. Stephenson or Dr. Obrigawitch could specifically remember which of them requested the specific set up of the Monte Vista site. Neither of them could remember who specifically came up with the idea to root the cuttings.

28. In addition, Mr. Stephenson testified that he had falsified expense reports to DuPont. One meal he listed on his expense report, one he stated he had eaten with Mr. Cefalo and Mr. Vargas, was simply to recover money had paid Mr. Cefalo for supplies while in Costa Rica in September 1992.

29. This Court finds that such testimony indicates Mr. Stephenson's unreliability as a truthful witness.

30. This court finds that the testimony of DuPont's witnesses Gerald Stephenson and Timothy Obrigawitch is unreliable.

31. Every witness for both Plaintiff and Defendant testified as to the presence of Leon Vargas at the Costa Rica site.

32. Mr. Vargas is a Costa Rican national with no interest in the outcome of the litigation.

33. The testimony presented by the witnesses in this case conflicts. This Court, having read the depositions of all witnesses filed in this case, finds that the testimony of Leon Vargas is persuasive, and represents the most accurate account of what occurred at the Monte Vista site in Costa Rica in 1992.

34. While the Court does not believe that memory is perfect after a span of four years, the documents Mr. Vargas produced at his deposition indicate that he understood the events at Monte Vista to be a research project involving Benlate, and that DuPont did not take any steps to dissuade him of that belief.

35. Leon Vargas' testimony, in conjunction with Cefalo's testimony and the documents produced in this case, indicate that DuPont contracted with R.P. Welker Plants to do research on Benlate in Costa Rica at the Monte Vista site.

36. These documents give further evidence that testifying was in fact performed.

37. Leon Vargas' invoice to DuPont for payment of services stated his activities as setting up an experiment in Monte Vista, and asked for fees for consultation regarding the effects of Benlate in ornamental plants.

38. The Welker Services Agreement specifically refers to a research project: "WHEREAS, DUPONT is desirous of conducting confidential research concerning the use and effects of its fungicide Benlate 50 DF;..."

39. DuPont employee Erik Seay's travel and expense report states the reason for travel to Costa Rica in September, 1992 was "Benlate field test."

40. This Court is persuaded by evidence presented at the June 21, 1996 hearing that testing occurred at the Monte Vista site in Costa Rica in the fall of 1992.

41. This Court finds that the documentary evidence taken in conjunction with the testimony of the witnesses indicates that there was a research project in Costa Rica involving different concentrations of Benlate 50 DF.

42. This Court finds that DuPont conducted an experiment or test, albeit not strictly adhering to scientific protocol, involving the effect of Benlate 50 DF on plants in Costa Rica in September, 1992.

43. This Court finds that DuPont destroyed plants treated with Benlate 50 DF when they turned black and began to die.

44. This Court finds that DuPont then sought to conceal information about the Monte Vista Site from Plaintiffs.


Statements to the Court

45. DuPont's defense hinges on semantic tricks which flout the Court's authority. DuPont's perception appears to be that if Plaintiffs and the Court do not mention the correct "buzzwords," then DuPont is free to deny any allegation it chooses.

46. At the June 21, 1996 hearing, DuPont supplied the Court with a child's version of Webster's dictionary definitions of "test" and "trial" to support its argument than it did not conduct a test or trial in Costa Rica.

47. DuPont's actions demean this Court authority. By asking it to adhere to dictionary definitions rather than examine the overwhelming evidence that an experiment did in fact take place, DuPont asks this Court to ignore the judicial process. This court does not need a dictionary in this case to guide its ruling; the evidence speaks for itself.

48. When questioned directly by the court on the nature of DuPont's actions at Monte Vista, in order to maintain its untenable position, Defense counsel addressed only those words Plaintiffs referred to in their requests for

production.

The Court: Let me see if I understand this. Are you saying to me that because it wasn't rigorous, or because it wasn't a textbook field trial that it didn't take place, or are you saying to me we can't use these terms and, if they did something, it wasn't really a field trial even if they used Benlate?

Mr. McGregor: What I'm saying to you, Your Honor, is that in response to the interrogatory that was asked, we said there were no tests, no trials, no investigations, no analyses. Our answer was truthful. Our answer was truthful in terms of as they've defined it as, the very beginning of their motion, Costa Rican Benlate field trials, field trials, which I will get to, Your Honor, I promise you. Field trials, the Florida field trials, the Hawaiian field trials have a definition, and that definition isn't a test or trial, isn't too different than the one we learned as kids, which says you go through a process and you get some results. This was--

The Court: I don't think you've answered my question.

Mr. McGregor: I'll try again, Your Honor.

The Court: My question is very simple, sir. If they went there and if what Mr. Vargas says is true, they did buy the Benlate, they did bring the Benlate and they did dip the plants in Benlate and they didn't use any kind of a control and the plants died and they threw them away, that would not be a test of any kind in your mind and you would be confident that you could say that to a court of law without lying?

Mr. McGregor: *That's correct, Your Honor, under the facts, under the facts in this case, that is correct.* They were rooting cuttings in Costa Rica. They were not doing any types of test of Benlate. The were not doing any type of field trial of Benlate.

The Court: But did you hear what I said? Even if they dipped them in solutions of Benlate; now did you hear me say that?

Mr. McGregor: I did hear you say that, Your Honor. I heard you say that.

The Court: I want to make sure I understand you and you understood me.

Mr. McGregor: Okay.

(Transcript of June 21, 1996 hearing, at 100-101) (emphasis

added).

49. DuPont counsel's blatant defiance of this Court's authority in refusing to depart from such semantical game playing is deliberately evasive and totally inexcusable. The Third District Court of Appeal has faced this situation as well, and has responded aptly:

"By contrast, the tortfeasor in the present case had coverage that was lower than [the plaintiff's] limits. Although Hartford's argument engages in the Alice-in-Wonderland practice of departing from the usual meaning of words, it does not take a leap through the looking-glass for this Court to conclude that the tortfeasor who injured [plaintiff] was 'uninsured' to the extent those injuries exceeded the policy limits. See Lewis Carroll, Through the Looking Glass, (1872) ('When I use a word, it means just what I choose it to mean - neither more nor less.')"

Hartford Insurance Co. v. Minagorri, 675 So. 2d 142, 143-44 (Fla. 3d DCA 1996).

50. Defendant's refusal to acknowledge that the work in Costa Rica in September 1992 constituted an experiment, simply because Plaintiffs did not use the right words in their requests, demonstrates bad faith and contemptuous behavior on the part of DuPont and its attorneys in discovery. DuPont is unilaterally deciding the evidence by determining that words only mean what it chooses them to mean, "neither more nor less." Hartford Insurance Co. v. Minagorri, 675 So. 2d at 144.

51. This court finds that DuPont engaged in willful and malicious behavior with respect to discovery concerning the research project in Costa Rica in September, 1992.

52 DuPont's argument, that the Motion to Strike simply hinged on one response to one request for production out of roughly 500, again demonstrates to this Court DuPont's utter disregard for the rules of discovery and ethical conduct. If DuPont has misled this Court and Plaintiffs and lied about the nature of their actions in Costa Rica, it is irrelevant if it is one interrogatory or one hundred; the result is the same.

53. This Court finds that DuPont intentionally withheld this crucial information, and denied its existence in an effort to prevent the disclosure to the Plaintiffs and this Court of its action in Costa Rica concerning Benlate 50 DR.

Destruction of Evidence

54. The plants at Monte Vista were destroyed sometime after

the test was performed. Plaintiffs were unable to gather information on these plants.

55. Plaintiffs argue that they have been irreparably prejudiced because DuPont destroyed all evidence from Monte Vista.

56. Dr. Timothy Obrigawitch ordered Mr. Cefalo to "dump" the plants when Cefalo told him of their deteriorated condition.

57. Mr. Cefalo then told Leon Vargas to "dump the plants." Soon after, Cefalo faxed Vargas, asking him to hold the plants and takes pictures of them. Mr. Vargas did not save the plants.

58. DuPont argues that Mr. Cefalo's urgent fax requesting that Vargas not dump the plants shows that DuPont did not have control over the destruction of the evidence. Mr. McGregor: "... if they felt that there was something wrong with those plants, Your Honor, they wouldn't have dumped them. So who had control over that when you talk about destroying evidence?" (Transcript of June 21, 1996 hearing at 115).

59. Again DuPont engages in the narrowest of semantic distinctions. It submits to this Court that although it was a DuPont run project, although Vargas was paid by DuPont, and although Dr. Obrigawitch had ordered Cefalo and Vargas to "dump" the plants, because Cefalo faxes an urgent message to Vargas asking him not to dump the plants, DuPont did not have control over the evidence.

60. With such legal gymnastics, DuPont again demonstrates its inability to be truthful to this Court, and seems to forget the entire body of law on agency.

61. DuPont has made claims in defending other litigation and before this Court that the results of the field tests exonerate Benlate 50 DF as the cause of crop damage.

62. Plaintiffs will have no opportunity to rebut or question the results of the Florida field trials by examining and utilizing the results from Monte Vista.

63. It is clear that DuPont has destroyed the evidence from the "Monte Vista research project." Plaintiffs will never have an opportunity to examine the plants, the medium, or the protocol.

64. DuPont argues that since there is no trial date set in this case, Plaintiff are not irreparably harmed. Again DuPont asks this Court to ignore the magnitude of its actions. Simply because there is no trial date set does not

mean that DuPont can attempt to conceal such evidence by destroying it and willfully disobeying the orders of this Court.

65. This court finds that DuPont's destruction of evidence and refusal to comply with discovery requests to prove same, irreparably harmed the Plaintiffs in this matter, and demonstrates their complete disregard for the canons of ethics and the rules of discovery.

Leon Vargas Work Product Claim

66. DuPont has repeatedly sought to prevent Plaintiffs from obtaining information about its activities at Monte Vista.

67. In furtherance of this, it has delayed discovery, filing motions for protective order to prevent Plaintiffs from taking Leon Vargas' deposition, and then, a motion for return of Vargas work product and seeking sanctions against Plaintiffs' counsel.

68. DuPont did not assert a privilege over the testimony of Leon Vargas until after counsel had spoken with him before his deposition, and discussed his possible testimony. DuPont did not assert that Mr. Vargas was a non-testifying consultant until after counsel spoke to him about his testimony.

69. Over Defendant's protests, the Special Master in this action, allowed Mr. Vargas' deposition to proceed.

70. During his deposition, Mr. Vargas testified that DuPont's counsel in another action has informed him that since he was a Costa Rican national, he could not be subpoenaed to testify in Florida, and didn't "really have to" give testimony.

71. At his deposition, Vargas clearly stated that he had not done any consulting for DuPont after his confidentiality agreement was signed. He also stated that he had never discussed trial strategies with DuPont.

72. This Court sees Defendant's motion concerning Vargas work product and its previous motion for protective order to be simply more examples of Defendant's tactics to prevent a full and fair exposure of the events at Monte Vista.

Chemdesign and Kirschner

73. DuPont has attempted to thwart discovery in other areas of this litigation as demonstrated by its actions with

respect to the depositions of Chemdesign Corporation and Theodore Kirschner. This Court has already sanctioned DuPont for its misconduct in this respect. However, this simply further proves the wilful pattern and practice DuPont has engaged in heretofore.

Ethical Considerations

74. Attorneys are bound by the Florida Rules of Professional Conduct. They have a duty of candor to the judicial tribunal. See comment to Rule 4-3.3, Florida Rules of Professional Conduct, 1996).

75. However, Rule 4-3.4 is particularly apt in describing DuPont's counsel's conduct in these proceedings:

A lawyer shall not: (a) unlawfully obstruct another party's access to evidence or otherwise unlawfully alter, destroy, or conceal a document or other material that the lawyer knows or reasonably should know is relevant to a pending or a reasonably foreseeable proceeding; nor counsel or assist another person to do any such act. (Rule 4-3.4, Florida Rules of Professional Conduct, 1996).

76. This Court finds that DuPont's counsel violated the letter of these rules in their conduct before this tribunal.

II. Conclusions of Law

The reasonableness of a sanction depends in part upon the willfulness or bad faith of the party. The accidental or negligent destruction of evidence often justifies lesser sanctions directed toward compensating the victims of evidence destruction. The intentional destruction or alteration of evidence undermines the integrity of the judicial process and, accordingly, may warrant imposition of the most severe sanction of dismissal of a claim or defense, the striking of pleadings, or entry of a default. Trammel v. Bass, 672 So. 2d 78, 84 (Fla. 1st DCA 1996) (citations omitted).

77. "Thus, in the case of the intentional alteration of evidence, the most severe sanctions are warranted as much for their deterrent effect on others as for the chastisement of the wrongdoing litigant." Trammel at 84 (citations omitted).

78. In this instance the court is in the unique position of sanctioning a litigant which has been severely sanctioned in other courts, seemingly to no avail. By striking DuPont's pleadings, this court hopes that this will have a

deterrent effect, not only on other litigants, but on DuPont's actions in other cases in the future.

79. "A drastic sanction that denies the availability of the court's processes is therefore appropriate to one 'who defiles the judicial system by committing a fraud on the court.'" Trammel at 84 quoting Aoudad v. Mobil Oil Corporation, 892 F. 2d 1115, 1118 (1st Cir. 1989).

80. Courts have also upheld the sanction of striking the pleadings when litigants have "engaged in bad faith 'games playing' with the court and opposing counsel in delaying and thwarting the orderly process of discovery." EZJ, Inc. v. Wysocki, 511 So. 2d 1088, 1089 (Fla. 3d DCA 1987).

81. This Court finds that DuPont's conduct constitutes abusive litigation practices and specifically finds that such practices were done in bad faith.

82. This Court concludes that DuPont's conduct as set forth in the Findings of Fact herein demonstrates that DuPont engaged in intentional misconduct which abused the judicial process.

83. This Court determines that DuPont has engaged in a systematic design to thwart discovery. This Court further finds that DuPont's conduct in this regard is so atrocious that it shocks the conscience of this Court. DuPont has destroyed evidence; it has delayed discovery; mislabeled documents at its document depository to thwart discovery; and it has produced totally illegible discovery. DuPont has purposefully set upon a course of conduct that has served as a complete denial of Plaintiffs' right to have its day in court. This Court has no choice but to strike DuPont's pleadings and enter a default judgment.

84. This Court hopes and believes that imposing this fine and striking the pleadings will impress upon DuPont and its counsel the importance of proceeding under the rules of civil procedure and canons of ethics.

85. These sanctions are limited solely to those items outlined above, and in no way reflect on DuPont or its counsel's further involvement in this case and the discovery process.

DONE AND ORDERED in Miami, Dade County, Florida this 5th day of August, 1996, nunc pro tunc as of June 21, 1996.

/s/AMY STEELE DONNER
CIRCUIT COURT JUDGE

cc: all counsel of record